FILED
*E-filing*

JUL - 7 2008

**UNITED STATES DISTRICT COURT**
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
**NORTHERN DISTRICT OF CALIFORNIA** NORTHERN DISTRICT OF CALIFORNIA

*(PR)*

TEH

**CV 08      3269**

| | |
|---|---|
| **STEVEN DALE BELL,** | **No.** _____ |
| Petitioner, | |
| v. | **Evidentiary Hearing Requested** |
| **J. D. HARTLEY**, Warden, | |
| Respondent. | |

**EXHIBITS IN SUPPORT OF 28 U.S.C. §2254**

**PETITION FOR WRIT OF HABEAS CORPUS**

STEVEN D. BELL
Avenal State Prison
#J-69411, 120-236-L
P. O. Box 9
Avenal, CA 93204

Petitioner, *In Pro Se*

# TABLE OF EXHIBITS

| Exhibit | Description | No. of Pages |
|---------|-------------|--------------|
| A | Transcripts of Parole Hearing, 11/7/06 | 124 |
| B | Parole Hearing Decision Forms, 11/7/06 | 3 |
| C | Verified Request for Parole (no exhibits), 10/14/06 | 20 |
| D | Dr. Paul Koller's Psychiatric Evaluation, 6/11/95 | 4 |
| E | Dr. Steven Walker's Psychiatric Evaluation, 10/19/02 | 9 |
| F | Dr. Corinne Schroeder's Psychiatric Evaluation, 11/10/05 | 4 |
| G | Bell's Statement of Disagreement with C. Schroeder's Evaluation (with Exhibits), 10/18/06 | 29 |
| H | Dr. Melvin Macomber's Psychiatric Evaluation, 3/9/06 | 10 |
| I | Excerpt from Sentencing Transcript, Judge Thomas Hansen (RT 30-31) 6/19/95 | 2 |
| J | Transcript of 2004 Parole Hearing Decision (2004 PH 126-135), 3/23/04 | 10 |
| K | BPT Matrix of Base Terms, Attempted Murder | 1 |
| L | Life Prisoner Evaluation Report, 3/24/06 | 9 |
| M | Director's Level Denial of CDC-602 Appeal (Schroeder report), 11/17/06 | 1 |
| N | Bell's Request for Rehearing (no attachments), 1/5/07 | 5 |
| O | Selected Community Support Letters, 2006 | 10 |
| P | Declaration of Dr. Terry Chase, 9/19/06 | 5 |
| Q | Dr. Schroeder's Psychiatric Evaluation of Inmate David Twinn, 7/16/05 | 4 |
| R | Excerpts from Prosecutor's Closing Argument at Trial (RT 1614-15, 1623-24, 1645) | 5 |
| S | Denial of Habeas Petition, Santa Clara County Superior Court, 5/15/07 | 1 |

//

T        Denial of Habeas Petition, Sixth Appellate District,
         California Court of Appeal, 8/2/07 . . . . . . . . . . . . . . . . . . . . 1

U        Denial of Habeas Petition, California Supreme Court,
         3/12/08 . . . . . . . . . . . . . . . . . . . . 1

V        Application For Judicial Notice of Lower
         Court Finding (Transcript Error), 10/5/07 . . . . . . . . . . . . . . . . . 4

A

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life    )
Term Parole Consideration    )        CDC Number J-69411
Hearing of:                  )
                             )
STEVEN BELL                  )
_____)

AVENAL STATE PRISON

AVENAL, CALIFORNIA

NOVEMBER 7, 2006

9:28 A.M.

PANEL PRESENT:

Ms. Cathy Poncavare, Presiding Commissioner
Mr. Dennis Smith, Deputy Commissioner

OTHERS PRESENT:

Mr. Steven Bell, Inmate
Ms. Linda Buchalter, Attorney for Inmate
Mr. Ronald Rico, Deputy District Attorney (via video)
Ms. Catherine Gandrud, Victim
Mr. Thomas Riordan, Victim's Next of Kin
Ms. Janelle Hanes, Victim Services Representative
Ms. Jennifer McQuillan, Observer (via video)
Mr. Bruce Ortega, Observer (via video)
Correctional Officers, Unidentified

**INMATE COPY**

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

Patricia Chapin                Vine, McKinnon & Hall

ii

## INDEX

Page

Proceedings. . . . . . . . . . . . . . . . . . . . . 1

Case Factors. . . . . . . . . . . . . . . . . . . 18

Pre-Commitment Factors. . . . . . . . . . . . . . 20

Parole Plans. . . . . . . . . . . . . . . . . . . 22

Post-Commitment Factors. . . . . . . . . . . . . .38

Closing Statements. . . . . . . . . . . . . . . . 67

Recess . . . . . . . . . . . . . . . . . . . . . 117

Decision. . . . . . . . . . . . . . . . . . . . .118

Adjournment. . . . . . . . . . . . . . . . . . . 121

Transcriber Certification. . . . . . . . . . . . 122

--oOo--

1

1    **P R O C E E D I N G S**

2        **PRESIDING COMMISSIONER PONCAVARE:** Good morning.

3    Today's date is Tuesday, November 7th, 2006, and we're at

4    Avenal State Prison for a subsequent parole consideration

5    hearing number one on behalf of Steven Bell, CDC No.

6    3-69411 (verbatim). The time is 9:28 a.m. Since your

7    hearing is being recorded, Mr. Bell, and for the purpose

8    of voice identification, each of us will be required to

9    state our full name, spell our last name, and after --

10   and when it comes to your turn, I will ask you to state

11   your first name, spell your last name, and please give

12   the panel your CDC number. My name is Cathy Poncavare,

13   P-O-N-C-A-V-A-R-E, Commissioner, Board of Parole

14   Hearings.

15       **DEPUTY COMMISSIONER SMITH:** Mr. Bell, before I

16   introduce myself, would you lower the microphone down a

17   little bit. That way, I'm sure that we'll get any

18   statement you make on the transcript. Thank you. My

19   name is Dennis Smith, S-M-I-T-H. I'm the Deputy

20   Commissioner.

21       **MR. RIORDAN:** My name is Thomas Riordan,

22   R-I-O-R-D-A-N. I'm the brother of the victim.

23       **MS. GANDRUD:** My name is Catherine Gandrud, I'm the

24   victim. G-A-N-D-R-U-D.

25       **ATTORNEY BUCHALTER:** Linda Buchalter,

26   B-U-C-H-A-L-T-E-R, attorney for Mr. Bell.

27       **INMATE BELL:** Steven Bell, B-E-L-L, J-69411.

2

1        **DEPUTY COMMISSIONER SMITH:**  Janelle Hanes,

2    H-A-N-E-S, Victim Services Representative for Avenal

3    State Prison.

4        **DEPUTY DISTRICT ATTORNEY RICO:**  Ronald Rico,

5    R-I-C-O, Deputy District Attorney, Santa Clara County by

6    way of video conference.  And I have two observers in the

7    room with me.  First, on my right -- I'll let her speak.

8        **MS. MCQUILLAN:**  Jennifer McQuillan,

9    M-C-Q-U-I-L-L-A-N.  I'm a legal clerk with the District

10    Attorney's Office.

11        **MR. ORTEGA:**  Bruce Ortega, O-R-T-E-G-A.  I'm a

12    Deputy Attorney General of the State of California.

13        **DEPUTY COMMISSIONER SMITH:**  And Mr. Rico, would you

14    confirm your observers will be observing and will not be

15    participating in the hearing; is that correct?

16        **DEPUTY DISTRICT ATTORNEY RICO:**  That is correct.

17        **DEPUTY COMMISSIONER SMITH:**  Thank you, sir.

18        **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.  We do

19    have a correctional officer with us today who is here for

20    security purposes only and will not be participating in

21    the process other than to help us with the video

22    conferencing.  Mr. Bell, according to your CDC records,

23    you were received on July 17th, 1995, from Santa Clara

24    County, Case No. 177776.  Your life term began on

25    July 17th, 1995, and your minimum eligible parole date is

26    January 3rd, 2004.  As to the controlling offense for

27    which you were committed, it is attempted murder, Penal

3

1    Code Section 664/187, Count 1, with an enhancement of PC

2    12022(b), use of a deadly weapon. And PC 12022.7(a),

3    infliction of great bodily injury. The weapons you used

4    were a metal pipe and a garbage bag. Your victim was

5    42 years old at the time of her attempted murder. You

6    were sentenced to life plus four years for the

7    enhancement. Once again, your minimum eligible parole

8    date is January 3rd, 2004. Before we continue, would you

9    please read aloud the ADA rights and self-identification

10   statement that you have in front of you.

11        **INMATE BELL:** The Americans With Disabilities Act,

12   ADA, is a law to help people with disabilities.

13   Disabilities are problems that make it harder for some

14   people to see, hear, breathe, talk, walk, learn, think,

15   work, or take care of themselves than it is for others.

16   Nobody can be kept out of public places or activities

17   because of a disability. If you have a disability, you

18   have the right to ask for help to get ready for your BPH,

19   Board of Parole Hearings, hearing, get to the hearing,

20   talk, read forms and papers, and understand the hearing

21   process. BPH will look at what you ask for to make sure

22   that you have a disability that is covered by the ADA and

23   that you have asked for the right kind of help. If you

24   do not get help or if you don't think you got the right

25   kind of help, you need to ask for a BPT 1074 grievance

26   form. You can also get help to fill it out.

27        **PRESIDING COMMISSIONER PONCAVARE:** Thank you,

4

1    Mr. Bell.  Let the record reflect that you signed BPT
2    form 1073 on November 17, 2005, which is the Reasonable
3    Accommodation Notice and Request which is in accordance
4    with the Americans With Disabilities Act.  You've
5    indicated on the form that you do not have a disability.
6         **INMATE BELL:**  That's correct.
7         **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.  And
8    that information is still current and correct?
9         **INMATE BELL:**  That's correct.
10        **PRESIDING COMMISSIONER PONCAVARE:**  Did you have any
11   problem whatsoever walking to the hearing room today?
12        **INMATE BELL:**  Not at all.
13        **PRESIDING COMMISSIONER PONCAVARE:**  So you are able
14   to walk distances of a hundred yards or more or climb
15   stairs?
16        **INMATE BELL:**  Yes.
17        **PRESIDING COMMISSIONER PONCAVARE:**  Do you need
18   glasses or a magnifying device in order to see or read
19   documents?
20        **INMATE BELL:**  Yes.  I'm wearing them.
21        **PRESIDING COMMISSIONER PONCAVARE:**  Those are
22   prescription?
23        **INMATE BELL:**  Yes, they are.
24        **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,
25   Mr. Bell.  Do you have any hearing impairments?
26        **INMATE BELL:**  No, I do not.
27        **PRESIDING COMMISSIONER PONCAVARE:**  Did you take

5

1    psychotropic medication prior to your incarceration?

2        **INMATE BELL:**  No, I did not.

3        **PRESIDING COMMISSIONER PONCAVARE:**  How far did you

4    progress in school?

5        **INMATE BELL:**  I have a college degree and several

6    years of post-graduate work.

7        **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.  Did

8    you take special educations while you were -- special

9    education classes while you were growing up?

10       **INMATE BELL:**  No, I did not.

11       **PRESIDING COMMISSIONER PONCAVARE:**  Do you suffer

12   from any disability that would prevent you from

13   participating in today's hearing that we haven't yet

14   discussed?

15       **INMATE BELL:**  No, I do not.

16       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.

17   Counselor, are there any ADA issues that you believe need

18   further discussion in terms of your client's ability to

19   fully participate in today's hearing?

20       **ATTORNEY BUCHALTER:**  No, Commissioner.  Thank you.

21       **DEPUTY COMMISSIONER SMITH:**  Counselor, would you

22   mind turning that microphone just a little bit.  You

23   anticipated that, didn't you?

24       **PRESIDING COMMISSIONER PONCAVARE:**  Mr. Bell, your

25   hearing today will be conducted pursuant to Penal Code

26   Sections 3041 and 3042 and the rules and regulations of

27   the Board of Parole Hearings governing parole

6

1    consideration hearings for life inmates.  The purpose of

2    this hearing is to once again consider your suitability

3    for parole.  We will consider the number and nature of

4    the crimes for which you were committed, your prior

5    criminal and social history, your behavior and

6    programming while incarcerated, and your parole plans

7    should you be released.  Your Central File has been

8    reviewed.  And you'll be given the opportunity to correct

9    or clarify the record if necessary.  We will also

10    consider your progress since your commitment including

11    your counselor's reports, your mental, psychological, and

12    psychiatric evaluations, and any new reports that focus

13    on your progress since your last hearing.  Please bring

14    any change in your parole plans to our attention.  Once

15    we have discussed all the areas I've just mentioned,

16    we'll have a question and answer period where

17    Commissioner Smith and I can ask you questions on issues

18    that have or have not been discussed or which we think

19    require further discussion.  At that time, the District

20    Attorney and your attorney -- the District Attorney's

21    representative from Santa Clara County, and your attorney

22    will also have an opportunity to ask you questions.  The

23    questions from the District Attorney will be directed to

24    the panel, and you will direct your responses to us.  We

25    will assist you with any clarification if necessary.  A

26    decision will be reached today as to whether or not we

27    find you suitable for parole.  The reasons for our

7

1    decision and the length of your commitment will be

2    explained to you thoroughly.  Do you understand the

3    process so far?

4        **INMATE BELL:**  Yes, ma'am, I do.

5        **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

6    Mr. Bell.  Before we recess for deliberations, the

7    District Attorney's representative, your attorney, and

8    you will be able to make a closing statement.  Please

9    focus your closing statement as to why you feel you are

10   suitable for parole.  The victim and the victim's brother

11   will then be given an opportunity to provide an impact

12   statement to the panel, and those statements will occur

13   in the order I just presented.  Once the statements have

14   taken place, we will then recess and clear the room to

15   allow the panel to deliberate your case.  Once

16   Commissioner Smith and I have completed our

17   deliberations, we will resume the hearing and announce

18   our decision.  The California Code of Regulations states

19   that regardless of time served, a life inmate shall be

20   found unsuitable for and denied parole if in the judgment

21   of the panel the inmate would pose -- for the record, we

22   just had another correctional officer enter the room for

23   security purposes only -- thank you -- if in the judgment

24   of the panel the inmate would pose an unreasonable risk

25   of danger to society or a threat to public safety if

26   released from prison.  Mr. Bell, as you are clearly

27   aware, you do have certain rights.  Those rights include

8

1    the right to a timely notice of this hearing, the right

2    to review your Central File, and the right to present

3    relevant documents.  Counselor, have your client's rights

4    been met?

5        **ATTORNEY BUCHALTER:**  Yes, they have.

6        **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

7    Counselor.  You also have the right to be heard by an

8    impartial panel.  Do you have any objections to

9    Commissioner Smith and I conducting your hearing today?

10       **INMATE BELL:**  No, I do not.

11       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.

12   Counselor?

13       **ATTORNEY BUCHALTER:**  No.

14       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.  You

15   will receive a copy of our written tentative decision

16   today.  That decision will be final within 120 days, and

17   a transcript will be sent to you as well.  Regarding your

18   right to an appeal of a decision made at this hearing,

19   the regulations were repealed in May of 2004.  Please

20   consult with your attorney if you have any questions or

21   visit the prison law library for information as to the

22   appeals process.  You are not required to admit or

23   discuss your commitment offense; however, this panel does

24   accept as true the findings of the court.  Do you clearly

25   understand what that means, Mr. Bell?

26       **INMATE BELL:**  Yes, I do.

27       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.

9

1    Commissioner Smith, will confidential material be

2    considered today?

3        **DEPUTY COMMISSIONER SMITH:**  No, it will not.

4        **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

5    Commissioner.  Please note that I am passing the hearing

6    checklist marked Exhibit 1 to your attorney.  And

7    Mr. Rico, do you have a copy of the hearing checklist?

8        **DEPUTY DISTRICT ATTORNEY RICO:**  Commissioner, I have

9    a copy of the checklist dated 10/13/2006, lower right

10   corner signed by a Steve Baker.  I have all those

11   documents.  I'm assuming I have all the documents

12   necessary to proceed today.

13       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

14   Mr. Rico.

15       **DEPUTY COMMISSIONER SMITH:**  And for the record, let

16   me confirm that the date and name on the document -- the

17   checklist that Mr. Rico addressed is, in fact, the one

18   that we have before us that defense counsel reviewed as

19   well.

20       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.  This

21   document is to ensure that all of us are operating on the

22   same set of documents.  It appears that we're all in

23   compliance.  Counselor, do you have any additional

24   documents that you would like to submit to the panel?

25       **ATTORNEY BUCHALTER:**  I do, Commissioner.

26       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.

27       **ATTORNEY BUCHALTER:**  Would you just like for me to

1    give you these few documents here?

2         **PRESIDING COMMISSIONER PONCAVARE:**   Yes.   Are these

3    documents additional -- other than what you had already

4    provided us prior to the hearing?

5         **ATTORNEY BUCHALTER:**   I believe so.   Would you like

6    for me to articulate what they are before I hand them to

7    you, or would you like to just see them?

8         **DEPUTY COMMISSIONER SMITH:**   Yeah.   We can accept

9    them and review them.

10        **ATTORNEY BUCHALTER:**   Okay.

11        **DEPUTY COMMISSIONER SMITH:**   And they'll be happy to

12   do that.

13        **ATTORNEY BUCHALTER:**   Thank you.

14        **PRESIDING COMMISSIONER PONCAVARE:**   Counselor, do you

15   have any preliminary objections for the panel?

16        **ATTORNEY BUCHALTER:**   Yes.   Just a couple.   I object

17   to the negative information that was presented by the

18   District Attorney that violates the ten-day rule.   It's a

19   small packet, a news article from 1995 of a floor plan of

20   a house, and it's against policy.   I object to those

21   documents.

22        **PRESIDING COMMISSIONER PONCAVARE:**   Thank you,

23   Counselor.   Since we did discuss those documents, they

24   will not be used in today's hearing, so we will sustain

25   your objection.

26        **ATTORNEY BUCHALTER:**   Thank you.

27        **DEPUTY DISTRICT ATTORNEY RICO:**   Commissioner, if I

11

1   might just indicate for the record, the documents -- well

2   first of all, I take issue as to whether they're negative

3   documents.  They're actually factual documents that

4   document the crime.  But I submitted them by letter of

5   October 19th, 2006, to Avenal State Prison addressing it

6   to the head of the lifer desk there with three copies;

7   one for the Central File, one for the panel, and one for

8   defense counsel.  And I asked the institution to forward

9   them in a timely fashion to counsel.  So just so the

10  record is clear, I did submit them in a timely fashion,

11  and I guess that they just weren't passed on by the

12  institution as requested.

13       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

14  Mr. Rico.  And for the record, we did have a brief

15  opportunity to review those documents.  However, again,

16  we will not be using them in today's hearing.

17       **DEPUTY DISTRICT ATTORNEY RICO:**  I understand.  Thank

18  you.

19       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.

20       **DEPUTY COMMISSIONER SMITH:**  I don't recall, Counsel,

21  the documents that you just provided -- one is Mr. Bell's

22  resume?

23       **ATTORNEY BUCHALTER:**  Yes.

24       **DEPUTY COMMISSIONER SMITH:**  We'll review this during

25  our deliberation, and you'll certainly have an

26  opportunity to address it.

27       **ATTORNEY BUCHALTER:**  Thank you.

12

1    **DEPUTY COMMISSIONER SMITH:**  If you like.

2    **ATTORNEY BUCHALTER:**  Thank you.

3    **DEPUTY COMMISSIONER SMITH:**  The education background

4    of Dr. Macumber (phonetic) was included in his evaluation

5    as well.

6    **ATTORNEY BUCHALTER:**  All right.  Thank you.

7    **DEPUTY COMMISSIONER SMITH:**  So we already have that

8    document.  The copies of the laudatory chronos that you

9    have -- I've already reviewed those, and I'll be

10   addressing those during the course of the hearing as

11   well.  And the self-study report, which I'm guessing is a

12   book, because I haven't read it -- is that accurate?

13   **INMATE BELL:**  That's correct.

14   **DEPUTY COMMISSIONER SMITH:**  All right.  Then I'll

15   address this during the adjustment section as well, and

16   we'll review it in more detail during our deliberation.

17   **ATTORNEY BUCHALTER:**  All right.

18   **DEPUTY COMMISSIONER SMITH:**  Is that acceptable?

19   **INMATE BELL:**  Certainly.

20   **DEPUTY COMMISSIONER SMITH:**  Counsel?

21   **ATTORNEY BUCHALTER:**  Oh, yes, it is.  Thank you.

22   **DEPUTY COMMISSIONER SMITH:**  All right.  And I will

23   make sure that all of these documents get back to you as

24   well.

25   **ATTORNEY BUCHALTER:**  Thank you.

26   **PRESIDING COMMISSIONER PONCAVARE:**  And your second

27   objection?

13

1       **ATTORNEY BUCHALTER:** And my second objection is, the

2       counselor's report talked about factors of aggravation

3       and mitigation.  They have wrongfully identified factors

4       of abrogation -- do you want me to address that now, or

5       would you like for me to address it later?

6       **PRESIDING COMMISSIONER PONCAVARE:** That's the

7       counselor's report.

8       **ATTORNEY BUCHALTER:** The counselor's aggravating and

9       mitigating circumstances are inaccurate in part, and

10      corrections are necessary since only accurate and

11      relevant information is permitted in this hearing.  So I

12      can do that now, or I can make comments in my --

13      **PRESIDING COMMISSIONER PONCAVARE:** I think that,

14      Counselor, under the circumstances, we would prefer

15      that -- it would be more appropriate for you to address

16      that in your closing statement.

17      **ATTORNEY BUCHALTER:** I'm able to do that.  That's no

18      problem.  The only other objection I would have -- I

19      believe you said that the victim's next of kin -- his

20      brother will be speaking today; is that correct?

21      **PRESIDING COMMISSIONER PONCAVARE:** Yes.

22      **DEPUTY COMMISSIONER SMITH:** That's correct.

23      **ATTORNEY BUCHALTER:** Title 15 does not permit that.

24      Title 15 of the Penal Code -- it says that the victim or

25      next of kin, if there is no victim, can speak only if the

26      victim, the victim alone may speak, not the next of kin.

27      So the victim or next of kin.  So one or the other is

14

1    entitled to speak by Title 15.  I will object to the next

2    of kin speaking unless he will be the only one speaking.

3         **DEPUTY COMMISSIONER SMITH:**  We'll take that under

4    consideration.  You both planned on making statements; is

5    that correct?  Did I understand that correctly?

6         **MS. GANDRUD:**  Yes.

7         **MR. RIORDAN:**  Cathy will speak if that's what's

8    permitted.

9         **PRESIDING COMMISSIONER PONCAVARE:**  Yes, please.

10        **DEPUTY COMMISSIONER SMITH:**  Is that acceptable to

11   you?  In that case, we'll sustain your objection, and

12   we'll only take a statement from the victim.

13        **ATTORNEY BUCHALTER:**  Okay.  Thank you.

14        **DEPUTY DISTRICT ATTORNEY RICO:**  Commissioner, just

15   on that issue, I don't know if there are any additional

16   family letters from family members, but I don't believe

17   that those would be precluded.  Counsel's argument only

18   goes to an actual statement, but if there's anything in

19   writing or letters, I think that that would be

20   appropriately received.

21        **DEPUTY COMMISSIONER SMITH:**  I would agree, Mr. Rico.

22        **ATTORNEY BUCHALTER:**  Well, I don't have any letters.

23        **DEPUTY COMMISSIONER SMITH:**  And I don't believe we

24   do either.

25        **PRESIDING COMMISSIONER PONCAVARE:**  Neither do we,

26   Counselor.

27        **ATTORNEY BUCHALTER:**  Okay.  I believe that may be --

15

1    that's it.

2        **PRESIDING COMMISSIONER PONCAVARE:**  Okay.  Thank you,

3    Counselor.

4        **ATTORNEY BUCHALTER:**  Thank you.

5        **INMATE BELL:**  May I clarify one point?

6        **DEPUTY COMMISSIONER SMITH:**  After you talk -- after

7    you share it with your counsel.

8        **ATTORNEY BUCHALTER:**  Do you have a portfolio like

9    this that was submitted to the institution some time ago?

10       **DEPUTY COMMISSIONER SMITH:**  I would have to check.

11       **ATTORNEY BUCHALTER:**  It's voluminous in weight.

12   It's just a document that Mr. Bell has prepared that

13   is -- would you just like to take a look at this for your

14   convenience?

15       **DEPUTY COMMISSIONER SMITH:**  What's the date of the

16   document?  When was it --

17       **ATTORNEY BUCHALTER:**  Oh.  This is really an

18   organization of the information that will be used today

19   like his chronos.  It's just superbly organized.

20       **INMATE BELL:**  It was submitted to the lifer desk

21   about three weeks ago.

22       **PRESIDING COMMISSIONER PONCAVARE:**  Three weeks ago.

23       **DEPUTY COMMISSIONER SMITH:**  There they are.

24       **PRESIDING COMMISSIONER PONCAVARE:**  There they are.

25       **DEPUTY COMMISSIONER SMITH:**  I didn't know that.

26       **ATTORNEY BUCHALTER:**  We didn't know if they would be

27   helpful to you or not.  But anyway, you have them in case

1   you want to make a reference or something is missing.   I

2   think it's a very thorough presentation just for your

3   edification.

4        **DEPUTY COMMISSIONER SMITH:**   Okay.

5        **ATTORNEY BUCHALTER:**   Thank you.

6        **DEPUTY COMMISSIONER SMITH:**   Thank you.

7        **ATTORNEY BUCHALTER:**   That's all.   Correct?   Thank

8   you, Commissioners.   We have concluded our objections.

9        **PRESIDING COMMISSIONER PONCAVARE:**   Thank you,

10   Counsel.   Counselor, will your client be speaking with

11   the panel today?

12        **ATTORNEY BUCHALTER:**   Did you make -- give him his

13   advise that he has the right not to speak?

14        **PRESIDING COMMISSIONER PONCAVARE:**   Yes, I did.

15        **ATTORNEY BUCHALTER:**   You've advised Mr. Bell,

16   Commissioners, that he has a constitutional right to not

17   discuss the offense with you today, and as a matter of

18   law, this cannot be held against him in any way.   I've

19   advised Mr. Bell to exercise that right today.   Mr. Bell

20   is convicted of this crime, and we are not here today to

21   retry this case.   You have before you the official

22   versions of the facts of this case.   Mr. Bell will

23   however, Commissioners, discuss with you all of the other

24   relevant factors of suitability concerning his current

25   risk of harm to society.   Mr. Bell wants you to know that

26   he will also discuss with you his feelings and insights

27   about his actions that led him to prison, and he wants to

1    speak about his remorse.

2        **DEPUTY COMMISSIONER SMITH:**  All right.

3        **DEPUTY DISTRICT ATTORNEY RICO:**  Commissioner, I do

4    need to state for the record that I don't think that

5    counsel and Mr. Bell can have it both ways.  He has a

6    right to choose not to speak about the life crime.  But I

7    believe that if he attempts to speak about remorse, or if

8    he intends to speak about or talk about his thoughts or

9    feelings that led up to the circumstances that brought

10   him here, a natural and open area of inquiry, then

11   becomes what is it that he is remorseful for?  What is it

12   he did?  Those thoughts and feelings -- how do those play

13   into his actions?  And that opens up the whole area.  I

14   don't think it can be done in the fashion that counsel

15   suggests.

16       **DEPUTY COMMISSIONER SMITH:**  Mr. Rico, we'll

17   certainly be mindful of your concerns.  You know,

18   Mr. Bell does have a right not to speak about the

19   circumstances of the offense.  If he wants to talk about

20   how he feels about the offense without going into the

21   offense itself, that would be acceptable, and we'll

22   certainly try to guard against that.  Certainly, should

23   Mr. Bell cross the bridge and begin talking about any

24   part of the commitment offense, vis a vis his remorse and

25   feelings, that that would open that door.  I'm sure that

26   Ms. Buchalter will be very mindful that he doesn't do

27   that, and we will be as mindful as well.

18

1    **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you.

2    **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.  In

3    that case, Mr. Bell, since you have -- your counselor has

4    said on your behalf that you will be addressing other

5    aspects of the hearing, I do need to swear you in.  Could

6    you please raise your right hand.  Do you solemnly swear

7    or affirm that the testimony you give at this hearing

8    will be the truth, the whole truth, and nothing but the

9    truth?

10   **INMATE BELL:**  I do.

11   **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

12   Mr. Bell.  I will now read the Statement of Facts into

13   the record.  The Statement of Facts is taken from -- is

14   derived from the Milpitas Police Department crime report

15   No. 94-227023 and from the District Attorney's file

16   including a transcript of the preliminary examination

17   occurring between the date of December 13, 1994, and

18   January 5th -- January 5th, 1995.  On August 15th --

19   **DEPUTY COMMISSIONER SMITH:**  Excuse me Commissioner,

20   that's actually taken out of the Board Reports; is that

21   correct?

22   **PRESIDING COMMISSIONER PONCAVARE:**  Yes.  The Board

23   Report of March 2006.

24   **DEPUTY COMMISSIONER SMITH:**  Thank you.

25   **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

26   Commissioner.  On August 15th, 1994, at approximately

27   7:22 a.m., a 911 call was received from Mr. Bell

19

1    indicating the victim, Mrs. Cathy Bell, had hit her head

2    and was bleeding and ranting.  Emergency personnel

3    responded to Mr. and Mrs. Bell's residence located at 646

4    Clauzer (phonetic) Drive, Milpitas, California.  Upon

5    arrival of the police officer, Mr. Bell was at the front

6    door beckoning the officer to enter.  The victim, age 42,

7    the wife of Mr. Bell, was observed lying on her back on

8    the bed in the master bedroom.  Blood was observed on the

9    pillow and on the back of her head.  Mr. Bell indicated

10   he did not know what had happened to the victim, his

11   wife.  The victim told the police officer that her

12   husband, Mr. Bell, had tried to hurt her.  Mr. Bell was

13   then escorted from the room.  The victim recalled sitting

14   on the end of the bed.  The next thing she knew, she was

15   on the floor with a plastic bag over her face.  She did

16   not know how she hurt her head, and she didn't know if

17   her husband had placed the plastic bag over her head.

18   Mr. Bell was transported to the Milpitas Police

19   Department.  Mr. Bell waived his rights and provided a

20   statement.  He informed the police officers that he and

21   Mrs. Bell had been married for 15 months.  They both had

22   two children each from previous marriages who were away

23   visiting relatives at that time.  He and his wife had

24   argued the night before over the return of their

25   children.  Mr. Bell continued to say he didn't know what

26   had happened to his wife.  A search of the residence

27   revealed there were blood spots in the master bedroom and

1    master bathroom.   In the bathroom adjacent to the master

2    bedroom, a blanket was uneven on the bed.   After further

3    searching, it was discovered that underneath the blanket

4    was a white trash bag.   Beneath the trash bag was a metal

5    pipe that was approximately two feet long.   Mr. Bell,

6    since you have waived your right to discuss the

7    commitment offense, the controlling offense, and you have

8    also refrained from a prisoner's version; is that

9    correct?

10          **INMATE BELL:**   That is correct.

11          **PRESIDING COMMISSIONER PONCAVARE:**   Thank you.   Then

12    I will move on to discussing your Pre-Conviction Factors.

13    You have no juvenile record.

14          **INMATE BELL:**   That's correct.

15          **PRESIDING COMMISSIONER PONCAVARE:**   And you had no

16    adult convictions and arrests until the August 15th,

17    1994, the controlling offense.

18          **INMATE BELL:**   That's correct.

19          **PRESIDING COMMISSIONER PONCAVARE:**   Thank you.   In

20    terms of your personal factors, you were born in Los

21    Angeles, California, to the marriage of Lavonia

22    (phonetic) Cauble, C-A-U-B-L-E.   Am I pronouncing that

23    correctly?

24          **INMATE BELL:**   Lavonia.

25          **PRESIDING COMMISSIONER PONCAVARE:**   Lavonia Cauble.

26          **INMATE BELL:**   Uh-huh.   That's correct.

27          **PRESIDING COMMISSIONER PONCAVARE:**   And Kenneth Bell.

21

1      **INMATE BELL:**  Yes.

2      **PRESIDING COMMISSIONER PONCAVARE:**  Bell's father was

3      employed as a supervisor at Hughes Aircraft while his

4      mother was a full-time homemaker.  Because his father,

5      Kenneth Bell, had various management positions with a

6      number of aerospace and electronics companies, the family

7      moved frequently throughout Southern California during

8      his early childhood.  When Bell was eight years old, his

9      father accepted a job at an electronics plant before the

10     family settled in a Glendora, California.  The family's

11     Glendora home was a comfortable house in a middle to

12     upper class neighborhood.  Bell was raised in an

13     environment free from verbal, physical, and alcohol

14     abuse.  In August of 1972, Bell met Susan Montoya

15     (phonetic) while in high school.  In high school he was a

16     perennial honor student who took accelerated classes.  In

17     1973, he graduated fourth in a class of 300.  Bell was a

18     model student and involved himself in numerous

19     achievements and awards.  Bell attended California

20     Polytechnic University where he graduated cum laude in

21     1977.  He has one sister, Deborah Garrett (phonetic), who

22     resides in Roseburg, Oregon.  Bell has two children,

23     Shawn, 25, and Aaron, 23, from a previous marriage to

24     Deborah King.  He married Deborah King in 1977, and they

25     were divorced in December 1991.  You were employed by

26     Chilson's (phonetic) Management Controls as a director of

27     data processing.  You had established your own company,

1    Integrated Management Systems.  Your company was forced
2    to file bankruptcy, and as a result, you felt depressed.
3    You divorced in December 1991.  Bell married Cathy, the
4    victim, in May of 1993.  Cathy had two children from a
5    previous marriage.  The relationship was considered
6    stable and happy; however, the marriage ended due to the
7    attempted murder.  On June 28th, 1996, Bell married Susan
8    Montoya.  That statement of the personal factors was,
9    again, taken from the March 2006 Board Report.  Mr. Bell,
10   is there any clarifications, or is that statement
11   accurate?

12        **INMATE BELL:**  Yes, it is.

13        **PRESIDING COMMISSIONER PONCAVARE:**  Were you working
14   at the time of the commitment offense?

15        **INMATE BELL:**  Yes, I was.

16        **PRESIDING COMMISSIONER PONCAVARE:**  Where were you
17   working?

18        **INMATE BELL:**  Kaiser Permanente.

19        **PRESIDING COMMISSIONER PONCAVARE:**  As a senior
20   consultant?

21        **INMATE BELL:**  That's correct.

22        **PRESIDING COMMISSIONER PONCAVARE:**  And you'd been
23   with Kaiser for three years prior?

24        **INMATE BELL:**  At that time, yes.

25        **PRESIDING COMMISSIONER PONCAVARE:**  Okay.  Thank you.
26   I will now move on to your future plans.  In terms of
27   residence, upon release from custody, you intend to live

23

1    with your wife, Susan Bell, at her home at 4352 Raynor

2    (phonetic) Court in Chino, California.  She has owned

3    this home for over 20 years, currently working in the

4    health care profession, and she is considered to be

5    stably employed.  In the unlikely event that you could

6    not live with your wife, you would live with your

7    parents, Lavonia --

8         **INMATE BELL:**  Uh-huh.

9         **PRESIDING COMMISSIONER PONCAVARE:**  -- and Joseph

10   Margala (phonetic) at 1692 Camel Circle, West Upland,

11   California.  You've also provided your Uncle Dave and

12   Aunt Lynn Cauble's address should these residential plans

13   be denied with your wife or your parents.  And they live

14   in Redondo Beach, California.  Is all that accurate,

15   Mr. Bell?

16        **INMATE BELL:**  One typographical error.  My uncle's

17   name is Dale, D-A-L-E.  Not Dave.

18        **PRESIDING COMMISSIONER PONCAVARE:**  Dale.  Thank you.

19        **DEPUTY COMMISSIONER SMITH:**  Mr. Bell, let me ask --

20   it talks about as an option of living with your parents,

21   Lavonia and Joseph.

22        **INMATE BELL:**  That's correct.

23        **DEPUTY COMMISSIONER SMITH:**  Earlier it indicated

24   that your father's name was Kenneth?

25        **INMATE BELL:**  Stepfather.  Joseph Margala is my

26   stepfather.

27        **DEPUTY COMMISSIONER SMITH:**  Stepfather.  All right.

24

1          **INMATE BELL**:   That's correct.

2          **DEPUTY COMMISSIONER SMITH**:   Thank you.

3          **INMATE BELL**:   My father has passed away.

4          **DEPUTY COMMISSIONER SMITH**:   Sorry.

5          **PRESIDING COMMISSIONER PONCAVARE**:   Thank you for

6     that clarification.   In terms of your potential

7     employment, should you be released from custody, you have

8     several support letters, which I will address at another

9     point in the hearing.   You do have a list of job offers

10    that are reflected in the Board Report of 2006 -- of

11    March, 2006.   Full-time positions, Information System

12    Analyst with Chino Valley Medical Center, Dr. James

13    Lally.

14         **INMATE BELL**:   Lolly (phonetic).

15         **PRESIDING COMMISSIONER PONCAVARE**:   Lolly.   Michael

16    Olieno (phonetic).

17         **PRESIDING COMMISSIONER PONCAVARE**:   Olacino

18    (phonetic).

19         **INMATE BELL**:   Olacino.   It's misspelled.   The E

20    should be a C.

21         **PRESIDING COMMISSIONER PONCAVARE**:   Okay.   Olacino,

22    Regional CFO with Alpine Development Group at their

23    information help desk.   Fred Armagida (phonetic).

24         **INMATE BELL**:   That's correct.

25         **PRESIDING COMMISSIONER PONCAVARE**:   Warehouse with

26    Protech -- he's the co-owner of Protech.   A Medical

27    Warehouse Manager would be the job offer.   You also have

25

1    part-time positions that have been included in the Board
2    Report.  Roger Hanson, Ph.D., he's an attorney -- a
3    Contract Legal Assistant.  Sarah Fetter (phonetic), MS --
4    web site development.  And I believe she works for
5    Sacramento.

6         **INMATE BELL:**  Sacramento City College.

7         **PRESIDING COMMISSIONER PONCAVARE:**  City College as a
8    professor.

9         **INMATE BELL:**  That's correct.

10        **PRESIDING COMMISSIONER PONCAVARE:**  Cathy Heldon
11   (phonetic), web site design and maintenance with Reality
12   Executives, and it's my recollection we have letters from
13   all those individuals.

14        **INMATE BELL:**  That's correct.

15        **PRESIDING COMMISSIONER PONCAVARE:**  Okay.  Thank you.
16   Penal Code Section -- Commissioner Smith, do you have any
17   questions, any comments about anything that I've just
18   read into the record?

19        **DEPUTY COMMISSIONER SMITH:**  No, I don't.  However, I
20   do have a comment, and that has to do with the Board
21   Report in that page seven under the counselor's notation
22   of aggravating and mitigating circumstances which
23   Miss Buchalter addressed briefly prior to your reading
24   the Board Report.  As a matter of practice, there are
25   several sections within a counselor's report that we do
26   not consider when we go into deliberation.  One has to do
27   with the summary section.  And the other has to do with

26

1    aggravating and mitigating circumstances.  So the

2    comments made in both of those sections will not be

3    considered by the panel.

4         **ATTORNEY BUCHALTER:**  Commissioner, if you will not

5    be considering those, then I will withdraw the objection

6    and move on from there.  Thank you.

7         **DEPUTY COMMISSIONER SMITH:**  Noted.  Thank you,

8    Counselor.  Other than that, I have no other comments.

9         **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

10   Commissioner Smith.  Mr. Bell, Penal Code Section 3042

11   notices were mailed to agencies having a direct interest

12   in your case.  For the record, we did not have any

13   written responses to the 3042s; however, we do have the

14   District Attorney's representative from Santa Clara

15   County who will be providing -- asking you questions and

16   providing a statement at a later phase in the hearing.

17   Now, I would like to examine and read into the record

18   your letters of support.  And there are a substantial

19   amount of letters.  So what I would like to do is simply

20   take excerpts, Mr. Bell, highlight certain factors of

21   these letters.  And I will state who they are from, their

22   affiliation to you, the date they were received, and the

23   type of letter based on whether it's a letter of support

24   or residential, a place to live, financial support,

25   emotional support, and perhaps offers of employment.

26   Okay?  The first one is from Susan Montoya Bell, Licensed

27   Clinical Social Worker, dated November 29th, 2005.  She,

27

1    of course, is your wife.  She has been employed at Chino
2    Valley Medical Center where she is the Director of Case
3    Management, Discharge Planning, and Social Services.  The
4    letter is dated -- I just mentioned the date.  She is, of
5    course, where you plan to reside if you were to be
6    paroled today.

7         **INMATE BELL:**  That is correct.

8         **PRESIDING COMMISSIONER PONCAVARE:**  And that is your
9    first choice.

10        **INMATE BELL:**  Yes.

11        **PRESIDING COMMISSIONER PONCAVARE:**  Next is a letter
12   written on December 12, 2005, from your mother, Lavonia
13   Margala.  She has -- she's retired after working in
14   school districts for over 35 years.  She is essentially
15   stating that she is willing to help you accomplish your
16   goals in every way possible should you be released.  And
17   once again, for the record, she is your -- she and your
18   stepfather would be your second choice in terms of a
19   potential place to live.

20        **INMATE BELL:**  That's correct.

21        **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.
22   January 22, 2006, your younger sister, Deborah Bell
23   Garrett.  Deborah lives in Salem, Oregon.  And I'm sorry.
24   For the record, on your stepparents -- they live in
25   Upland.  And your wife lives in Chino.  Again, for the
26   record.  She is in Salem, Oregon, and she is your younger
27   sister.  She's known you for over 50 years, and of

28

1  course, offers support basically stating that she thinks
2  you should be paroled and is solidly supporting your
3  parole.  Your uncle Dale Cauble, he wrote a letter on
4  November 19th, 2006.  He worked for 36 years as a
5  fireman, paramedic, and was a station captain in the Los
6  Angeles County Fire Department.  He lives in Redondo
7  Beach.  He has stated that you can live in his home for
8  any length of time -- for any length of time that it
9  takes you to become established in a new profession.  We
10 have a letter from Lynn Cauble, who is Dale's wife, dated
11 November 19th, 2006.  Again, just substantiating that
12 they have offered you a place to reside until you find
13 employment and are able to support yourself.  Jim Hatten
14 (phonetic), November 28th, 2005.  He has known you for
15 nearly 40 years.  You grew up together, went to grade
16 school, high school, and attended the same university.
17 He is an insurance and financial service agent with
18 Farmers Financial Services.  He's also apparently a
19 minister.

20      **INMATE BELL:**  That's correct.

21      **PRESIDING COMMISSIONER PONCAVARE:**  And he would not
22 only offer you additional counseling and financial
23 support, he would also offer you his own personal
24 financial support.  November 25th, 2005, from Mike
25 DeBiase (phonetic).

26      **INMATE BELL:**  DeBiase.

27      **PRESIDING COMMISSIONER PONCAVARE:**  DeBiase.  He has

1    been a computer programmer for about 32 years.  He's

2    worked for Kaiser for 18.  You two worked together when

3    you were at Kaiser prior to the controlling offense.

4    He's offering essentially a general letter of support in

5    terms of any help you might need.  November 29th, 2005,

6    James Cook.  You have been friends since kindergarten.

7    You both graduated from Cal Poly.  Once again, a general

8    letter of support.  November 30th, 2005, from Janet

9    Lawton in Arroyo Grande.  She was employed at the

10   Glendora Unified School District and was in human

11   resources subsequent to that employment.  And she and her

12   husband are offering you help and support and a place to

13   live should you be released.  And I did state that they

14   live in Arroyo Grande.

15           **INMATE BELL:**  Yes.

16           **PRESIDING COMMISSIONER PONCAVARE:**  Okay.

17   November 25th, 2005, from Christine Higgins.  Christine

18   is a Registered Diabetic Technician at Chino Valley

19   Medical Center.  She knows you through your wife, Sue.

20   And she is providing the panel and you a general letter

21   of support, and she lives in Chino.  Wade and Claudia

22   Askew (phonetic) from Glendora.  This letter was written

23   on January 2, 2006.  He retired as an assistant

24   superintendent in the Arcadia School District several

25   years ago.  She was a principal's secretary at a middle

26   school in Glendora.  They've known you for 28 years, and

27   they have stated that they will do all they can do to

1   give you your emotional stability should you be released.

2   January 1st, 2006, Shirley Flynn.  She lives in Lincoln,

3   Nebraska.  She was married to your father Kenneth Bell,

4   and so she's your stepmother prior to his passing.  And

5   she is willing to provide you with support.  Christopher

6   Christenson from Glendora, January 6th, 2006.  He wrote

7   this letter stating that more than 32 years ago he

8   enjoyed -- for more than 32 years he enjoyed a career in

9   law enforcement going from a patrolman to Chief of Police

10  with the City of Sierra Madre.  He was the policeman who

11  arrested you at the time of your controlling offense?

12      **INMATE BELL:**  That's incorrect.  He's a family

13  friend for many years.

14      **PRESIDING COMMISSIONER PONCAVARE:**  It says, I wrote

15  to the Board of Prison Terms on behalf of (inaudible) who

16  I arrested years before.  That's incorrect?

17      **INMATE BELL:**  That's correct.  He's speaking about

18  the only other time he's ever written to the Board, a

19  letter of support for another person.

20      **PRESIDING COMMISSIONER PONCAVARE:**  Oh, I'm sorry.  I

21  stand corrected.  Thank you for that clarification.  And

22  he is stating that if you were to be released, you are

23  available to him -- to you and your family in whatever

24  capacity he can be of help.  We have a letter from James

25  Heart from Sacramento.  He worked for the California

26  Youth Authority and for the California Department of

27  Corrections.  He first met you in 1983 at a convention

1    center in Asiomar (phonetic).  And he has written a

2    letter of support on your behalf.  Roger Hanson, attorney

3    at law in Santa Ana, November 28th, 2005; he says he can

4    use you in his practice due to your extensive background

5    in computers.  So that's an offer of potential

6    employment.  Deborah Preston, Sebastopol, California,

7    January 5th, 2006; she's employed by the Superior Court

8    of California, County of Marin in the information

9    technology records and exhibits division.  She's known

10   you since 1970.  You met in high school, and she has

11   written a letter of support on your behalf to help you

12   re-enter into society in any way she can should you be

13   paroled.  January 3rd, 2006, Fred Armagida, Protech

14   Medical in Chino.  He's a licensed respiratory therapist.

15   He started his own business, and he would have a job for

16   you in his business.  Michael Olacino.

17        **INMATE BELL:**  Olacino.

18        **PRESIDING COMMISSIONER PONCAVARE:**  Olacino, Regional

19   Chief Financial Officer, January 16th, 2006.  He works

20   for a finance and accounting company.  He is offering you

21   a place to reside for you and your wife.  November 20th,

22   2006, April Fisher, retired from Martin-Marietta

23   Aluminum.  She and her husband have known you for

24   20 years plus before the incident.  They will do whatever

25   they can to support your transition to a new life if

26   paroled.  February 25th, 2006, Cathy Fox, flight

27   attendant with American Airlines.  She's known you for

1    several years, general letter of support.  Sue Magon,

2    M-A-G-O-N, Public Accountant, January 25th, 2006.  She's

3    known you since 1963.  She's committed to helping you

4    accomplish your parole plans should you be released.

5    Baram Daruwala --

6            **INMATE BELL:**  Baram Daruwala.

7            **PRESIDING COMMISSIONER PONCAVARE:**  Baram Daruwala,

8    Westminster, New Jersey, January 23rd, 2006.  He's known

9    you since the late 1980s, Assistant Vice President of

10   Technology and Planning at an insurance company in

11   Preston, New Jersey, general letter of support.

12           **DEPUTY COMMISSIONER SMITH:**  Commissioner, you might

13   want to spell the last name for the transcriber.

14           **PRESIDING COMMISSIONER PONCAVARE:**  I'm sorry.  For

15   the record, the last name from the previous letter, Baram

16   Daruwala, D-A-R-U-W-A-L-A.  Sandra H. Fetter, Professor,

17   Sacramento City College, Professor of Computer Science.

18   She has known you through a social organization since

19   1991.  She's kept in contact with your wife, Sue, and she

20   is ready to support you and your wife financially.

21   Robert Lawhon, L-A-W-H-O-N, from Arroyo Grande, November

22   30th, 2005.  He and his wife are offering support should

23   you need it upon release.  January 29th, 2006, Robert

24   Whiting, retired commercial electrician.  He's known you

25   for over 30 years.  Again, general letter of support.

26   Jean Whiting, is his wife.

27           **INMATE BELL:**  His mother.

1      **PRESIDING COMMISSIONER PONCAVARE:**  His mother, thank

2    you.  She's a retired school bus driver and would be glad

3    to help you if you were to be paroled.  Rosalie Bonilla,

4    B-O-N-I-L-L-A, January 15th, 2006.  She's employed at the

5    Chino Valley Medical Center.  She's known you for over

6    ten years and is offering her support for your parole.

7    January 9th, 2006, Linda Ruggio, R.N., P.S.N., P.H.N.,

8    Ruggio, R-U-G-G-I-O, January 9th, 2006.  She's the

9    Director of Emergency Services at Chino Valley Medical

10   Center, and she is recommending to the panel that you be

11   granted parole.  Becky Riggs from Azusa, November 27th,

12   2005, social worker for eleven years.  She believes that

13   you're an excellent candidate for parole.  Natalie Bass

14   from Denver, North Carolina, December 4th, 2005.  Natalie

15   Cauble Bass, so she's your first cousin.  She's employed

16   by a large retail chain and says that your family is very

17   strong and supportive of your release.  February 20th,

18   2006, Joseph M. Rose, Lieutenant Colonel, U.S. Army

19   Specific Forces, Odessa, Florida.  He is encouraging the

20   panel to release you on parole.  You've known him since

21   high school.  Priscilla Rice and Steven Rice -- Priscilla

22   is president and Steven is vice president of Computer

23   Tech Systems, Inc.  They have known you for 26 years, you

24   were next-door neighbors, and would be willing to offer

25   financial support.  Cathy Hatton with Reality

26   Executives -- she is good friends with your wife,

27   December 4th 2005.  She lives in Kingman, Arizona.  And

34

1    again, a general offer of support.  Carol Thomas

2    Williams -- she's an executive officer of an agency

3    appointed by the LA Superior Court to manage ground water

4    in the San Gabriel Valley, December 28th, 2005.  She

5    looks forward to recommending and even employing

6    Mr. Bell.  We have a letter from Victoria and Robert

7    Whale (phonetic).

8        **INMATE BELL:**  Whale.

9        **PRESIDING COMMISSIONER PONCAVARE:**  Whale.  They are

10   from Claremont, California.  This letter is not dated, so

11   we will not be considering it.  You have another general

12   letter of support from Richard K. Smith, Ph.D.  He's a

13   clinical psychologist, Back in the Saddle, Apple Valley.

14   And he has written a letter of support on your behalf.

15   And we have a letter from Dr. Terry Chase, Licensed

16   Psychologist, Chief Executive Officer, Foothills

17   Psychological Services.  This is not a support letter.

18   We don't have any way of telling whether -- the validity

19   of the letter, so we will not be considering this letter.

20   He actually said that he reviewed your three

21   psychological evaluations.

22       **INMATE BELL:**  The letter that you have there is a

23   general letter of support.  You also have a declaration

24   from Dr. Terry Chase where he reviewed the other

25   materials.

26       **DEPUTY COMMISSIONER SMITH:**  There are two letters?

27       **INMATE BELL:**  There's a letter here, and there's a

35

1    declaration separately.

2        **PRESIDING COMMISSIONER PONCAVARE:**  All right.  I
3    have the letter dated March 23rd, 2006, where he states
4    in the fourth paragraph, "I have reviewed all of three
5    psychological evaluations," and this is his conclusion
6    which we will not be considering.

7        **DEPUTY COMMISSIONER SMITH:**  Yeah.  Mr. Bell, if you
8    can locate that -- the other letter that you're
9    addressing, we'll certainly be more than happy to address
10   it for the record.

11       **INMATE BELL:**  Okay.  The letter of March 23rd, 2006,
12   which you are referring to does, in fact, in one of the
13   paragraphs mention the review of the psychological
14   reports.  But it goes on to state that I have an
15   outstanding support system in the area and that he will
16   give me any help that I could need in terms of treatment
17   or finding employment, and he, in fact, could personally
18   hire me.  There is a letter of recommendation here as
19   well having reviewed those other reports.

20       **DEPUTY COMMISSIONER SMITH:**  So there's one letter.

21       **INMATE BELL:**  There's one letter --

22       **DEPUTY COMMISSIONER SMITH:**  There's not another
23   letter?

24       **INMATE BELL:**  There is a separate declaration
25   dealing with the Carolyn (verbatim) Schroeder report.
26   And that's a sworn declaration, not this letter here.
27   This is a letter of support, because Terry is an old

36

1    friend.

2        **DEPUTY COMMISSIONER SMITH:**  Okay.  Let me note for

3    the record that he writes that he will personally do

4    everything within his power to help you readjust to

5    society once you're released and the support will include

6    facilitation of any necessary mental health treatment and

7    assistance in finding employment.

8        **INMATE BELL:**  Right.  The declaration -- if you have

9    this document in front of you -- is Exhibit D, and that's

10   a five page sworn declaration reviewing -- again, a peer

11   review.

12       **DEPUTY COMMISSIONER SMITH:**  Do you want to help us

13   out with the page number?

14       **INMATE BELL:**  Yeah.  It's Exhibit -- sorry.  Exhibit

15   D.  I just have it behind a red divider page.  It's

16   Exhibit D.  It looks like this.

17       **DEPUTY COMMISSIONER SMITH:**  Oh, all right.  And in

18   that document, he indicates that he's reviewed the other

19   psychological evaluations and draws his own opinions

20   based on his review; is that correct?

21       **INMATE BELL:**  He drew his own opinion of the

22   validity of the Schroeder report.  It was a peer review,

23   not a review of me.

24       **DEPUTY COMMISSIONER SMITH:**  Right.  And we won't

25   consider that because we don't have any opportunity to

26   cross-examine him with regard to you.  But Counsel can

27   certainly address that part of her closing.

1      **ATTORNEY BUCHALTER:**  May I make that objection right

2    now then to that, to your statement that you won't be

3    using it?  And I would like my objection on the record.

4      **DEPUTY COMMISSIONER SMITH:**  Yes.

5      **ATTORNEY BUCHALTER:**  Thank you.

6      **DEPUTY COMMISSIONER SMITH:**  And it's overruled.

7      **ATTORNEY BUCHALTER:**  I understand.  But I need it

8    for the record.

9      **DEPUTY COMMISSIONER SMITH:**  That's fine.

10      **ATTORNEY BUCHALTER:**  For purposes of transcript.

11      **DEPUTY COMMISSIONER SMITH:**  Yes.

12      **ATTORNEY BUCHALTER:**  In psychology, Commissioners,

13    there is a process called peer review, which looks at

14    only the adequacy of the report itself.  And the key is

15    to ensure that all conclusions are supported by facts

16    located and stated within the report itself.  Dr. Chase's

17    report is a peer review report.  This is customary.

18    There's a whole peer review system in the medical domain.

19    The peer review does not involve re-interviewing the

20    subject.  The peer review is customary to review the

21    quality of the report to ensure that all the conclusions

22    have been supported with facts that are contained within

23    the report itself.  Therefore, this peer report is, in

24    fact, valid.  Dr. Macumber, himself, also in addition to

25    interviewing Mr. Bell, did a peer review himself.  So

26    Dr. Chase and Dr. Macomber's peer review assessments are

27    in agreement and are valid.

38

1    **DEPUTY COMMISSIONER SMITH:**  Noted, Counsel.

2    **ATTORNEY BUCHALTER:**  Thank you.

3    **PRESIDING COMMISSIONER PONCAVARE:**  Noted, Counselor.

4    I will now turn the hearing to Commissioner Smith who

5    will discuss your Post-Conviction record with you.

6    **ATTORNEY BUCHALTER:**  May I just have a quick word

7    here with my client?

8    **DEPUTY COMMISSIONER SMITH:**  Certainly.

9    **ATTORNEY BUCHALTER:**  Thank you.  Your coverage was

10   excellent.  Thank you.

11   **DEPUTY COMMISSIONER SMITH:**  Certainly.  There were

12   quite a large number of letters, and you anticipated my

13   question without anticipating what I was going to ask

14   you.  Did we cover all of the letters that were

15   submitted?

16   **ATTORNEY BUCHALTER:**  Great job.  You did.

17   **DEPUTY COMMISSIONER SMITH:**  She did?

18   **ATTORNEY BUCHALTER:**  Thank you.

19   **DEPUTY COMMISSIONER SMITH:**  Mr. Bell, you were

20   received by a Department of Corrections on July 17th,

21   1995; received here at Avenal on November 1st, 2002.  You

22   have a classification score of 19, which is the lowest

23   classification score that the life inmate can attain.

24   Your last hearing was held on March 23rd, 2004.  That was

25   your initial hearing.  You received a two-year denial at

26   that time, so this is your first subsequent hearing.

27   Since you have been incarcerated, you've had a superior

39

1    disciplinary history.  You've had no 115s or 128s.  This
2    panel realizes what a remarkable achievement that is.  We
3    realize that it is very difficult to remain completely
4    disciplinary-free in an institutional setting.  And the
5    effort that's required to accomplish that.  So our
6    sincere congratulations to you on establishing that.
7    Since your last hearing -- and most of what I'm going to
8    be discussing has to do with your last hearing forward,
9    but I will certainly provide both you and Counsel an
10   opportunity to address anything I may have overlooked or
11   any other programs or accomplishments that you may have
12   achieved that I haven't addressed.  Since your last
13   hearing, you've received six laudatory chronos, one in
14   October of 2004 regarding your work ethic and your
15   excellent work as a Clerk in Vocational Carpentry.  And
16   the writer indicates that you're the best clerk that
17   they've had in that program for the last 14 years.  The
18   next laudatory is dated 12/16/05 regarding your
19   completion of the 12-hour Pro-literacy America Workshop.
20   Another laudatory dated 12/16/05 regarding your
21   completion of the Literacy Tutor Training Program.
22   February 16th, '06, for completing the six-hour Living
23   Anger Management Program.  And two dated May 31st of this
24   year -- or I'm sorry, one dated May 3rd of this year for
25   the completion of a six-hour program Values of
26   Responsible Living.  And the most recent, May 31st of
27   this year for completing six hours of the Life Management

40

1    Program.  You also have multiple certificates of

2    appreciation regarding your attendance and participation

3    in Narcotics Anonymous, the most recent is dated

4    September of this year and identifies that you have been

5    attending Narcotics Anonymous for 27 months.  And are you

6    currently in Narcotics Anonymous?

7        **INMATE BELL:**  That's correct.

8        **DEPUTY COMMISSIONER SMITH:**  Okay.  If you received a

9    parole date, would you continue to participate in

10   Narcotics Anonymous or a similar type program in the

11   community?

12       **INMATE BELL:**  I have come to value the 12-step

13   program.  I don't believe I would participate in

14   Narcotics Anonymous, but I would find another 12-step

15   program to keep me focused, yes.

16       **DEPUTY COMMISSIONER SMITH:**  What type of -- have you

17   explored other types of programs that would be available

18   to you?

19       **INMATE BELL:**  I have not, no.

20       **DEPUTY COMMISSIONER SMITH:**  But you would in the

21   community attempt to locate like programs?

22       **INMATE BELL:**  That's correct.

23       **DEPUTY COMMISSIONER SMITH:**  You have had prior

24   assignments to Vocational Welding, as a Clerk in the

25   educational program, and as a Porter.  And in March of

26   2005, you were assigned to the Trash and the Yard Crew.

27   Are you still assigned in that?

41

1        **INMATE BELL:**  I am.

2        **DEPUTY COMMISSIONER SMITH:**  Okay.  You have a B.A.

3    from Cal Poly, correct?

4        **INMATE BELL:**  B.S., but yes.

5        **DEPUTY COMMISSIONER SMITH:**  Or a B.S., right.  And

6    you completed numerous self-help programs and received

7    certificates, and I'm going to refer to the Board Report

8    for that list.  Again, going back to your last hearing

9    forward, you have a certificate of completion in Anger

10   Management dated April 2004; several certificates from

11   FEMA in the Emergency Management area, May 2004

12   Mitigation for the Homeowner; August 2004, Professional

13   Emergency Management; September 2004, Emergency Planning.

14   You also have a number of vocational achievement

15   certificates; one, November 2004, for Welding and

16   Regional Mathematics.  I'm going to need help with that.

17       **INMATE BELL:**  I believe "regional" is a

18   typographical error.  The welding program that I was

19   involved with, which CDC has subsequently cancelled, had

20   a unit in Required and Related mathematics.  Somehow when

21   this report came out, it came out "Regional Mathematics."

22   It is --

23       **DEPUTY COMMISSIONER SMITH:**  Required?

24       **INMATE BELL:**  Required and related.  It was part of

25   the book program that goes along with the welding trade.

26       **DEPUTY COMMISSIONER SMITH:**  Okay.  Thanks for the

27   clarification.  Another vocational achievement

42

1   certificate in November of 2004 for Welding and

2   Metallurgy; December 2004, for Basic Welding Joints and

3   Symbols; December 2004, for Welding and Printer Reading.

4       **INMATE BELL:**  Should be Print Reading, as in blue

5   print reading.

6       **DEPUTY COMMISSIONER SMITH:**  Oh, okay.  And then

7   there are a couple of other notes here.  You know, one

8   indicates that the Staff Information Analyst said that

9   you were overqualified for computers, that -- also one in

10  January of this year by the senior librarian said that

11  you were an avid user of the law library.  And I have

12  already addressed the Values for Responsible Living.  In

13  addition, you've completed vocations in Carpentry,

14  Landscaping, and Office Services.  And you have completed

15  three book reports:  One in December 2005, titled *The Ten*

16  *Natural Laws of Successful Time and Life Management* --

17  and during our recess we'll review these in more

18  detail -- another dated September 2006 titled *Voice of*

19  *Knowledge, Practical Guide to Inner Peace*.  And the third

20  is dated May 2006, titled *The Seven Habits of Highly*

21  *Effective People: Restoring the Character Ethic*.  And

22  before I go to the two psychological evaluations, are

23  there any other activities that you've been involved in

24  since your last hearing that I haven't addressed that we

25  should be aware of?

26      **INMATE BELL:**  Well, you mentioned that I completed

27  the -- trained to become the Lawbach (phonetic) tutor.  I

43

1    have been tutoring students to help them get their GED.
2    I have been for a period of about two years, I have been
3    involved in collecting pull tabs from aluminum cans for
4    the Ronald McDonald House in Orange County, California.
5    That's one of the reasons I took the yard crew job was to
6    collect pop tops. We've collected tens of thousands of
7    those. I have -- I think you mentioned I took that
8    correspondence course in anger management. I have also
9    taken and am still taking a correspondence course in
10   meditation. I have been doing that now for almost four
11   years.

12       **DEPUTY COMMISSIONER SMITH:** Who is that
13   correspondence course through?

14       **INMATE BELL:** Originally it was from the Heart
15   Mountain Project in Santa Fe, New Mexico. Currently it's
16   from the Saraha (phonetic) Buddhist Center in San
17   Francisco.

18       **DEPUTY COMMISSIONER SMITH:** Anything else? Because
19   I want to make sure that we have captured all of the
20   positives that are present.

21       **INMATE BELL:** In the document you have here, there
22   is a complete list as well as the exhibits in the back
23   that show the certificates.

24       **DEPUTY COMMISSIONER SMITH:** Okay. And we'll review
25   that as well. I'm going to address both psychological
26   evaluations, the one that was prepared by Dr. Schroeder,
27   that's dated November 2005, and then I will also address

44

1    the evaluation that was prepared by Dr. Macumber dated

2    March 2006.  And in both cases -- yes, Mr. Rico?

3        **DEPUTY DISTRICT ATTORNEY RICO:**  Yes.  I'll just

4    mention this in advance because I don't like to do

5    anything that would be perceived as ambush.  I have some

6    issues with Dr. Macumber's report in terms of what it

7    purports to include, given Mr. Bell's statement that he

8    chooses not to discuss the facts of the crime, and I

9    expect that that will be a significant issue.  I don't

10   know if you wish for me to be heard until it comes up or

11   how we should deal with it.

12       **DEPUTY COMMISSIONER SMITH:**  Yeah.  Let me review

13   both of the psychological evaluations.  And then

14   certainly any comments regarding those evaluations that

15   you and Ms. Buchalter would like to address for the

16   record -- I'll give you both that opportunity.

17       **DEPUTY DISTRICT ATTORNEY RICO:**  And it may very well

18   be that that will even come up later in the hearing, so

19   perhaps if you address those reports and then defer to

20   the end of the hearing what consideration or weight you

21   would be giving to either or both of those reports --

22   maybe that would be a way to address it.

23       **DEPUTY COMMISSIONER SMITH:**  Right.  And we certainly

24   won't make a decision in any way provided to any

25   documents, generally speaking, until the hearing is

26   concluded and we go away for deliberations.

27       **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you.  Sorry I

45

1    interrupted.

2        **DEPUTY COMMISSIONER SMITH:**  No, not at all.  As I

3    was about to indicate, I'm going to address just a few of

4    the sections of both of the reports that I think are most

5    pertinent.  And then any other sections that Mr. Bell and

6    Counsel would like to have addressed for the record or

7    any comments that they would like to make regarding the

8    evaluations, I'll certainly give them that opportunity as

9    well as Mr. Rico.  I'll give you that opportunity as

10   well.  Any questions?

11       **ATTORNEY BUCHALTER:**  No.  We have that opportunity

12   when we have an opportunity to make our statements,

13   correct?

14       **DEPUTY COMMISSIONER SMITH:**  Absolutely.

15       **ATTORNEY BUCHALTER:**  Thank you.

16       **DEPUTY COMMISSIONER SMITH:**  Absolutely.  Moving to

17   page three, under current mental status and treatment

18   needs, Dr. Schroeder, S-C-H-R-O-E-D-E-R, writes that

19   mental status is clear in all areas of the exam,

20   behavior, speech, thought content, thought process,

21   speech, and cognition.  Under diagnostic impression,

22   indicates under Axis I and II, there is No Diagnosis.

23   Axis IV, there's Psychosocial Stressors as a Result of

24   Incarceration.  That is a standard diagnostic impression

25   that's applied to all life prisoners.  And under Global

26   Assessment Functioning, Axis V, there's an assessment

27   functioning score of 85, which is relatively high.  Under

46

1    Assessment of Dangerousness, the doctor writes that

2    Mr. Bell's commitment offense is his only known act of

3    violence.  His risk of harm to others is below average

4    for the parolee population, but his risk of harm to

5    others before his crime was also low.  He did not commit

6    his crime during a moment of rage or loss of control; he

7    was calm and deliberate in his actions.  And under

8    observations and recommendations, the doctor writes that

9    in his opinion -- or in her opinion, Mr. Bell has not

10   come to terms with his crime.  He's not expressed

11   remorse, and he must come to terms with his crime in

12   order to move toward resolution.  The other evaluation

13   was prepared by Dr. Macumber.  It's dated March of 2006,

14   and although Dr. Macumber provides a summary overview of

15   his resume and qualifications, Dr. Macumber routinely

16   prepares psychological evaluations for Board hearings, so

17   I'm not going to address his background and

18   qualifications because they are clearly noted, and I have

19   personally reviewed hundreds of Dr. Macumber's

20   evaluations.  So there is certainly no question if my

21   mind with regard to his ability to do such assessments.

22   And again, I will address just those sections that I

23   think are most appropriate.  On page three under the

24   psychological test results, it indicates that the doctor

25   administered the million clinical multi-axial inventory.

26   It's M-U-L-T-I-A-X-I-A-L.  He indicates that that's a 175

27   item inventory that's designed to identify Axis I and

47

```
 1   Axis II psychiatric disorders, and that the scales on the
 2   measure in Mr. Bell's case were within the normal range.
 3   The clinical personality pattern scale showed that
 4   Mr. Bell is free from any Axis II personality disorder.
 5   His Axis II personality disorder scores were all in the
 6   average range compared to normal citizens and that there
 7   were no Axis I clinical disorders evident.  He then
 8   addresses the psychological inventory of criminal
 9   thinking styles and writes that this instrument is
10   designed to identify a person's cognitions in the form of
11   attitudes, belief, and thinking styles and that his --
12   Mr. Bell's scores were all in the normal range indicating
13   that he does not have any criminal thinking styles at
14   this point in his life.  The next test that was
15   administered is called the level of service inventory,
16   and the doctor notes that this inventory was developed to
17   assist service providers in the assessment of the
18   offender's need for services on probation or parole and
19   that the score indicate that Mr. Bell would make a good
20   adjustment to open and free society.  His score placed
21   him in 0.4 cumulative frequency in comparison with other
22   prison inmates and that score means that if a hundred men
23   were released on parole, he would do better than 99 of
24   them and that that actuarial measure predicts that
25   Mr. Bell would make a good adjustment in society.  Moving
26   to page five under the review of the life crime, the
27   doctor writes that we discussed at length the details of
```

1    the commitment offense, and in the doctor's opinion,

2    Mr. Bell shows a great deal of self-examination,

3    introspection, and remorse for his sins which included

4    his marital unfaithfulness to his wife at the time.  And

5    he believes he has very excellent insight and accepts

6    responsibility for things that he did wrong at that time

7    in his life.  Just as a note, that does raise a question

8    in my mind in that we have two psychological evaluations,

9    both that we're going to attempt, to every extent

10   possible, to weigh equally.  However, in one evaluation,

11   you chose not to discuss your commitment offense, which

12   is certainly your right to do, and in this one you did

13   choose to discuss your commitment offense in some detail.

14   So clearly, I think we've created an apple and an orange.

15   You can't compare the two findings because the doctors

16   were using different information.  And I'll certainly

17   take comments to that follow-up comment when we get to

18   that point.

19        **ATTORNEY BUCHALTER:**  Can I address that now,

20   Commissioner?

21        **DEPUTY COMMISSIONER SMITH:**  I'd rather you waited.

22        **ATTORNEY BUCHALTER:**  Thank you.

23        **DEPUTY COMMISSIONER SMITH:**  Would you?

24        **ATTORNEY BUCHALTER:**  Yes.

25        **DEPUTY COMMISSIONER SMITH:**  I will certainly give

26   you that opportunity.  I won't forget it.

27        **ATTORNEY BUCHALTER:**  All right.  Yeah.  Thank you.

49

1      **DEPUTY COMMISSIONER SMITH:**  Going on to the next

2      page, Dr. Macumber concludes that the potential for

3      dangerous behavior in the institution environment is

4      definitely below average in comparison to other inmates

5      in that Mr. Bell does not pose any more risk to society

6      than the average citizen.  Moving to page eight under

7      comments and recommendations, the doctor writes that the

8      prognosis for successful adjustment in the community is

9      outstanding.  Mr. Bell, Counsel, with that, any comments

10     regarding the evaluation?

11     **ATTORNEY BUCHALTER:**  Yes.  Concerning both reports,

12     Commissioners, both doctors have full access to the files

13     and to the entire Statements of Facts from all of the

14     official documents that exist and which are numerous in

15     the files.  So all of the facts of the case are, in fact,

16     available to both.  I mean, Mr. -- my client hasn't

17     changed the facts.  The facts are available to both

18     doctors.  He did speak about remorse and responsibility

19     to both doctors, so both of the reports have the same.

20     And also you will note that both reports have given him

21     low risk assessment.  They have come to the same

22     conclusion.

23     **DEPUTY COMMISSIONER SMITH:**  Right.  Thank you,

24     Counselor.  Mr. Rico, any comments you'd like to make at

25     this time?

26     **DEPUTY DISTRICT ATTORNEY RICO:**  I think I'll defer

27     the comments to a later point.

50

1      **DEPUTY COMMISSIONER SMITH:** All right. Thank you,
2  sir. Any other comments you'd like to make regarding
3  either of the evaluations or any of the positive
4  adjustment activities before I return to Commissioner
5  Poncavare?

6      **ATTORNEY BUCHALTER:** No, thank you.

7      **INMATE BELL:** I have one if I might. As you know --

8      **DEPUTY COMMISSIONER SMITH:** Let me ask you -- does
9  it have to do with your adjustment history or have to do
10  with the evaluation?

11      **INMATE BELL:** Has to do with the Schroeder
12  evaluation.

13      **DEPUTY COMMISSIONER SMITH:** All right. I'd ask you
14  to share that comment with your attorney before you share
15  it with us.

16      **ATTORNEY BUCHALTER:** For the record, the fact that
17  he expressed no remorse is contrary to the record, and
18  that's under appeal.

19      **DEPUTY COMMISSIONER SMITH:** All right.

20      **ATTORNEY BUCHALTER:** Thank you.

21      **DEPUTY COMMISSIONER SMITH:** Thank you.

22      **ATTORNEY BUCHALTER:** That's the Schroeder report
23  we're speaking of.

24      **DEPUTY COMMISSIONER SMITH:** Correct. Thank you.
25  Commissioner.

26      **PRESIDING COMMISSIONER PONCAVARE:** Mr. Bell, this
27  now brings us to the question and answer phase of the

51

1    hearing.  I -- since you have again, once again,

2    exercised your right not to discuss the controlling

3    offense, or provide the panel with your version of the

4    attempted murder, I don't have any questions for you.  I

5    will say that I think we've done a comprehensive

6    examination of your record.  Whether or not you have

7    anything else you'd like to add at this point before we

8    direct the questions --

9       **INMATE BELL:**  I'm ready for the questions.

10      **PRESIDING COMMISSIONER PONCAVARE:**  Okay.  Thank you.

11   Mr. Rico do you have any questions for the inmate?

12      **DEPUTY DISTRICT ATTORNEY RICO:**  Just briefly.  I

13   believe that there's materials that I can't find, and if

14   I might inquire, there are a couple of -- there's a

15   letter, is there not, from a Roger Hanson.  Is that a job

16   offer of 11/28/05?

17      **PRESIDING COMMISSIONER PONCAVARE:**  Yes.  He's an

18   attorney, and he did offer the inmate employment if he

19   were to be released.  Would you like a copy of that

20   letter faxed to you, Mr. Rico?

21      **DEPUTY DISTRICT ATTORNEY RICO:**  The problem is, I

22   don't want to unduly delay things.  Is that in -- was

23   that just provided this morning?

24      **PRESIDING COMMISSIONER PONCAVARE:**  Yes, it was.

25   However, it was dated subsequent to his previous initial

26   hearing in 2003.

27      **DEPUTY DISTRICT ATTORNEY RICO:**  All right.  Perhaps

52

1    if you could set that aside.  I may refer to it.  I don't

2    have it at hand, so -- the other one -- is there a job

3    offer from -- is it a James Lowrey (phonetic)?

4        **DEPUTY COMMISSIONER SMITH**:  Mr. Rico, what's your

5    fax number?  And I'll ask one of the officers to fax that

6    letter to you.  Would that be possible?

7        **DEPUTY DISTRICT ATTORNEY RICO**:  Yes.

8        **DEPUTY COMMISSIONER SMITH**:  While you're referring

9    to other documents.

10       **DEPUTY DISTRICT ATTORNEY RICO**:  Certainly.  I

11   believe the number -- it's in a different room.  But it's

12   408-279 -- I'm sorry.  Just -- may I just have a brief

13   break and let me verify the number so we can expedite?

14       **PRESIDING COMMISSIONER PONCAVARE**:  Certainly.

15       **DEPUTY COMMISSIONER SMITH**:  In fact, shall we take a

16   short recess?  We've been sitting for a while, and give

17   ourselves a chance to stretch.

18       **ATTORNEY BUCHALTER**:  It will give me an opportunity

19   to find the letter as well, Mr. Rico.

20       **DEPUTY DISTRICT ATTORNEY RICO**:  Fine.  Five minutes?

21       **ATTORNEY BUCHALTER**:  Yes.

22       **DEPUTY DISTRICT ATTORNEY RICO**:  That'd be great.

23   Thank you.

24       **ATTORNEY BUCHALTER**:  Is it too difficult?  Do you

25   want us to find it?

26                [Recess taken.]

27       **DEPUTY COMMISSIONER SMITH**:  We're back on the record

53

1    after a short recess.  Everyone previously identified is

2    in the hearing room.

3        **DEPUTY DISTRICT ATTORNEY RICO:**  Your end is still on

4    mute.

5        **DEPUTY COMMISSIONER SMITH:**  That should work.

6        **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you.

7        **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.  Back

8    on record at 11:14 a.m.  Mr. Rico, I neglected to ask my

9    colleague, Mr. Smith, whether or not he had any further

10   questions for the inmate.  So before you proceed, I want

11   to ask my colleague for his questions.

12       **DEPUTY DISTRICT ATTORNEY RICO:**  Certainly.

13       **DEPUTY COMMISSIONER SMITH:**  And I do not.  But thank

14   you.

15       **PRESIDING COMMISSIONER PONCAVARE:**  Thank you.  Thank

16   you, Commissioner.  All right, Mr. Rico.  Your questions,

17   please.

18       **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you.  And

19   Commissioner, I will address the questions to the Chair

20   rather than to the inmate.

21       **PRESIDING COMMISSIONER PONCAVARE:**  Yes, thank you.

22       **DEPUTY DISTRICT ATTORNEY RICO:**  Referring to a

23   couple of these job offers -- well, first of all, if

24   Mr. Bell had his preference, which job offer would he

25   wish to pursue?

26       **INMATE BELL:**  No question, the job offer at Chino

27   Valley Medical Center, the one offered by Dr. Lolly.

54

1      **DEPUTY DISTRICT ATTORNEY RICO:**  Now, how is it that
2   Mr. Bell knows Dr. Lolly?

3      **INMATE BELL:**  I know Dr. Lolly originally through my
4   wife who has worked with him for many years.  He and I
5   have corresponded back and forth.  He's been actively
6   involved with my case for a number of years.  I consider
7   him a friend although not a close one.

8      **DEPUTY DISTRICT ATTORNEY RICO:**  And what is it that
9   Mr. Bell would be doing if he accepted an offer with
10  Mr. Lolly?

11     **INMATE BELL:**  Dr. Lolly has offered me a position in
12  his information services department.  At the time he
13  originally wrote his letter, that was a position to be a
14  systems analyst.  I know he has sent an updated letter by
15  fax just this last week to reiterate the job offer.  I
16  don't know if the current letter -- the update which
17  includes an offer of employment -- I don't know if that
18  includes a specific job title or not.

19     **DEPUTY DISTRICT ATTORNEY RICO:**  Now, Dr. Lolly is
20  the Chief Medical Officer at -- is it Chino Medical
21  Center?

22     **INMATE BELL:**  Chino Valley Medical Center.  That is
23  correct.

24     **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you.  Now, was
25  Dr. Lolly also an expert in Mr. Bell's habeas proceeding
26  in this matter?

27     **INMATE BELL:**  Yes, he was.

55

1       **DEPUTY DISTRICT ATTORNEY RICO:**  And I believe that

2    there was a document that was prepared -- I think a

3    26-page document referred to or entitled *Cathy's Injury.*

4    Was Dr. Lolly involved in the preparation of that

5    document?

6       **INMATE BELL:**  No, he was not.

7       **DEPUTY DISTRICT ATTORNEY RICO:**  Was he an expert who

8    was called or who an effort was made to call him as an

9    expert in connection with the habeas in reference to any

10   of the material contained within that document?

11      **ATTORNEY BUCHALTER:**  I object to this.  He's

12   referring to a habeas corpus writ, and it's not relevant

13   to this hearing.  It was not information that was

14   discussed at this hearing.  The prosecutor's role is to

15   ask the Board to clarify, so this is not a part of this

16   hearing, and I object to this question.  I advise my

17   client not to answer.  It's not relevant.

18      **DEPUTY DISTRICT ATTORNEY RICO:**  I'll respond.  The

19   purpose is, these are two job offers.  This is the job

20   offer that Mr. Bell indicates he would greatly intend to

21   pursue.  This would be the one that he wanted.  And so I

22   am just inquiring or asking the Board to clarify the true

23   relationship between Mr. Bell and his purported employer.

24      **ATTORNEY BUCHALTER:**  I still object.  I think it's

25   irrelevant.  The writ of habeas corpus, who was the

26   expert or not.

27      **DEPUTY COMMISSIONER SMITH:**  Counsel, we'll allow the

56

1   question.  But you can certainly advise Mr. Bell not to

2   answer the question if you so choose to do so.  And

3   nothing negative will be attached to his choice not to

4   answer.

5       **ATTORNEY BUCHALTER:**  I will so advise him if he

6   wants to ask the question again.

7       **DEPUTY DISTRICT ATTORNEY RICO:**  Actually, by this

8   point I forget what the question was.  I think it had to

9   do with whether Dr. Lolly was an expert who was offered

10  by Mr. Bell or his counsel on the issue of the victim's

11  injuries and this document *Cathy's Injury* during the

12  course of the habeas proceeding.

13      **ATTORNEY BUCHALTER:**  I raise my objection and advise

14  my client not to answer that question.  It's not

15  relevant.

16      **DEPUTY COMMISSIONER SMITH:**  Noted, Counsel.

17      **PRESIDING COMMISSIONER PONCAVARE:**  Any further

18  questions, Mr. Rico?

19      **DEPUTY DISTRICT ATTORNEY RICO:**  Oh, I didn't hear

20  Mr. Bell's response.

21      **DEPUTY COMMISSIONER SMITH:**  He chose not to answer

22  the question.

23      **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you.  Now, as

24  far as the offer of employment -- the alternative offer

25  of employment by letter dated 11/28/2005 from Roger

26  Hanson, what does Mr. Bell anticipate that that offer

27  entails?

57

1    **INMATE BELL:**  That's an offer that would not be my

2    first choice.  However, Mr. Hanson, or Dr. Hanson has

3    offered me work in his law firm assisting in the

4    preparation of legal documents.

5    **DEPUTY DISTRICT ATTORNEY RICO:**  All right.  And I

6    believe that Mr. Bell referred to him as Dr. Hanson.  Is

7    that a medical doctor or a Ph.D.?

8    **INMATE BELL:**  Ph.D. in engineering.

9    **DEPUTY DISTRICT ATTORNEY RICO:**  Wasn't the author of

10    that letter, Roger S. Hanson, also Mr. Bell's attorney on

11    the habeas matter that I referred to a few minutes ago?

12    **INMATE BELL:**  That is also correct.

13    **DEPUTY DISTRICT ATTORNEY RICO:**  And so he was the

14    practicing lawyer that was handling the habeas?

15    **INMATE BELL:**  That's correct.

16    **DEPUTY DISTRICT ATTORNEY RICO:**  Is that how Mr. Bell

17    met him?

18    **INMATE BELL:**  That's correct.

19    **DEPUTY DISTRICT ATTORNEY RICO:**  And how would

20    Mr. Bell characterize his relationship with Mr. Hanson?

21    **INMATE BELL:**  Reasonably close for a professional

22    relationship.

23    **DEPUTY DISTRICT ATTORNEY RICO:**  And in connection

24    with that one, Mr. Bell said reasonably close.  During

25    the tendency of that habeas proceeding, wasn't there some

26    feeling on Mr. Bell or his family's part that Mr. Hanson

27    was not handling the habeas as it should have been

58

1   handled?

2       **ATTORNEY BUCHALTER:**  I'm going to object to this as

3   totally outside the scope of this hearing, and I would

4   advise my client not to answer the question based on it's

5   not relevant and outside the scope of the hearing.

6       **DEPUTY COMMISSIONER SMITH:**  We'll sustain that

7   objection.  Mr. Rico, excuse me.  I need to turn the

8   tape.

9           [Thereupon, the tape was turned over.]

10      **DEPUTY COMMISSIONER SMITH:**  Thank you.

11      **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you.  Let me

12  ask this then:  How is it that Mr. Hanson came to write

13  this letter for a job offer?  Is it something that

14  Mr. Bell solicited?

15      **INMATE BELL:**  Well, certainly all of my letters of

16  support from Mr. Hanson and all the other people, I

17  advised all of them of the upcoming hearing and asked

18  them for letters of support.  So I suppose in the general

19  sense, all of them were solicited.  I did not

20  specifically solicit a job offer from Mr. Hanson.  That

21  was his choice.

22      **DEPUTY DISTRICT ATTORNEY RICO:**  I see.  And the last

23  question I have about that letter is, did -- in obtaining

24  that letter from Mr. Hanson, did Mr. Bell discuss with

25  Mr. Hanson anything about any pending lawsuit or in

26  confidence of counsel claim an exchange for a letter?

27      **ATTORNEY BUCHALTER:**  Same objection.  Not relevant.

59

1   Outside the scope of this forum.

2       **DEPUTY COMMISSIONER SMITH:**  We'll sustain that.

3       **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you.  And does

4   Mr. Bell agree with the conclusions of Corinne Schroeder

5   in her mental health evaluation?

6       **INMATE BELL:**  I agree with the conclusion that I am

7   low risk.  I agree with the conclusions that I have no

8   diagnoses on any Axis.  I agree with the conclusion that

9   I have an outstanding prison record with no disciplinary

10  write ups.  I disagree that I have never expressed

11  remorse.  I disagree that I have never taken an anger

12  management class.  I disagree that I need more self-help

13  because that report includes none of my copious self-help

14  in prison.  This is currently under administrative appeal

15  at the director's level.  And I have included in C File a

16  list of my concerns and objections to the unsubstantiated

17  conclusions of that report.

18      **DEPUTY DISTRICT ATTORNEY RICO:**  Does Mr. Bell agree

19  with Corinne Schroeder's statement that, quote, "anger

20  management programs would be beneficial," unquote?

21      **INMATE BELL:**  I disagree with that to this extent:

22  In the interview with Corinne Schroeder, no question was

23  ever raised, the issue never came up of what my self-help

24  to that point had included, which included four different

25  anger management programs.  I would suppose that everyone

26  could benefit in some measure from anger management.  But

27  there is nothing in the record to suggest that I have any

1    current problem with anger.

2        **DEPUTY DISTRICT ATTORNEY RICO:**  I know that Mr. Bell

3    has just said that there is nothing in the record to show

4    that he has any current problem with anger.  But does

5    Mr. Bell believe that he has or in the past has had an

6    anger problem?

7        **INMATE BELL:**  Certainly, there have been occasions

8    in the past where I have handled my anger in ways that

9    I'm not proud of.  I would suggest that it did not rise

10   to the level that it was a factor in this case.  As you

11   know, the conditions not for a heat of passion offense

12   but for a premeditated one, anger is not an issue.

13       **DEPUTY DISTRICT ATTORNEY RICO:**  Well, I guess I

14   don't quite understand that.  Is Mr. Bell saying that

15   anger is not an issue from the legal standpoint, or is he

16   saying that anger is not an issue for him?

17       **ATTORNEY BUCHALTER:**  I'm going to object to this

18   question and advise my client not to answer the question

19   because number one, the prosecutor's role according to

20   Title 15 of the Penal Code Sections is only this:  to ask

21   the Board to clarify.  His anger issues were never

22   discussed here.  Therefore, there is nothing to clarify

23   as far as the examination of this Board because all of

24   the -- whatever there is about anger management classes

25   that he has had is part of the record.  Therefore, this

26   is not a clarification question, it's a kind of a tangent

27   of its own, and outside the scope of what was to be the

1    body of this hearing today.  So to ask the Board to
2    clarify, I object for that purpose because that's not
3    what he's doing.  And I advise my client not to answer
4    that question.

5        **DEPUTY COMMISSIONER SMITH:**  We'll sustain the
6    objection.

7        **DEPUTY DISTRICT ATTORNEY RICO:**  If I could ask the
8    Board to clarify this point.  Mr. Bell a few moments ago
9    said that one of the things he disagrees with in Corinne
10   Schroeder's report is that he did not express remorse
11   because he says that he has expressed remorse.  Isn't it
12   true that the only remorse that Mr. Bell has ever
13   expressed is remorse for having an extramarital affair
14   with Ms. Montoya during his marriage?

15       **ATTORNEY BUCHALTER:**  I object to the question
16   because an extramarital affair is not a part of this
17   hearing, and this is not clarification.  It's a whole now
18   interrogation avenue.  And I object to the question and
19   advise my client not to respond.

20       **DEPUTY DISTRICT ATTORNEY RICO:**  For the record, I
21   would disagree with the objection because all I'm asking
22   the Board to do is to clarify when Mr. Bell said a few
23   moments ago, out of his own mouth, that he has expressed
24   remorse.  And my question is, what has he expressed
25   remorse for?

26       **ATTORNEY BUCHALTER:**  The question was about an
27   extramarital affair.  I objected to that and advised my

62

1    client not to answer it.  I continue my objection and

2    continue to advise my client thus.

3    **DEPUTY COMMISSIONER SMITH:**  We'll overrule that

4    objection, but we'll certainly allow Mr. Bell not to

5    answer that question without any negative attachment.

6    **ATTORNEY BUCHALTER:**  Thank you.

7    **DEPUTY COMMISSIONER SMITH:**  Mr. Bell?

8    **ATTORNEY BUCHALTER:**  I advise him not to answer.

9    **INMATE BELL:**  On the advice of counsel, I decline to

10   answer.

11   **DEPUTY COMMISSIONER SMITH:**  That's fine.

12   **DEPUTY DISTRICT ATTORNEY RICO:**  And in terms of the

13   private psych eval prepared by Melvin Macumber dated

14   March 6th of 2006, how long does Mr. Bell believe that he

15   spent being interviewed by Dr. Macumber?

16   **INMATE BELL:**  Well, in total -- because there were

17   two different interviews -- probably about five hours.

18   **DEPUTY DISTRICT ATTORNEY RICO:**  And during the

19   course of that interview, that clinical assessment

20   interview, did Mr. Bell provide for Dr. Macumber either

21   this document of *Cathy's Injury* or the document entitled

22   *The Case of Steven Bell Wrongly Accused, Wrongly*

23   *Convicted,* copyright 1995 by Steven Bell, all rights

24   reserved.  Did he provide either of those to Dr. Macumber

25   for the doctor's preparation of that report?

26   **INMATE BELL:**  No.  Nor do I have copies of either of

27   those.

63

1    **DEPUTY DISTRICT ATTORNEY RICO:**  The last document I
2    referred to, *The Case of Steven Bell Wrongfully Accused,*
3    *Wrongly Convicted*, it states in 1995 by Steven Bell.
4    Isn't that a document that Mr. Bell authored or
5    contributed to?

6    **ATTORNEY BUCHALTER:**  I object to the question
7    because it's not a question to clarify.  This is outside
8    the scope of the information that was dealt with in this
9    particular hearing.  It's not relevant.  I object and
10   advise my client to not respond.

11   **DEPUTY COMMISSIONER SMITH:**  Mr. Rico, the point of
12   your question?

13   **DEPUTY DISTRICT ATTORNEY RICO:**  The point of my
14   question is, what information was provided to
15   Mr. Macumber in connection with the preparation of this
16   report during the five plus hour interview.  And I was
17   asking if either of these documents were provided.
18   Mr. Bell said that he does not have copies of either of
19   these documents.  And it was my understanding that
20   Mr. Bell actually -- the one I referred to is either
21   authored by him or contributed to by him.  And I was
22   asking if that was the case.

23   **DEPUTY COMMISSIONER SMITH:**  Okay.  I understood and
24   from Mr. Bell's answer to the previous question that he
25   did not provide Dr. Macumber with any documents.  Is that
26   correct?

27   **INMATE BELL:**  That is correct.

64

1    **DEPUTY DISTRICT ATTORNEY RICO:**  All right.

2    **DEPUTY COMMISSIONER SMITH:**  In that case, we will

3    sustain the objection, and we'll rely on Mr. Bell's

4    earlier answer in that no documentation was provided to

5    Mr. Macumber during the two sessions of interview.

6    **ATTORNEY BUCHALTER:**  And it's to be remembered that

7    Dr. Macumber had access to the Central File and that

8    those were in there.  I'm sure he saw them.

9    **DEPUTY COMMISSIONER SMITH:**  Noted, Counsel.

10    **DEPUTY DISTRICT ATTORNEY RICO:**  And finally, on page

11    five of Dr. Macumber's report, it states, quote, "We

12    discussed at length the details of the commitment

13    offense.  In my opinion Mr. Bell shows a great deal of

14    self-examination, introspection and remorse for his sins

15    which include his marital unfaithfulness to his wife at

16    the time.  I believe he has very excellent insight.  He

17    accepts responsibility for the things that he did wrong

18    at that time in his life."  Unquote.  I would ask the

19    panel to clarify just what does Mr. Bell think that he

20    did wrong at that time in his life.

21    **ATTORNEY BUCHALTER:**  I object to the question and

22    advise my client not to answer the question.  It is

23    outside the scope of this hearing, and it would be

24    touching upon perhaps the facts of the life offense,

25    which he's already exercised his constitutional right to

26    not discuss.

27    **DEPUTY COMMISSIONER SMITH:**  Sustained, Counsel.

65

1     **DEPUTY DISTRICT ATTORNEY RICO:**  If I might, I

2     intended to ask some additional questions in that area.

3     The problem that I have is that since Mr. Bell apparently

4     has -- at least according to this report, and this is why

5     I was asking for clarification on the issue -- since

6     Mr. Bell apparently talked to Dr. Macumber, as the doctor

7     says at length regarding details of the commitment

8     offense, and has accepted responsibility for the things

9     that he did wrong, the doctor's opinion seems to be

10    substantially based, not as counsel would suggest on

11    items in the file -- documentation and police reports --

12    but on what Mr. Bell told him.  And I thought it was

13    legitimate to inquire regarding clarification of what it

14    is Mr. Bell told him, what it is Mr. Bell expressed

15    remorse for other than, as the doctor says, his marital

16    unfaithfulness, and what it is he responsibility for.  If

17    Mr. Bell chooses not to answer that, then I think that

18    this entire report needs to be stricken because the

19    doctor's conclusions are based on that and unless those

20    are disclosed to the panel and to all of us present for

21    this hearing, the report is worthless.  So that's why I

22    asked for clarification.

23    **DEPUTY COMMISSIONER SMITH:**  And I understand the

24    point of clarification.  But certainly Mr. Bell has the

25    right not to answer any questions regarding the

26    commitment offense.  Now, whether he chose to discuss the

27    commitment offense during his evaluation or not -- just

66

1  because he chose to discuss it at one point under one set

2  of circumstances doesn't remove his right from choosing

3  not to discuss the circumstances of the offense at this

4  hearing.  Certainly as I had indicated in my review of

5  both of the evaluations, I believe that there is some

6  apple and orange present because the circumstances were

7  discussed in one event and not discussed in the other.

8  We will not strike the evaluation, but we will weigh both

9  evaluations appropriately during our deliberations.

10      **DEPUTY DISTRICT ATTORNEY RICO:**  Thank you,

11  Commissioner.  And just for the record, I want to make it

12  clear I understand and respect Mr. Bell's right to choose

13  not to discuss the life crime.  And I just find myself in

14  a difficult situation because of this report that is so

15  inherently based on what it is he said that no one will

16  then talk about.  And so I just state that for the

17  record.  And in that regard, I have no further questions.

18      **DEPUTY COMMISSIONER SMITH:**  Thank you, Mr. Rico.

19      **PRESIDING COMMISSIONER PONCAVARE:**  Counselor, do you

20  have any questions for your client?

21      **ATTORNEY BUCHALTER:**  I may.  Just a moment, please.

22  I have no questions.

23      **PRESIDING COMMISSIONER PONCAVARE:**  All right.  Thank

24  you, Counselor.  Mr. Rico, do you have a closing

25  statement for the panel?

26      **DEPUTY DISTRICT ATTORNEY RICO:**  Yes, I do,

27  Commissioner.  If I might have just one moment.

67

1      **PRESIDING COMMISSIONER PONCAVARE:**  Certainly.

2      **DEPUTY DISTRICT ATTORNEY RICO:**  Well, I note that

3   this hearing has been quite thorough.  We've spent a lot

4   of time -- the panel has spent a lot of time going

5   through a lot of different areas and reviewing the file

6   and all of the materials submitted.  And I'm sitting

7   here, and I recognize (inaudible).  I recognize what the

8   purpose of this hearing is.  And the purpose of this

9   hearing is to determine whether or not Mr. Bell is

10  suitable for parole, and that is based upon whether or

11  not he still presents a substantial risk if he were to be

12  released.  And so as I've been sitting here reflecting, I

13  look back over the course of the hearing.  And a lot has

14  been covered, but the only reference to the life crime,

15  because of the way this hearing has unfolded, is what the

16  Commissioner read into the record from the Board Report.

17  And I would ask during the course of the deliberations

18  for the panel to take some time and go back through.  I

19  know you've probably already reviewed it.  But in the

20  legal documents section, the entire probation report as

21  well as the material -- there's a court of appeal opinion

22  as well that is involved here.  And I know Counsel has

23  said that all of this material is on the record and in

24  the file, and that may be true.  But the one thing that

25  this hearing lacks is an extensive reference to what

26  brought Mr. Bell and all of us here today, and that's the

27  life crime and what led up to it.  To summarize briefly,

68

1    it would appear that Mr. Bell married the victim in this

2    case, who is seated in the room there, Cathy -- and I

3    hope I don't mispronounce her name, Gandrud -- married

4    her in 1993.  By August of 1994, he was apparently the

5    beneficiary of insurance policies the record seems to

6    indicate, also a 401K.  There's a reference in the court

7    of appeal opinion to the facts that there were some

8    financial -- some financial assets that he was privy to

9    and entitled to in connection with the marriage.  We're

10   talking life insurance.  We're talking 401K.  We're

11   talking about stock options as well as possibly one-third

12   or at least a portion of the value of the home which

13   apparently had $90,000 in equity.  The home, apparently,

14   which the victim had owned prior to the marriage.  And

15   then there was some joint savings.  Now, the court of

16   appeal opinion as well as the probation report indicates

17   that there had been discussions before between Mr. Bell

18   and his wife where Cathy had indicated to him that she

19   would divorce him if he ever had an affair.

20   Nevertheless, Mr. Bell started having an affair with an

21   old high school flame, Sue Montoya, his current wife.

22   And they started to meet.  There was contact and

23   arrangements made something -- some of them very

24   sophisticated in terms of Mr. Bell's actions to conceal

25   this affair from his wife.  Now I look at the psych evals

26   and particularly the one from Dr. Macumber.  And

27   Dr. Macumber's eval seems to be very glowing, painting an

1    attractive picture of Mr. Bell as not having any issues

2    basically.  And when I look at the facts of the life

3    crime, Mr. Bell has conceded that he was deceiving his

4    wife, having an affair with Sue Montoya and going so far

5    as to arrange fraudulent phony travel itineraries to

6    mislead his wife when he was going off and meeting in

7    clandestine locations with Ms. Montoya.  Now, in terms of

8    remorse, I've heard Mr. Bell talk about remorse.  But the

9    only remorse that I can see, because I reviewed the file,

10   is remorse for having an affair, which he says was the

11   wrong thing.  Which kind of begs the question.  It

12   doesn't deal with the life crime that followed as a

13   resulted.  The facts seem to suggest that Cathy who had

14   indicated she would divorce him if he ever had an

15   affair -- she also, I believe, represented that at some

16   point Mr. Bell reportedly in a joking fashion said, well,

17   I guess if I'm ever suspected of having an affair, I'll

18   have to kill you.  And contact continued between

19   Miss Montoya and Mr. Bell.  And telephone records were

20   starting to show it prior to the life crime.  Then on

21   August 15th, 1994, which was the 15-month anniversary,

22   Cathy indicates that she was there that morning, that

23   Mr. Bell said that he had a surprise for her, had her sit

24   down on the edge of the bed -- the foot of the bed -- and

25   close her eyes.  And at that point, everything went

26   black.  She woke up.  She was on the floor on her back

27   with plastic over her face and it being held down over

70

1   her face.  She struggled.  She was able to push and
2   remove and resist until the plastic came off, and
3   Mr. Bell was there.  All indications are -- and I think
4   that when the panel goes through and reviews the
5   probation report and reviews the court of appeal
6   opinion -- all of the evidence shows that Mr. Bell hit
7   her in the back of the head with this pipe that had been
8   concealed and used upon her.  The pipe itself was later
9   found in another room in a bed under covers where it was
10  not routinely kept.  And there were traces of blood on
11  the implement or the plastic bag.  Now, I've reviewed all
12  of the file, and I see that Mr. Bell in prior hearings,
13  in notes to lawyers that were made part of this document
14  that I have -- the case of Steven Bell -- there seems to
15  be an explanation for everything, about erroneous blood
16  transfer, everything is always somebody else's fault.
17  The police didn't process this right.  Maybe somebody
18  transferred blood.  Maybe somebody did this.  Cathy fell.
19  She hit her head.  I didn't do anything.  And what we
20  basically have here is a situation that I believe is
21  rather scary.  Mr. Bell apparently had in effect the
22  perfect childhood, a good upbringing, a fine education.
23  And yet, in coldly calculating and brutal fashion he
24  betrayed his wife as well as his or her children and
25  mercilessly tried to kill her.  There's been no adequate
26  explanation of this horrendous act and nothing to show
27  that he's change or is any less of a threat today.  And

1    the only analogy I can think of is that I heard at the

2    hearing today -- I heard Mr. Bell present himself and his

3    counsel present himself in the record all of these

4    glowing testimonials.  And what I looked at -- when I

5    look at Corinne Schroeder's psych eval, she points out

6    that this appears to be the only act of violence, the

7    only known act of violence, and he's had no 115s, no

8    disciplinaries while he's been in custody.  She points

9    out his risk of harm to others is below average for the

10   parolee population.  He's not doing anything in prison to

11   hurt anyone.  But his victim in this case was very

12   vulnerable, and he orchestrated and positioned the

13   vulnerability by asking her to close your eyes and sit at

14   the foot of the bed.  And then he does this without

15   warning.  And as Dr. Schroeder's assessment says, even

16   though his risk of harm to others seems to be below

17   average for the parolee population, his risk of harm to

18   others before his crime was also low.  And it points out

19   he did not commit his crime during a moment of rage or

20   loss of control.  Mr. Bell pointed out today that anger

21   wasn't an issue, as he pointed out, that the theory was

22   premeditation, setting this up.  The preparation of the

23   pipe, the orchestration of the events and everything that

24   is referred to in that probation report and court of

25   appeal opinion.  And Dr. Schroeder says Mr. Bell was calm

26   and deliberate in his actions.  And that's what makes

27   this even more troublesome, and the only analogy I can

 1    come up with is almost a Jekyl and Hyde situation where
 2    the individual that sits before you and the Board comes
 3    across as highly educated, a member of Mensa, everything
 4    is -- he has all of these glowing recommendations and
 5    everybody likes him.  But he did this to his wife, and
 6    there's no explanation for it.  And the specter of
 7    violent unpredictability looms, and that's what's not
 8    been addressed.  Mr. Bell chooses not to discuss the life
 9    crime, and that is his right.  And it cannot be held
10    against him that he chooses not to.  It cannot be held
11    against him that he maintains his innocence.  But
12    Dr. Schroeder says Mr. Bell has not come to terms with
13    his crime.  It says he's not expressed remorse except --
14    and I ask the panel to go back and look through the files
15    and see what it is he's ever expressed remorse for other
16    than having an affair.  And I've seen him make statements
17    that he holds no ill will towards his wife, the victim,
18    nor the criminal justice system.  And I find that very
19    arrogant and egotistical that he says he's not holding
20    anybody else responsible.  He doesn't accept that he has
21    done anything wrong except for having an affair.  And as
22    Dr. Schroeder points out, Mr. Bell must come to terms
23    with his crime in order to move towards resolution.  I
24    have already stated my objections to Dr. Macumber's
25    report.  I think that it is artificial to hire an
26    individual to do a report and then for Mr. Bell to
27    purportedly discuss at great length and detail the

1    circumstances of the commitment offense but then the
2    doctor doesn't put those down and he says, well, I'm not
3    going to tell you what it is that he's told me.  But you
4    know, what he told me really shows that he's a prince of
5    a guy.  He comes to terms with everything, and he said
6    that he recognizes all of this.  It's an empty
7    conclusion.  If there were done in a court of law, the
8    doctor would be subject to cross-examination as to well,
9    what do you base this on?  When he talks about remorse,
10   what does he say he's remorseful for?  When he talked
11   about the details of the offense, what is it?  Otherwise,
12   it's just so many words on paper.  And I would ask that
13   the panel review all of the material in the file in
14   connection with an assessment whether or not Mr. Bell
15   truly has come to terms with what he did, because as a
16   matter of an individual redeeming himself from an act, it
17   seems absolutely necessary to recognize what one did and
18   what caused it if there is to be any hope of correcting
19   what led up to the wrongful act and preventing a
20   recurrence of the same in the future.  And I know that
21   when counsel argues, she will be talking about what all
22   Mr. Bell has done in custody, and that's a good thing.
23   He should be commended for that.  I know that Mr. Bell
24   has taken issue with Dr. Schroeder's comment that
25   Mr. Bell must come to terms with his crime in order to
26   move towards a resolution and he needs to look in the
27   mirror instead of out of the window.  He has much work to

1    do.   That last sentence or two has apparently been the

2    subject of an appeal in that regard.   And Mr. Bell's

3    letter that he spoke about, dated January 30th of '06,

4    indicating that he's puzzled by that notation that he has

5    not come to terms for his crime and expressed remorse for

6    it and the part about looking out the window -- it

7    doesn't mean that he's been sitting around doing nothing.

8    But what it means is that any review of true culpability

9    here seems to have been superficial at best and not

10   addressing the underlying causes, and that's what still

11   needs to be done.   So I believe that at this point,

12   Mr. Bell is at best an unpredictable risk because these

13   favorable psychiatric assessments or components thereof

14   now would have been the same before the life crime.

15   Nobody saw this coming, and nobody has been able to

16   explain why because it remains below the surface,

17   unresolved, and there lies the unpredictability and the

18   fact that Mr. Bell still continues to be an unacceptable

19   and unreasonable risk if he is released.   Thank you.

20        **PRESIDING COMMISSIONER PONCAVARE:**   Thank you.

21        **DEPUTY COMMISSIONER SMITH:**   Thank you, sir.

22        **PRESIDING COMMISSIONER PONCAVARE:**   Counselor, your

23   closing statement, please.

24        **ATTORNEY BUCHALTER:**   Thank you, Commissioner.   The

25   District Attorney has talked about when counsel argues

26   she will speak about the things that he has done.   First

27   of all, I would like to clarify the record that this is

1    not an adversarial forum, that counsel does not argue.

2    Counsel makes an advocacy statement.  There is no

3    argument in this particular forum.  I would like to just

4    make that record clear that this is not an adversarial

5    forum.  I don't argue; I state facts.  And he's right.  I

6    do intend to talk about all the exemplary rehabilitative

7    efforts that my client has made to show that he is fully

8    rehabilitated.  Unpredictable -- he talked about he's

9    completely unpredictable.  The word unpredictable in the

10   dictionary is -- especially if you look in the Oxford

11   English Dictionary -- will tell you that one cannot

12   predict.  It tells you much more about the one attempting

13   to predict than it does about the one that you want to

14   predict about.  It says the one who cannot predict.  Of

15   course, we're here today to examine a lot of information

16   to make a prediction.  So there will be a prediction made

17   regardless, and when one cannot predict, it tells you

18   much more about the predictor.  They don't have enough

19   information to make a prediction.  We have the

20   information here today.  The District Attorney and his

21   statements as they are entitled to have -- I want to

22   point out that the Rosenkrantz court, currently state

23   law, held that in its opinion published June the 26th,

24   2006, mandates -- and I'll spell Rosenkrantz for the

25   transcriber.  R-O-S-E-N-K-R-A-N-T-Z.  It mandates, quote,

26   "While the Board is required to consider such

27   opposition," meaning the District Attorney -- and see

76

1    Penal Code Section 3042 as a citation on this -- "that
2    opposition is not a factor on which the Board may rely to
3    deny parole as enumerated in Title 15 Section 2281 of the
4    California Code of Regulations."   Therefore
5    Commissioners, the District Attorney's opposition or the
6    opposition by law enforcement cannot be used as a factor
7    to support a finding of unsuitability to deny parole.   It
8    cannot as a matter of law.   Since there is a victim
9    here -- the victim has the right to be here, and that is
10   the case today.   The victim is allowed to attend in order
11   to express their views regarding the crime and especially
12   limited to the impact of the crime on the victim.
13   Outreach is allowed at parole hearings.   However, the in
14   re Fain, F-A-I-N, case mandates that this venting of
15   anger is not evidence.   Other case law mandates that the
16   decisions made by the Board must be impartial.   I'm sure
17   you will.   This is not a reward forum for those who
18   choose to come and speak about what happened to them.   It
19   is to be remembered that this hearing is about one person
20   only and his right to return to the community.   There is
21   only one question to be answered today, which is: If we
22   let him go home, does this person, Mr. Bell, pose an
23   unreasonable risk of harm to others?   The opposition to
24   parole by any party is just that, opposition.   Case law
25   set by the Rosenkrantz opinion -- you already have the
26   date -- quote, "While the Board is required to consider
27   such opposition, that opposition is not a factor in which

77

1    you may deny parole." And again it cites the Title 15.
2    So if the Board does use these statements, the law goes
3    on to state, of opposition in citing findings of
4    unsuitability, then the Board must consider and include
5    in their report how those statements would support a
6    finding of unsuitability and how do they make my client a
7    danger to society -- and see section 3046 for that.  To
8    go on to the meat of this thing, I also want to make one
9    more comment:  That the law permits my client and myself
10   under the law of the rebuttal to the victim's next of kin
11   statements.  Penal Code Section 3043.2 mandates that any
12   statement made by the victim or its representative,
13   pursuant to Section 119.16 or a combination of those
14   sections -- quote, "Shall be limited to comments
15   concerning the effect of the crime on the victim," end
16   quote.  Penal Code Section 3043.6 mandates that the
17   presiding commissioner over the parole hearing shall take
18   steps to ensure that only accurate and relevant
19   statements are considered, quote, "including but not
20   limit to the rebuttal of inaccurate statements made by
21   any party," end quote.  I wish to inform the Board at
22   this time that if any inaccurate statements are made at
23   the hearing by any victim or next of kin, my client and I
24   wish to exercise the right to enter as a matter of law to
25   rebut those inaccurate statements.  I hope that will not
26   be the case.  I want to start by saying that
27   California -- the governor -- has joined other political

78

1    leaders, Commissioners, and publicly stated that they are
2    now insisting -- and that's a quote from the media --
3    that California make rehabilitation a focus of our prison
4    system.   And this mandate is evidenced by the official
5    name change of the Department of Corrections to include
6    the word rehabilitation.   My following remarks will be
7    directed to the fact that my client, Steven Bell, is
8    fully rehabilitated and has served the amount of time the
9    law requires, that is the minimum eligible parole date.
10   And in fact, he has exceeded that amount of imprisonment
11   by approximately almost three years.   And you've already
12   articulated what his eligible parole date to go home is.
13   There is a presumption of release accompanying Mr. Bell
14   into this hearing sitting before you, as you are the
15   guardians of the public safety -- that is acknowledged.
16   The United States Supreme Court, Commissioners, held in
17   1979 and reiterated in 1987 that, quote, "A state's
18   statutory scheme if it uses mandatory language creates a
19   presumption that parolees will be granted when or unless
20   certain designated findings are made and thereby rise to
21   a constitutional liberty interest," which my client has
22   and is hoping you will free him.   See also the McQuillen
23   case -- and I have the cite available for you if you need
24   it.   I can also cite the Holtz versus Inmates in the
25   Nebraska Penal Code -- and I have the cite for that if
26   you like.   And the (inaudible) versus Allen -- I have the
27   cite for that.   All of these say the same thing.   And the

1    Ninth Circuit, Commissioners, has held that California's
2    parole scheme creates a recognizable liberty interest in
3    release on parole because Penal Code Section 3041 uses
4    mandatory language.  It states the Board of Parole
5    Hearings shall normally set a parolee's date as provided
6    in Section 3041.5.  The release date shall be set in a
7    manner that will provide uniform terms for offenses of
8    similar gravity and magnitude in respect to their threat
9    to the public.  End quote.  In this case, Commissioners,
10   the gravity in this offense compared to all other life
11   offenses is, quote, "not such that a consideration of the
12   public safety requires a more lengthy period of
13   incarceration for this individual," end quote.  See Penal
14   Code Section 3041(b) for that cite.  This hearing is not
15   a sliding scale forum.  It has the same weight and it
16   should be given the same consideration for parole as any
17   hearing that Mr. Bell might attend or has attended.  This
18   is not a forum where if a two-year denial has been given,
19   that a one-year should be given and then perhaps a grant
20   of parole should be given.  This hearing should result in
21   a grant of parole for all of the positive reasons that
22   have been brought out at this hearing and the ones I want
23   to touch upon now to show why he deserves a grant of
24   parole today and to explain his rehabilitation to you.
25   And the District Attorney talked a great deal about the
26   life offense, and he talked a great deal about the
27   infidelity, a marital, an extramarital affair, which has

80

1   nothing to do with his dangerousness to society.  And I'm

2   going to talk about the rehabilitation for the life

3   offense and the law that's starting to govern how you can

4   characterize the life offense.  And I will get to that

5   shortly.  I want to touch upon the rehabilitation factors

6   for Mr. Bell, which once I believe the conclusion can

7   only be that he does not at the present time pose an

8   unreasonable risk of harm to others.  He's very well

9   educated.  He graduated high school, and he ranked four

10  out of 300 students.  He's highly intelligent.  In fact,

11  so much so, that he's a Mensa qualified former member.

12  He's a university graduate with honors from California

13  Polytechnic University in Pomona.  He has a bachelor of

14  science in Business Administration degree, cum laude,

15  with a major in Data Processing as well.  He took

16  graduate classes in the MBA degree program curriculum at

17  UC San Bernardino and San Francisco State University as

18  well.  He has the business occupation program here with

19  honors, first to ever complete the course his superiors

20  have written.  The instructors also stated he was

21  absolutely outstanding.  He self-studied law.  He was the

22  lead legal clerk for two years in Lancaster when he was

23  housed there.  He studied music, jazz, and musical theory

24  and the trumpet.  He's been a librarian.  He took FEMA

25  classes for two years including Earthquakes of Tomorrow,

26  Effective Communications, and other classes.  He's a

27  highly well-educated man, and that should be put to good

1   use on the outside, I do believe.  He's done charity
2   work.  And here also -- which I think is important --
3   when one tries to contribute to society in some small way
4   or some large way -- either one, they are equally
5   important -- that if you can just help one life, it
6   helps, especially people who have been in here who have
7   caused pain and suffering to others.  He's donated his
8   blood when called upon.  He's been involved in the pop
9   tab program as he talked about.  They raised tens of
10  thousands for the Ronald McDonald House for sick kids, as
11  we know.  He's a Literacy American Workshop.  He's a
12  certified tutor in literacy and he helps the inmates
13  prepare for their GED.  This is all donated time for him.
14  So I believe, Commissioners, these unselfish efforts to
15  help others by Steven Bell speaks volumes about his pro-
16  social attitude and who he is today and his excellent
17  conduct.  And these are attributes he will carry with him
18  into the free community, of course.  He has a resume on
19  the file.  I don't want to go over that resume, but it's
20  very lengthy, and it goes all the way back to 19 -- way
21  back to the '70s as a matter of fact, prior to his coming
22  in here.  He's a highly educated and terrific resume in
23  here -- all the things that he's done, which again, will
24  bode well for the jobs or the job that he may undertake
25  when he goes outside and gets home.  So I want that
26  resume just to be a part of the record.  I believe it's
27  in his C File, and I would like to acknowledge that that

1    be held as something you might want to examine or look

2    at.  As far as -- Title 15 suggests, and certainly wants

3    that someone have a marketable skill.  That's all they

4    ask for -- just that someone would have a marketable

5    skill where they can go out and earn their living if they

6    don't have other means, I suppose.  Mr. Bell -- besides

7    all the other things I plan to just touch upon in a

8    moment -- has many marketable skills; Vocational

9    Landscaping, Vocational Carpentry, computer skills,

10   software management, software consultant.  And he was so

11   skilled, as you already read into the record

12   Commissioner, that CDCR won't even let him work in the

13   field in prison.  He's too skilled, so they won't let him

14   work in the computers here.  That's how skilled he is.

15   He has the Business Occupation Program with honors,

16   formerly the Vocation Office Services.  Mechanical

17   Drawing -- he has marketable skills in that.  They

18   weren't certified, but he has the skills for it.

19   Emergency Management, Homeland Security -- he's

20   already -- we've already talked about.  Welding -- he has

21   a marketable skill in that.  The program eventually shut

22   down, but he learned how to weld.  He's been a lead legal

23   clerk, and he's in the law library a lot, as you know.

24   And he's a musician also, and he works with Arts in

25   Correction in the jazz ensemble as well.  As far as his

26   financial assistance, I'm only going to touch on them.

27   And we have a current letter from Dr. Lolly, updated

83

1    letter October the 31st 2006.  I believe you have that.

2    Just confirming the fact that he's offering him

3    employment with his information systems department when

4    he's released.  If you don't have it, I have it available

5    for you.

6         **DEPUTY COMMISSIONER SMITH:**  We do have that.

7         **ATTORNEY BUCHALTER:**  Thank you.  As far as his

8    support, it's enormous.  The emotional support -- I'm not

9    going to talk or reiterate anything that you've already

10   read into the record.  But as far as the emotional

11   support and counseling letters, I counted 22 of them

12   offering all -- not financial, but emotional support and

13   counseling letters.  As far as other support, he has six

14   offers for housing that were read into the record.  He

15   has -- not in detail, but these letters will confirm what

16   I'm saying I believe if you decide to examine those

17   further.  He has all the needed support, which is

18   unqualified, from 12 writers who offer him all the

19   support, not qualified.  All needed support qualified,

20   which is all that I'm able to do or some limitation,

21   there were seven offers.  He also has, as far as all

22   financial assistance, he has 11 offers.  Employment

23   officers, he has eight on the table.  And job referrals,

24   he has 12 people offering him job referrals.  So

25   Commissioners, I believe his parole plans can only

26   receive an A plus from you since there is no issue,

27   because if all of those job offers fall out, if all of

84

1   those people fall out, he still has all these people who
2   say we'll offer him all financial support.  So there's
3   just obviously -- I don't need to belabor that because
4   there's no issue with his parole plans.  I would like to
5   comment, however, that all of the support are mostly from
6   people that he has known for a very long time.  They were
7   not strangers just drug up.  And I want to just comment
8   on the pillars of the community who are supporting his
9   release and asking you to send him back home.  I just
10  want to name some of their categories of who they are.
11  The chief of police, retired; two psychologists; two
12  social workers; and a lieutenant colonel of special
13  forces and West Point graduate retired; five doctors and
14  clinicians; seven educators, college professors and
15  administrators; two pastors; one also retired fireman;
16  paramedic, who's his uncle as well; the CEO of Chino
17  Valley Medical Center; eleven businesses and technical
18  professionals; a travel agent; a school bus driver; a
19  real estate agent; attorney; clerk of the superior court
20  of Marin County and jury supervisor; machine shop owner,
21  retired; American Airlines flight attendant.  All of
22  them -- every one of them are pillars of our society who
23  make it work for us.  All of them are saying we welcome
24  him back to the community.  Some of their comments
25  were -- his wife said he's in no way a threat to anyone.
26  The pastor, the fireman, the paramedic, his uncle said
27  he's ready to re-enter America in a positive way.  His

85

1    aunt said he will contribute to the community.  The

2    licensed psychologist and chief executive officer have

3    said the time has come for him to resume a productive

4    road to society.  Dr. Lolly says had the medical issues

5    in this case been appropriately investigated and

6    presented to the jury, there might have been a different

7    outcome in this case.  That's his strong belief in

8    Mr. Bell.  Mr. Armagida said the likelihood of re-

9    offending would be zero.  The chief of police retired has

10   said he would definitely not be a risk to society but

11   would be a very responsible citizen.  He will be a

12   valuable member of the community, the chief has written.

13   He will be one-hundred percent successful on parole.

14   He's intelligent, perseverant, stable, cooperative

15   attitude, outstanding character, and strong work ethic,

16   which I believe has been exhibited here today.  No reason

17   to consider him a threat.  He's a gentle person and

18   someone believes Mr. Bell is a low risk and should be

19   released.  He's nonviolent and has never threatened

20   behavior.  I believe all these comments are very pro-

21   release for him and should be given great weight when you

22   consider who he will be going back into the community to.

23   He has programmed extensively.  The District Attorney

24   omitted all of that and just dwelt on the immutable fact

25   of the life offense itself.  The life offense itself is

26   immutable; it cannot be changed, and it will be here

27   forever.  That is why we're here.  He is rehabilitated

86

1     from that offense.   The self-help programming, parenting

2     programming has been extensive, by the way, other these

3     past years that he's been in prison.   The Parenting

4     Program, the Early Engagement Program -- 40 hours of that

5     which is Life Skills, Personal Values.   It addresses

6     plans for parole, and it works on values and people

7     values too.   The Pre-release or orientation workshop, the

8     Decision Making and Problem Solving, the EQUAL Program

9     completed in 2001 was a 12-week course.   He's had 26

10    units of Life Skills Development, the EQUAL CALM course

11    was a 13-week class regarding anger management goals and

12    thinking.   He finished the Rebound Program, AA and NA,

13    even though he's never used drugs and the likeliness of

14    alcohol is socially only at one time in his life.   Life

15    Skills Development, Anger Management, correspondence

16    courses with Golden Hill Adult School, and read

17    independently books on that subject of anger management.

18    He did Values for Responsible Living, Life Management,

19    made inquire into Prison Fellowship or Victim Offender

20    Reconciliation Program.   He self-studied as he said.   He

21    talked about the meditation class that he described at

22    the Buddhist center that he has studied with.   The books

23    and literature that he's gone into is *Freeing the Mind*

24    *Introduction to Meditation*, *Breathing Meditation*,

25    *Breathing Meditation Combined with Mantra*, *Doing Your*

26    *Time with Peace of Mind*, *The Ten Natural Laws of*

27    *Successful Time and Life Management, et cetera, The Seven*

1    *Habits of Highly Effective People, Restoring the*

2    *Character Ethic, The Voice of Knowledge, A Practical*

3    *Guide to Inner Peace.* Mr. Bell has also made reports

4    about his studies and how the messages apply to his life

5    in order to continue his personal growth throughout his

6    entire lifetime, while in prison and outside as well.  So

7    the fact that Dr. Schroeder said he didn't have any anger

8    management was because she never asked him.  So I think

9    that the record is replete and very clear that he has, in

10   fact, taken considerable anger management.  The Title 15

11   speaks to the suitability factors that are guidelines for

12   you, Commissioners.  One of them is stable social

13   history.  There were no tumultuous relationships in his

14   history of growing up.  He does not have an unstable

15   social history.  On the contrary, he had a very stable

16   social history.  And the psychiatrist has written, quote,

17   "that Mr. Bell grew up in a relatively stable,

18   conservative, and traditional dual-parent household.  He

19   is the oldest of two children, and there was no abuse, no

20   neglect."  So the stable social history is a factor that

21   bodes well for a grant of parole today for him.  There's

22   some evidence standard I want to talk about.  The

23   Rosenkrantz case mandates, and it's current law, quote,

24   "Continued reliance on such unchanging circumstances such

25   as the life offense violates due process because

26   petitioner's commitment offense has become such an

27   unreliable predictor of his present and future

88

1    dangerousness that it does not satisfy the quote/unquote
2    some evidence standard." Such is the case with Mr. Bell.
3    In fact, the parole decision that purports to be
4    supported by some evidence may nonetheless abrogate due
5    process if it did not consider and weigh all favorable
6    evidence, which is what I'm asking you to do. And that
7    statement and that mandate by law comes in from the
8    Capistran case, C-A-P-I-S-T-R-A-N. It's a 2003 case.
9    The cite is 107 Cal.App.49 1900,1306. So the court in
10   Rosenkrantz, Commissioners, and the (inaudible) case and
11   other cases have held that the constitutional requirement
12   of some evidence doesn't mean literally any of this. It
13   must be weighed. There is overwhelming evidence that
14   Mr. Bell, in the weighing of his evidence here today,
15   does not pose an unreasonable risk of harm to the public.
16   Any contrary conclusion would lack any evidentiary
17   support because all you've had is the life offense. Some
18   of the overwhelming evidence is the low risk of
19   dangerousness which was made by the evaluating
20   psychologist as well. The psychological assessments are
21   relevant. The reason we tax payers pick up their bill is
22   certainly to use them and have them be a guideline for
23   you, Commissioners, is very relevant and very important
24   guideline, because they are the mental evaluators. They
25   are the professionals who are well qualified to make
26   these assessments for you. As far as back at 1995 --
27   that's eleven years ago -- Dr. Pall Koller, K-O-L-L-E-R,

1    after examination of Mr. Bell informed that, quote, "All

2    psychological testing, clinical impressions, and

3    historical material presented strongly and consistently

4    suggest that Mr. Bell does not represent a current threat

5    to his wife or to the community at large." That still

6    holds true today. In 2002, Dr. Walker has spoken. He

7    said his risk for violence is -- and so he was not glib

8    or superficial according to the doctor -- he said on the

9    violence risk appraisal guide, he scored in the low range

10   for violence risk. This assessment is unlikely to

11   significantly change over the course of his incarceration

12   he wrote. On the history, clinical risk, he wrote he had

13   scored in the low range of severity. He is emotionally

14   and behaviorally stable. Risk assessment, Dr. Walker has

15   written, measures suggest that the inmate poses a low

16   likelihood to become involved in a violent offense if

17   released into the free community. And on page 18 of his

18   report, he said these conclusions were based on the most

19   reliable and valid method for assessing risk for future

20   violence. He has no significant attitudinal

21   difficulties, no major mental illness, he's emotionally

22   and behaviorally stable, he is not motivated by an -- he

23   is motivated by improving his relationships and his sense

24   of connectedness with meaningful others in his life.

25   These are favorable parole release reports,

26   Commissioners. I want to get into the -- Dr. Schroeder

27   report, and I know that there has been some issue with

1    the report that Dr. Terry Chase -- I believe -- I won't
2    repeat what I read into the record, but I would like to
3    incorporate it at this time from what I had said before
4    about the peer review is a standard procedure,
5    Commissioners.  And the doctors talked about
6    Dr. Schroeder's negative -- the two -- a couple of
7    negative comments that he talked about.  He felt that --
8    after a peer review, he felt it was insignificant and not
9    accurate and unreliable.  He said reliance upon such a
10   subjective and unsupportive and inconsistent and
11   unprofessional report where Mr. Bell's life and future
12   are at stake cannot be justified.  I encourage the Board
13   to disregard Dr. Schroeder's report and to decide on
14   Mr. Bell's suitability for parole using the other
15   reports.  That's one of the comments that Dr. Chase has
16   made.  However, be that as it may, Dr. Schroeder's report
17   is in fact, favorable, because she said there's no
18   diagnosis on Axis I or II.  And we are here to answer one
19   question only, and the doctor has -- Dr. Schroeder has
20   answered that question when she states -- when we state
21   does Mr. -- if we let him -- release him to the
22   community, does Mr. Bell pose an unreasonable risk of
23   harm to others?  And Dr. Schroeder, along with the other
24   doctors, has answered no, he's a low risk.  The doctor
25   states on page three that Mr. Bell's commitment offense
26   is his only known act of violence.  His risk of harm to
27   others is below average for a parolee population.  Of

91

1    course, that's in this environment after his conviction.

2    And the doctor states that his risk of harm to others

3    before his crime was also low.  There is no implication

4    there that's negative, Commissioners, because she's

5    saying that before -- which is a predictor -- no evidence

6    of any violence or any criminal behavior, and also the

7    fact that he has been free from any activity or any

8    crimes while he's in prison she said was also low.  That

9    is not a negative.  She's telling you that he's been low

10    in both cases.  Those are both predictors of future

11    behavior.  The doctor continues on page four --

12    Dr. Schroeder does -- that Mr. Bell has not come to terms

13    with his crime.  He has not expressed remorse, and I

14    suggest that he must come to terms with his crime in

15    order to move towards resolution.  He needs to look in

16    the mirror instead of out the window.  He has much work

17    to do, Dr.  Schroeder said.  Now, these comments are

18    completely contrary to Mr. Bell's risk assessments given

19    by Dr. Schroeder and have no value, therefore.  And also,

20    the other doctors have said there's no value to them.

21    Mr. Bell has a constitutional right, Commissioners, to

22    not discuss, and you have acknowledged that, the life

23    offense with the doctor or anyone else, and this fact

24    cannot be used against him as the doctor has attempted to

25    do so.  The last paragraph I read is completely contrary

26    to everything in the record and what has been exhibited

27    here today before you.  These comments are just contrary

1   to the risk assessments given by Dr. Schroeder, and they

2   just don't have any value.  When she states that he needs

3   to move towards resolution, I ask a rhetorical question:

4   What does that mean?  Resolution of what?  And there's

5   nothing in law that says Mr. Bell needs to look in the

6   mirror instead of out the window before he can be given a

7   grant of parole.  That is ridiculous.  When the doctor

8   says -- Dr. Schroeder says he has much work to do, what

9   does that mean?  Work to do what?  Where?  When?

10  Mr. Bell has done much work, as you know, and has

11  presented you with voluminous documents showing much work

12  that he has done, and it's all been brought out in this

13  very thorough hearing.  And I want to point out,

14  Commissioners, that the risk assessment given by this

15  doctor and others are all low, and that is the only

16  answer to be used as a guide for this Board.  Looking in

17  mirrors and not out of windows is not a risk assessment,

18  Commissioners.  To say he has much work to do in light of

19  all the evidence here today of the work in every category

20  that Mr. Bell has done makes that statement absurd and is

21  completely opposite to the record.  I have heard the

22  Board state on many occasions -- I don't mean this

23  particular Board -- that the psychological report was not

24  totally -- that they might give a denial saying that the

25  psychological report was not totally favorable, and

26  therefore, use that fact to deny parole.  Where in the

27  law does it say that a psychological report must be

1    totally favorable before parole can be granted?  No

2    where.  I want to point out that this report is, in fact,

3    favorable -- the one by Dr. Schroeder -- because the risk

4    assessment, which is the only category that you need to

5    look at, gives the answer to the only question that we're

6    here to answer.  And that question is, does Mr. Bell pose

7    an unreasonable risk of harm to others if released?  And

8    Dr. Schroeder has answered that he does not.

9    Dr. Macumber has also commented on her comments that

10   Mr. Bell needs to look in the mirror instead of out the

11   window.  That was completely unsubstantiated and not

12   appropriate to the facts of Mr. Bell's efforts of

13   self-improvement.  That statement -- those two

14   statements, that he has much work to do and that is

15   completely insignificant and insufficient to support a

16   denial of a grant of parole for him today.  You have

17   Dr. Macumber's report before you, Commissioners, and it's

18   extensive.  And he's done thousands of reports, as you

19   know or have identified, for the Department of

20   Corrections over many years, for decades actually.  And

21   his report should be taken seriously as to the risk of

22   harm to others that Mr. Bell would or would not have

23   given equal weight to the other doctors.  And you can

24   only assess Mr. Bell -- all of them are favorable --

25   every one of them has given him a low risk of assessment

26   each time the report was made, including Dr. Schroeder.

27   Dr. Macumber interviewed Mr. Bell extensively, as he told

1  you, and administered several psychological tests to
2  reach his conclusions.  He informs us, the doctor, that
3  Mr. Bell does not think or act like a criminal.  He has
4  good feelings for others, empathy towards others and care
5  for others.  I believe that's been exhibited here today.
6  He states that Mr. Bell is a mature individual able to
7  resolve problems with other people in a productive,
8  responsible, and intelligent manner, which he will take
9  on the outside.  And he specifically reports the Mellon
10  (phonetic) test applied determined there is no evidence
11  of antisocial thinking on Mr. Bell's part.  The next
12  test, the Psychological Inventory of Criminal Thinking,
13  you've already discussed, Commissioner.  I appreciate
14  that.  He said that he does not have any criminal
15  tendencies in this point in his life at all.  The test
16  entitled Level of Service Inventory-R determined that Mr.
17  Bell attained an overall score that places him in the low
18  risk, low needs area.  This score indicates, quote, "that
19  he would make a good adjustment in open and free
20  society," end quote.  This score showed -- and you talked
21  about this already -- that if a hundred people, inmates,
22  were released, he would do better than 99 of them.  No
23  Diagnosis on Axis I, II, and III.  He also stated that
24  Mr. Bell has shown a great deal of self-examination,
25  introspection, and remorse for his sins.  And I believe
26  he is excellent insight.  He writes, he accepts
27  responsibility for the things that he did wrong at that

1   time in his life.  His statements continue to be
2   consistent with those given to law enforcement at the
3   time of the offense.  His feelings of remorse appear to
4   be sincere and genuine.  So he said that his statements
5   are the same as always; they did not become inconsistent.
6   The assessment of dangerousness to the community which is
7   the question we have, Mr. Bell does not pose any more
8   risk to society than the average citizen, and that would
9   be me, Commissioners.  I'm just an average citizen, and
10  he's no more risk than I am.  These are the risk factors
11  that the doctors have given you.  The prognosis, the
12  doctor writes, for successful adjustment to the community
13  is outstanding.  All the reports evaluating Mr. Bell
14  evaluate him as a low risk if returned to the community,
15  and his adjustment course would be excellent.   In
16  mitigation of the life offense itself, there's no past
17  history of criminal behavior.  He tried to help the
18  victim and sought aid immediately, which you have before
19  you in the record.  This is a situational crime, unlikely
20  to reoccur, and that's written in law that that equals
21  that.  The maturation and age of Steven Bell puts him at
22  a low risk for recidivism.  See the Justice Department
23  Exhibit 3 also Title 15 Section 2402(d)7, which also
24  tells you that is a consideration and an important one.
25  The victim reported to the probation officer on page
26  seven that she no longer suffered from headaches or
27  dizziness from the head injury.  He retained her

96

1    distorted sense of smell and taste as of May 1, 1995, the
2    only known residual fact at that time.  Now, as far as
3    remorse, he's expressed his sincere remorse today and has
4    always felt deep remorse.  And Title 15 and the in re
5    Jeffrey Elkins case, which is brand new, held that,
6    quote -- this is the court mandating now -- quote, "Signs
7    of remorse," quote, "means that the prisoner performed
8    acts which tend to indicate the presence of remorse such
9    as attempting to repair the damage, seeking help for or
10   relieving suffering of the victim," end quote.  Mr. Bell
11   did exactly that.  He called 911 for help and got help
12   for his wife.  He has had remorse from the instant
13   offense to the present, and he will always have remorse,
14   Commissioners.  There's a new case also, the Wen Lee,
15   W-E-N space L-E-E case, that talks about the acceptance
16   of responsibility.  On page 15 in the court's opinion --
17   and this is a new case -- as long as Lee generally
18   accepts responsibility, it does not matter how long-
19   standing or recent it is.  My client has accepted
20   responsibility from the get-go.  The court continues, the
21   same can be said about responsibility and remorse.  But
22   there is no issue here, because he's accepted
23   responsibility.  He's in prison for the crime.  And he's
24   exhibited remorse from the beginning.  And the law says
25   that his calling of paramedics and calling the police
26   equals that, that he did have remorse from the very
27   beginning.  So the court points out that it's genuine,

1    and I want -- I believe that is important.  The gravity

2    of the offense here -- there's new law on that also.

3    Again, the Elkins case also cites the Scott two case, and

4    they speak, Commissioners, to the gravity of the offense

5    which is to be weighed here, which the District Attorney

6    has asked you to hold against my client and to continue

7    to keep him in prison just because of the gravity of the

8    offense, because there are no other factors on which to

9    hold Mr. Bell in prison.  The case mandates -- the new

10   case, Jeffrey David Elkins, E-L-K-I-N-S, mandates that,

11   quote, "It violates due process to deny parole where no

12   circumstances of the offense reasonably can be considered

13   more aggravated or violent than the minimum necessary to

14   sustain a conviction for that offense," end quote.  The

15   court points out -- and the same relates to this case --

16   that quote, "Given the lapse of so many years and the

17   exemplary rehabilitation gains made by the inmate over

18   that time, continued reliance on the aggravating facts of

19   the crime no longer amount to," quote, "some evidence,"

20   end quote, "supporting a denial of parole," end quote.

21   Said the court.  This crime, Commissioners, is not

22   especially heinous, atrocious, or cruel, and no such

23   finding was made by the trial court or the probation

24   officer.  This life offense does not measure up to or

25   equal to the crimes that those definitions justify.  Also

26   the in re Ramirez case states that a crime must be

27   particularly egregious to justify denial of a parole date

98

1    for a longer observation.  The court in the October 2006
2    Wen Lee case has mandated what kind of crimes the word
3    atrocious may be applied to, and it would not equate to
4    this crime.  These cases -- the Wen Lee case, the court
5    named the cases that you can say were atrocious, and all
6    that we put to that that would be atrocious.  This case
7    is not in the category of the Rosenkrantz case, the
8    Dannenburg case, the McClendon, M-C-C-L-E-N-D-O-N case,
9    the Burns case, the Van Houten case, the DeLuno
10   (phonetic) case, the Lowe, L-O-W-E, case, and the
11   Morarall, M-O-R-A-R-A-L-L case.  These are the kinds of
12   crimes that the court has mandated be used as a measure
13   before atrocious can attach.  The crime is not atrocious,
14   and the courts have so limited by defining the crimes
15   that are, in fact, atrocious.  Therefore, this crime
16   cannot and should not alone prevent a grant of parole
17   today for Mr. Bell, because in comparison to all the
18   other similar crimes, this crime is not in those
19   categories that the court has outlined as atrocious.  The
20   in re Smith case is also addressed -- the second-degree
21   murder, and this, of course, is even less than a second-
22   degree murder.  But they talk about the malice or the
23   degree of cruelty and the callousness.  The court held
24   that a determination of the crime as cruel or callous
25   means that it was perpetrated in an especially cruel
26   manner or with an exceptionally callous disregard for
27   human suffering and would mean that the inmate tormented,

99

1   terrorized, or injured the victim before deciding to

2   shoot the victim.  The court goes on to conclude that

3   there was no evidence in the Scoot case that he did all

4   that before deciding to shoot the victim.  Since this,

5   Commissioners, is an attempted murder case and clearly of

6   lesser degree than that murder, the case law would

7   prohibit you from making a determination that he had

8   exceptionally callous disregard for human suffering as he

9   asked for aid immediately.  Because according to the

10  court, that would mean that the inmate tormented,

11  terrorized, or injured the victim before deciding to harm

12  the victim.  (Inaudible) of a definition of an

13  exceptionally callous disregard for human suffering, and

14  this is now the state of law, a brand new case.  This is

15  not the case where you call 911 for help.  As you know,

16  the victim is alive and well today.  The crime is not

17  exceptionally callous based, because the courts have

18  ruled that they are of a different category.  When you

19  use the offense to deny parole, the new Elkins case

20  talks -- speaks about it again, the Scott two case

21  point -- they point out that reliance, quote, "Reliance

22  on such an immutable factor such as the life offense

23  without regard to or consideration of subsequent

24  circumstances may be unfair and runs contrary to the

25  rehabilitative goals espoused by the prison system and

26  could result in a due process violation," end quote.  The

27  law stays, quote, "The commitment offense can negate

1    suitability only if circumstances of the crime reliably

2    established by evidence in the record rationally indicate

3    that the offender will present an unreasonable risk to

4    public safety if released from prison," end quote.  The

5    trivial motive, they say, is always there, and that is

6    not -- should not be a category.  Also, the Scott case

7    has determined that past crimes' value of predicting

8    future crime diminishes over time.  There's a lot of time

9    now between that crime and who Mr. Bell is today, of

10   course.  The law states also -- it touches on the

11   question that for so many years the predictive value of

12   the circumstances of the crime is near zero.  And that's

13   a direct quote from the court's own mandate.  The life

14   offense for which he was committed -- my client, now has

15   a predictive ability and value of near zero.  It is not

16   rational to use the life offense some 12 years later in

17   light of all of his extensive rehabilitative efforts

18   which he's shown that it doesn't hold now that he's a

19   danger to others.  When you look at Title 15, the

20   unsuitability factors, he passes muster.  When you look

21   at the suitability factors, he's right on point on all of

22   them.  I want to close with this comment from the trial

23   judge at the sentencing.  The trial judge made an

24   important statement about Mr. Bell on page 30, line 16 to

25   20 of the sentencing transcript.  This statement was made

26   after the trial judge had heard all there was to hear and

27   is the one in the best position to assess Mr. Bell's

1   future behavior at that time.  And his assessment has

2   been proven to be true by all we have heard and seen

3   today.  The judge said at the sentencing hearing, quote,

4   "I do not perceive him, other than in this instant

5   offense, as being a man of violence, and it is unlikely,

6   in my opinion, absent some unusual circumstances that he

7   would be re-offending in the future," end quote.  He's

8   paid his debt to society, Commissioners.  He's past his

9   minimum eligible parole date, which is what society

10  demanded he serve for what he did.  And the judge has

11  said he doesn't believe he'll re-offend.  And everything

12  that's been brought to you since that trial and since

13  that sentencing hearing shows that he's not a danger to

14  society.  The courts are holding that you cannot continue

15  to hold the crime against him, which is all there is to

16  hold against him.  So I would ask for a grant of parole

17  for him.  I believe he justly deserves it today.  He's

18  been punished dearly by having been taken out of society

19  for well over a decade, and the punishment is there.

20  He's been punished.  He's rehabilitated.  And the courts

21  say, and the Title 15 says, the law says, they all say,

22  he should go home now.  And I would ask for a grant of

23  parole for Mr. Bell today.  Thank you.

24          **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

25  Counsel.

26          **DEPUTY COMMISSIONER SMITH:**  Thank you, Counsel.

27          **PRESIDING COMMISSIONER PONCAVARE:**  Mr. Bell, do you

1    have a closing statement for the panel?

2         **INMATE BELL:**  Yes, I do.  Excuse me.  I'd like to

3    start, Commissioner, for thanking you both for the

4    opportunity today to be considered for parole.  I know

5    that granting parole does not excuse the commitment

6    offense nor condone my past behavior.  There can be no

7    excuse and no justification, and I offer none.  Rather, I

8    see the granting of parole as reflecting our deep-seated

9    American belief in redemption in offering those who have

10   fallen, as I have, a second chance.  This is what I'm

11   asking you for today, is a second chance.  As a first

12   time offender, I'm not asking for a third chance or a

13   fifth chance.  I know that even redemption has it's

14   limits.  All I'm asking you for today is a second chance

15   to put my sins behind me and to rebuild my life as a

16   contributing member of society.  I am totally committed

17   to living a peaceful and productive life.  I can promise

18   you this:  If you give me my second chance today, you

19   will never, never see me here again.  I believe that life

20   presents each of us with many possible paths to follow,

21   with many forks and turns along the way.  For most of my

22   life, as you know, I walked the right path making good

23   choices and doing the right thing.  God knows I wasn't

24   perfect.  Like everyone else I sometimes stumbled and

25   made mistakes, but overall, I led a good life, keeping my

26   feet on the right path.  I stepped off this path long

27   before the commitment offense when, as has been talked

1    about, I selfishly began an illicit affair. And in the
2    process of that, I lost touch with the man that I thought
3    I was. With my every decision first to conceal, then to
4    deny, then to lie, then to betray, I stepped farther and
5    farther from my right path in life. I lied to myself as
6    much as I did to Cathy, and step by step, decision by
7    decision, I built a secret life that ultimately poisoned
8    my marriage and corrupted my soul. My life became
9    unmanageable. I lied my way into a trap, and I saw no
10   way out. I've now had many years to think about how
11   self-centered my choices and behavior were. I've been
12   forced to confront parts of myself which are painful and
13   ugly to me. I did not live my principles, I did not take
14   responsibility for my life and my choices. And the
15   consequences of my flawed thinking then have been
16   devastating, not only for me, but for everyone I care
17   about. I can't even imagine the agony I put Cathy and
18   her family through. There is no way I would ever cause
19   such harm again. If I could go back and change my path
20   and make better choices and take the right steps, I would
21   do it in an instant. I know now how much damage a single
22   act of violence can cause. The negative effects radiate
23   outward like the ripples of a stone dropped into a pond,
24   affecting not only those directly involved, but also
25   their families and loved ones, their neighbors, and
26   ultimately society as a whole. If I had a way to undo
27   the harm I caused or if I had a way to truly make amends

1. for it, I would gladly do so. If, as it appears, Cathy's
2. wish is that I stay as far away from her as possible,
3. then I'll certainly respect that just as Step 9 advises.
4. I pray every day that she has found healing and peace,
5. and I pray for her forgiveness, even though I know I'm
6. not entitled to it. As I sit here today, I know in my
7. heart that I have found my way back to the right path and
8. that I'll never stray from it again. I've used my time
9. in prison working hard to become the man I should have
10. been before. I've taken the time to reflect upon my life
11. and my choices, to address my defects of character, and
12. to reconnect with the values I abandoned in 1994. My
13. daily activities and choices now consistently reflect my
14. core values; honesty, integrity, patience,
15. responsibility, and kindness. I've changed. I've grown.
16. I'm not the same man who walked that long path into
17. prison 12 years ago. How have I changed? We need a lot
18. more time than we have today to really address that, but
19. I'd like to touch on a few major points. Other
20. indications you've already heard from Dr. Macumber's
21. report, the support letters, and my prison record, which
22. Ms. Buchalter has already summarize. But in belief, I
23. have learned that my values are not a part-time matter.
24. I either practice integrity and responsibility all the
25. time, or I don't really have them at all. Every day I
26. live my principles in everything I do, and I will never
27. again step off the right path. I've learned that my

105

1   attitude is a choice that I make, not simply a condition

2   I encounter.  When life challenges me almost daily in

3   prison, I can choose to be angry and frustrated, or I can

4   choose to be positive and to learn from that experience.

5   It's completely up to me, and I choose to be positive.  I

6   have learned to count my blessings and not to dwell on my

7   troubles.  There are many people in the world worse off

8   than I am, and I'm thankful for the simple joys of my

9   life.  Rather than focusing every day on the pain of not

10  seeing my family, I'm sincerely grateful for their visits

11  and their letters, blessings that many other men here

12  don't have.  And I will never take these relationships

13  for granted.  I have learned not to take things so

14  personally.  It helps me to stay positive when I remember

15  that the negative moods and behaviors of others are

16  usually a projection of their own issues and where they

17  are on their own life paths and not necessarily specific

18  to me.  This has helped me deal with sometimes hostile

19  prison situations in a positive and nondestructive

20  manner.  I have learned that inner peace is to be found

21  in the acceptance of things that I'm unable to change.

22  The serenity prayer is probably the most valuable thing

23  that I have learned in prison.  I used to beat my head

24  against stone walls trying to make the world conform to

25  my expectations.  I used to impose impossible standards

26  of achievement upon myself to finding my best performance

27  of any task as a baseline for all future attempts.  When

1   invariably my efforts fell short, I became filled with

2   stress and frustration, berating myself for not being

3   good enough and too often misdirected those frustrations

4   to those closest to me.  But today the simple concept of

5   acceptance is central to my life and my attitude.  While

6   I always try to do my best, I accept that my best changes

7   from day to day.  I no longer confuse my level of effort

8   with the results I obtain.  I accept that I have done my

9   best, accept the outcome, and move on.  And because I

10  have become more accepting of myself and my own

11  limitations, I have also become more accepting and

12  tolerant of others and of the world around me.  Finally,

13  I have learned that anger harms no one more than he who

14  harbors it.  Nursing a grudge is not only emotionally

15  draining and disruptive to inner peace, but physically

16  damaging as well.  My chronic stress, anger, and

17  resentment stripped blood flow to increase oxygen

18  consumption, stress the immune system, and acerbate other

19  health problems.  The key to overcoming this is

20  forgiveness.  Forgiveness is a gift I give to myself, a

21  gift of health and inner peace.  Forgiveness does not

22  mean excusing or condoning injuries done.  It means I let

23  go of the negative emotions attached to an event, let go

24  of old angers and hurts and resentments that have been

25  poisoning my soul.  I have also learned to forgive

26  myself, to give myself permission not to be perfect.

27  Everyone makes mistakes, and the key is how I learned

1    from these and will avoid repeating them, but not

2    wallowing in needless and damaging self-condemnation.  I

3    accept reality.  I learn from it.  I forgive myself and

4    others.  These are the touchstones of my growth over the

5    past 12 years reflecting both my improved attitude and my

6    decreased threat to others.  This decreased threat is

7    reflected in my prison record.  I have gained 12 years of

8    experience in reducing stress and accepting reality in an

9    environment where I have no control over anything.  I

10   have been observed almost constantly during these years

11   under very stressful conditions, and have never acted out

12   violently regardless of the situation or provocation.

13   This is perhaps the best predictor of my future behavior,

14   my nonexistent risk of danger to society.

15        **DEPUTY COMMISSIONER SMITH:**  Excuse me, sir.  I need

16   to change tapes.

17             [Thereupon, the tapes were changed.]

18        **DEPUTY COMMISSIONER SMITH:**  Go ahead.  Thank you.

19        **INMATE BELL:**  More specifically, I am not the threat

20   to Cathy or her family.  I do not blame her for anything.

21   I, alone, am totally responsible for my own choices, my

22   own steps from the right path which ultimately brought me

23   to prison.  I do not desire any kind of revenge against

24   anyone.  I recognize that Cathy honestly believes she has

25   reason to fear my release, and I accept that there's

26   nothing that I can do or say to convince her that this

27   fear is groundless.  I know that I have hurt her too

1    deeply to ever win her trust. But in fact, her fears are
2    groundless. Whenever I think of her, it is with profound
3    sadness and genuine remorse for the agony I have caused
4    her. I pray that she has found healing, peace, and
5    happiness in her life. In closing, I would like to leave
6    you with these three thoughts. First, I now make better
7    choices. I will never again step off the right path nor
8    behave in a way which violates my principles or another's
9    trust in me. Second, I'm better able to handle stress
10   and frustration. I have adopted tools and behaviors that
11   enhance my ability to avoid stress and to handle it
12   appropriately and nondestructively. Third, even if
13   nothing else has changed, now that I have experienced the
14   oppressive ugliness of prison, I will never do anything
15   to risk coming back inside. Prison is intended to be a
16   deterrent against unacceptable behavior, and for me, it's
17   worked. Like a child who sticks his hand into a flame, I
18   have burned myself badly, burned my life and those I
19   love. I will never touch that flame again. The bottom
20   line, I am not and never will be any threat to public
21   safety. I am more than ready to resume my life in our
22   free society if you will give me a second chance. Thank
23   you for your consideration.

24        **DEPUTY COMMISSIONER SMITH:** Thank you.

25        **PRESIDING COMMISSIONER PONCAVARE:** Thank you,

26   Mr. Bell. Ms. Gandrud?

27        **MS. GANDRUD:** Can I give you these letters from my

1   family?

2       **DEPUTY COMMISSIONER SMITH:**  You can read them

3   because they weren't submitted ahead of time, we can't

4   review them.  But you can indicate that you have

5   additional letters from family members of oppositions

6   they gave.

7       **MS. GANDRUD:**  Oh.  So I can just read them?

8       **DEPUTY COMMISSIONER SMITH:**  I don't --

9       **MS. GANDRUD:**  Well, not read from the letters, but

10  just say that I have two letters from my daughters and

11  letters from my friends.

12      **PRESIDING COMMISSIONER PONCAVARE:**  Give us the

13  highlights, just certain excerpts of it.

14      **MS. GANDRUD:**  Okay.

15      **DEPUTY COMMISSIONER SMITH:**  That's acceptable.  And

16  would you identify yourself for the record again since

17  it's been a while since you did.

18      **MS. GANDRUD:**  Right.  Okay.  My name is Cathy

19  Gandrud, and I apologize, but I did write this out.

20      **DEPUTY COMMISSIONER SMITH:**  And would you spell your

21  last name again, please.

22      **MS. GANDRUD:**  G-A-N-D-R-U-D.

23      **DEPUTY COMMISSIONER SMITH:**  Thank you.

24      **MS. GANDRUD:**  And I sit here as I did two years ago,

25  terrified at the idea that my attacker, Steven Bell, may

26  be released from prison.  My damaged olfactory nerves

27  distorting my sense of taste are a daily reminder of

1   Mr. Bell's premeditated attempt to kill me.  I hope to
2   someday be able to smell and taste things like everybody
3   else does.  As my daughter wrote in her letter to you, my
4   biggest concern is that her alternated smell and taste
5   has also become a health hazard.  She cannot smell or
6   taste if foods turn bad.  She cannot smell gas leaking
7   from the stove or fireplace.  I worry that this may
8   create more problems in the future.  Meeting a
9   respectable, professional man in a Dale Carnegie class
10  seemed the perfect answer to my desire for wanting to
11  share my life with someone.  I ended up trusting, loving,
12  and sharing everything I had with him.  This was a result
13  of his overt acts of attention in what I thought was love
14  at the time.  How does one ever completely trust again?
15  Daily claims of love and devotion shattered by a
16  premeditated, calculated attack aimed at ending my life.
17  How does one pick up the pieces and go about your life?
18  As is true in most cases of domestic violence, there were
19  signs that I did not see and did not want to acknowledge.
20  The belittling remarks, the fits of rage when he felt
21  threatened, isolating me from my family and friends are
22  all characteristics of an individual that is a batterer.
23  He was very good at disguising his abusive behavior to
24  appear socially acceptable.  I am also a well-educated,
25  hard-working professional who at the time had a well-
26  paying management position with a national firm.  I owned
27  my own home, had money in the bank, traveled, and most

1   importantly, had two great kids and the close support of
2   an extended family.  My family was a threat to him.  My
3   wanting to visit them or have them visit us became
4   grounds for an argument.  Isolate the victim; classic
5   behavior for someone prone to domestic violence.
6   Screaming at the kids for questioning him -- he yelled at
7   my daughter for buying three cans of beans instead of two
8   because he had told her to buy a couple.  I did not go to
9   work with bruises on my body, but I had started
10  questioning my own ability to make decisions.  When the
11  telephone bill arrived, there were 20 calls from Hawaii
12  where we were on vacation to a number in Southern
13  California.  He told me no one needed to know about this.
14  He said we should keep this between us.  He also said I
15  was overreacting.  A week later when I asked a friend if
16  she thought I was crazy to be concerned about this, she
17  thought I would be crazy not to be concerned.  The lies
18  around these phone calls were the beginning of the end.
19  His needing to take care of all the finances in our
20  household, in fact, his insistence on doing this, seemed
21  like such a wonderful gesture at the time, one that left
22  me completely in the dark about our finances and gave him
23  ample opportunity to spend money on his affair without me
24  knowing, once again manipulative, premeditated, and
25  controlling.  Selling my home, uprooting my children,
26  moving with no forwarded address, all things I had done
27  to try and hide myself and my children from him and his

112

1    supporters.  I have received anonymous letters from his

2    friends, people duped into believing his innocence.  They

3    ask me to reconsider my testimony reminding me that if he

4    truly meant to kill me, he would have succeeded because

5    they all knew how smart he was, and they said if he

6    really wanted to do it, he would have been successful.  I

7    received a call from his attorney asking me if I would

8    welcome him back in a friendly manner if he got out on

9    bail.  All of this behavior drove me from my home where I

10   lived and raised my children for over 15 years.  Fear,

11   terrified of what this manipulative, lying person will do

12   to me or someone close to me, that is what I live with.

13   That is what brings me here today and will bring me here

14   every time he comes up for parole so I can plead my

15   caused against his release.  In the letter that my

16   youngest daughter wrote to you, she said, at only 13, a

17   time when most girls' biggest worries are boys and acne,

18   I was faced with a much harsher world.  She goes on to

19   say as I sit here twelve years later, I revert back to

20   that awkward teen trying to figure out who she is and the

21   chaos of an attempted murder trial, and unfortunately as

22   a teen, my what-if list was long.  But the one question

23   that scares me now is, what if Steve Bell no longer is in

24   prison?  This well-educated, controlling, manipulative

25   man told me he loved me at least three times a day,

26   calling when he traveled, and left me loving massages.

27   Of course, he told me he was on business trips, even

1    showing me itineraries of where he was going for work on
2    work stationery only for me to find out later from the
3    police that he was having an affair.  All the documents
4    he showed me were fake.  He had made up the itineraries
5    and put them all on work stationery to dupe me.  During
6    his trial he professed from the witness stand his love
7    for me, how he wished that we could just go on with our
8    lives.  He testified how the affair was his only mistake,
9    it was just a fling not going anywhere.  He stated he had
10   no intention of leaving me or moving to Southern
11   California where his lover lived.  His mistress also
12   testified it was just a fling.  She said that he had told
13   her he loved me.  Ironic, isn't it, that less than six
14   months after his sentencing, they were married in a
15   prison ceremony.  It is obvious that he is one to lie
16   under oath and get his friends to do the same.  His trial
17   was three weeks long.  I spent two weeks -- three days on
18   the witness stand with his attorney questioning,
19   prodding, and challenging everything I said, having our
20   whole lives spread like an open book in front of people
21   you do not know.  It was humiliating in so many ways.
22   His attorney subpoenaed everyone in my family.  This
23   stopped them from coming to court.  The DA finally went
24   to the judge to get permission for my 70-year-old father
25   to be there to support me.  They didn't call my family.
26   It was a control issue.  At the end of the trial the
27   judge even questioned how he could profess to love

1   someone the way he did and then put them through such an

2   ordeal.  The judge made them stop cross-examining me

3   after three days.  The last time I was here, I listened

4   to hours of rhetoric from him and his attorney.  They

5   told you that what a model prisoner he has been, all the

6   classes he has taken, his attendance at NA meetings even

7   though he professes not to have a drug or alcohol

8   problem.  But there were a couple of incidents in the

9   last Commissioner's Report where his anger and rage went

10  out, but we were told that these didn't matter.  For all

11  appearances, he was a model husband right up to the

12  morning when he bashed my head with a lead pipe and tried

13  to suffocate me.  There was no warning.  We were not

14  fighting.  He just wanted to give me an anniversary

15  present.  He said, please sit on the edge of the bed and

16  close your eyes.  The next thing I remember was waking up

17  on the floor fighting to get my breath while he was

18  holding the plastic bag over my face.  I will never

19  forget that moment.  And then having the police tell me

20  that he'd been having an affair for months -- actually,

21  no one really knows how long it had been going on.

22  First, the physical attack, and then the emotional roller

23  coaster of realizing that our whole life was a lie.  The

24  police even found nude photos in his office of a

25  different woman who he had been seeing before we started

26  dating.  The police also found cards from his current

27  mistress in his desk talking about their future together.

1    Contrary to the testimony at his trial, the cards
2    referred to them being together forever.  He is smart.
3    Just ask him, and he'll tell you how smart he is.  In
4    fact, I'm sure he thinks he's smarter than anyone in this
5    room.  He has tried to impress you with his
6    organizational skills, his attention to your questions,
7    his supposedly cooperative attitude, and sincerity.  He
8    is a classic abuser who tries to minimize the seriousness
9    of their violence.  He is manipulative, controlling, and
10   here to try to convince you that he has been wrongly
11   convicted.  He would like you to read and believe his
12   manuscript entitled *The Case of Steven Bell Wrongly*
13   *Accused, Wrongly Convicted*.  At the last meeting, the
14   attorney even said that this crime wasn't that heinous,
15   and again, she repeated that.  But you know what, to me,
16   this is a heinous crime.  The DA has tried to help me
17   understand that the prisoner does not need to admit what
18   he did to be paroled.  If I understand it correctly, he
19   does need to provide some sort of insight into why he
20   tried to kill me, some assurance that he will not attempt
21   to kill me or hurt me or someone I love.  I heard lots of
22   lies about not seeking revenge.  I heard nothing here
23   today that helps me understand why he found it necessary
24   to try and take my life; why he thought it was okay to
25   deprive my children of their mother; why when his son was
26   told that he had tried to kill someone, his son responded
27   with, Cathy.  What had his son seen that I had not?  I

116

1   don't really care how many classes he's taken or how many
2   meetings he has attended.  I am the victim of this crime.
3   And in a willful, premeditated, calculating manner, this
4   man tried to deprive me of my right to see my children
5   graduate and marry and hold my grandchildren.  Please,
6   for my physical safety and the safety of my family and my
7   mental health, please do not allow this man out of
8   prison.  Thank you.

9       **ATTORNEY BUCHALTER:**  I need clarification for a
10  rebuttal, please?

11      **DEPUTY COMMISSIONER SMITH:**  Yeah.  We're going to
12  accept the fact that her statement is, in fact, an impact
13  statement.

14      **ATTORNEY BUCHALTER:**  I have something else to rebut.
15  I want to say that I am not the attorney that called her.
16  The manuscript was not written by my client.  And
17  anything that did not concern the impact on her life
18  after the crime is irrelevant and is not permitted by
19  law.  I did not want to interrupt her because I know
20  she's been through pain and suffering.

21      **DEPUTY COMMISSIONER SMITH:**  And we will weigh that
22  appropriately.

23      **ATTORNEY BUCHALTER:**  Thank you.

24      **DEPUTY COMMISSIONER SMITH:**  We understand.  We can
25  separate.

26      **ATTORNEY BUCHALTER:**  You got it.  Thank you so much.
27  All right.

117

1    **PRESIDING COMMISSIONER PONCAVARE:**  All right,

2    Counselor.  We will now -- we appreciate everyone's

3    comments, and we will now recess for deliberations.  The

4    time is 12:47 p.m.

5                        **R E C E S S**

6                         --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

118

1    **CALIFORNIA BOARD OF PAROLE HEARINGS**

2    **D E C I S I O N**

3    **DEPUTY COMMISSIONER SMITH:**  We're back on the

4    record.  Everyone previously identified is back in the

5    hearing room with the exception of Deputy District

6    Attorney from Santa Clara County, Mr. Rico, who had an

7    appointment this afternoon on another matter and wasn't

8    able to remain by video for the reading of the decision.

9    **PRESIDING COMMISSIONER PONCAVARE:**  Thank you,

10   Commissioner.  In the matter of Steven Bell, CDC No.

11   J-69411, the panel has arrived at the following decision:

12   We reviewed all information received from the public and

13   relied on the following circumstances in concluding that

14   the prisoner is not suitable for parole and would pose an

15   unreasonable risk of danger to society or a threat to

16   public safety if released from prison.  In terms of your

17   controlling offense, Mr. Bell, the offense was carried

18   out in a cruel and callous manner.  And it was

19   dispassionate and calculated.  And it was a crime which

20   demonstrated a callous disregard for human suffering.  We

21   drew these conclusions from the Statement of Facts in

22   that wherein the inmate planned and attempted to kill his

23   wife by hitting her on the back of the head with a metal

24   pipe and holding a plastic bag over her face to suffocate

25   her.  In terms of your institutional behavior, you have

26   programmed in a significant manner while incarcerated.

27   **STEVEN BELL    J-69411    DECISION PAGE 1    11/7/06**

1   You have developed several marketable skills that can be
2   put to use upon release.  And you have participated in
3   beneficial self-help programs.  We would also like to
4   note and commend you for the fact that you have had no
5   disciplinary actions while incarcerated for over
6   11 years.  Your marketable skills include Vocational
7   Carpentry, Landscaping, and Offense Services.  And you
8   have attended Narcotics Anonymous for the past 27 months.
9   The psychological report, dated November 11th, 2005,
10  authored by Dr. Schroeder, is not totally supportive of
11  release in that you have not come to terms with your
12  crime, you have not expressed remorse, and you must come
13  to terms with your crime in order to move toward
14  resolution.  For the record, a second evaluation, dated
15  March 6th by Dr. Macumber, is supportive of your parole.
16  In terms of your parole plans, Mr. Bell, you do have
17  realistic parole plans in that you do have a viable
18  residence if you were to be paroled.  You do have
19  acceptable employment plans, and once again, you have
20  developed several marketable skills including a B.S.
21  degree in terms of your advanced education.  The hearing
22  panel notes that responses to PC 3042 indicate opposition
23  to a finding of parole suitability specifically from the
24  District Attorney of Santa Clara County and from your
25  victim who was present today at the hearing.  Other
26  information that bears upon your unsuitability for parole
27  **STEVEN BELL    J-69411    DECISION PAGE 2   11/7/06**

1    is that your past -- your present attitude toward the
2    crime and no apparent signs of remorse in that as far as
3    the panel is concerned at no time during the course of
4    the hearing did you show any emotion or remorse.  Your
5    closing statement, although detailed and lengthy,
6    detailed the effect on you, not your victim.  In fact,
7    mention of your victim was cursory at best.  In a
8    separate decision, the hearing panel finds that it is not
9    reasonable to expect that parole would be granted at a
10   hearing during the following two years.  Therefore, this
11   is a two-year denial.  The specific findings for this --
12   specific reasons for this finding -- for this finding are
13   as follows:  You committed the offense in an especially
14   cruel manner.  On the date of the commitment offense you
15   essentially woke your wife up with a kiss on the cheek.
16   As she walked to the bathroom, you asked her to sit down
17   and close her eyes and that she thought you were giving
18   her another anniversary present.  She heard rustling in
19   the closet.  Suddenly she woke up with an injury to the
20   back of her head due to the blow from the pipe, and with
21   a bag over her face with you standing above her.  The
22   offense was carried out in a manner which demonstrates a
23   callous disregard to human suffering.  The motive for the
24   crime was inexplicable or very trivial in relation to the
25   offense.  A recent psychological report, dated November
26   11th, 2005, authored by Dr. Schroeder, indicates a need
27   **STEVEN BELL    J-69411    DECISION PAGE 3    11/7/06**

121

1    for a longer period of observation and evaluation or

2    treatment.  Therefore, a longer period of observation

3    and/or evaluation of the prisoner is required before the

4    Board should find that the prisoner is suitable for

5    parole.  The panel recommends today that you should

6    remain disciplinary-free and you should cooperate with

7    clinicians in the completion of a clinical evaluation.

8    We will order a new psychological evaluation.

9    Commissioner Smith, do you have any comments?

10        **DEPUTY COMMISSIONER SMITH:**  I don't have any

11   comments at this time.  Thank you.

12        **PRESIDING COMMISSIONER PONCAVARE:**  Mr. Bell, the

13   hearing is concluded at 1:57 p.m.  Good luck, sir.

14        **DEPUTY COMMISSIONER SMITH:**  Counsel, thank you.

15                      --oOo--

16

17

18

19

20

21

22

23   **PAROLE DENIED TWO YEARS**

24   **THIS DECISION WILL BE FINAL ON:**_____MAR 0 7 2007_____

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **STEVEN BELL    J-69411    DECISION PAGE 4    11/7/06**

122

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, Patricia Chapin, a duly designated transcriber, VINE, MCKINNON & HALL, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 121, and which recording was duly recorded at AVENAL STATE PRISON, at AVENAL, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of STEVEN BELL, CDC No. J-69411, on NOVEMBER 7, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated DECEMBER 6, 2006, at Sacramento County, California.

Patricia R. Chapin
_____
Patricia Chapin
Transcriber
**VINE, MCKINNON & HALL**

B

State of California                    Department of Corrections and Rehabilitation
MEMORANDUM

Date:  November 6, 2006

To:  FACILITY J-69411

From:  CLASSIFICATION AND PAROLE REPRESENTATIVE'S OFFICE

Subject:  POST BOARD CLASSIFICATION FOR LIFER PRISONER HEARING
          ATTACHED ARE THE BPH RESULTS ON :

| J-69411 | BELL, STEVEN | J-69411 |
|---------|--------------|---------|
| CDC# | INMATE'S NAME | HOUSING |

POST-BOARD CLASSIFICATION MUST BE ACCOMPLISHED BY THE UNIT
SUB-CLASSIFICATION COMMITTEE WITHIN FIFTEEN (15) WORKING DAYS OF RECEIPT
OF THIS RESULT NOTICE, PER DOM 62010.8.4.  PLEASE INDICATE "YES" OR "NO" IF THE
POST BOARD CLASSIFICATION WAS HELD WITHIN FIFTEEN (15) DAYS OF RECEIPT OF
NOTICE.  AFTER THIS FORM HAS BEEN COMPLETED, RETURN IT TO THE BOARD DESK
TO BE LOGGED IN AND FILED IN THE CENTRAL-FILE.

POST-BOARD BPH HEARING WAS HELD WITHIN FIFTEEN (15) DAYS OF RECEIPT OF
RESULTS.

DATE HELD              YES                        NO

IF NOT, WHY?_____

_11-14-06_              X

INMATE RECEIVED COPY OF DECISION

INMATE SIGNATURE                        DATE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

POST-BOARD CLASSIFICATION AUDIT SECTION        11/14/06

SUPERVISING CCII'S SIGNATURE

PLEASE RETURN TO THE BOARD OF PAROLE HEARINGS DESK
                                          INMATE COPY

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

☐ INITIAL HEARING          ☒ SUBSEQUENT HEARING

| PRISONER'S NAME **BELL, STEVEN** | CDC NUMBER **J-69411** |
|---|---|
| DATE OF HEARING **11-07-06** | LOCATION **AVENAL STATE PRISON** |

## LEGAL STATUS

| DATE RECEIVED **07-17-95** | DATE LIFE TERM STARTS (IF DIFFERENT) **01-03-97** | COUNTY **SANTA CLARA** |
|---|---|---|
| OFFENSE **ATT MURDER 1ST; USE D'WPN; GBI** | | CASE NUMBER **SCL177776** |
| COUNT NUMBER(S) **1** | | PENAL CODE SECTION(S) VIOLATED **P187/664; P12022(b); P12022.7** |
| TERMS **LIFE + 04-00** | | MEPD **01-03-04** |

## OTHER COMMITMENT OFFENSES OR STAYED COUNTS

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | | | | | |
| ☐ | | | | | |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER K. POUCABRE | PANEL MEMBER DM SMITH | PANEL MEMBER |
|---|---|---|

OTHERS PRESENT

☒  PRISONER (IF ABSENT, WHY?) _____ **BELL, STEVEN**

☒  ATTORNEY  **LINDA BUCHALTER**

☒  DEPUTY D.A.  **RON RICO**  (VIDEO)          COUNTY OF          **SANTA CLARA**

☒  OTHERS  V NOK (2)

## STATEMENT OF FACTS

☐  THE HEARING PANEL INCORPORATES BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____, PAGES _____ THROUGH_____

☒  THE STATEMENT OF FACT IS

☒  QUOTED FROM THE BOARD REPORT, DATED  **3|06**  , PAGE(S)  **1 & 2**

☐  QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) _____

☐  QUOTED FROM THE COURT OPINION PAGE(S) _____

BPT 1000 (Rev. 8/90)

**BOARD OF PRISON TEI**                                           **STATE OF CALIFORNIA**
**LIFE PRISONER: PAROLE CONSIDERATION PROPOSED DECISION:**
**DENY PAROLE**

---

☑ **PAROLE DENIED FOR:**       1    ②    3    4    5      **YEARS**

Place the prisoner on the ___2008___ calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled. The Board will send you a copy of the decision. It will indicate the reasons you did not get paroled. If this decision is not final, the Board will set up another hearing. You can read the laws about your hearing. You can find the laws at California Code of Regulations, Title 15, section 2041.

---

**RECOMMENDATIONS**

**The Board Recommends:**
[  ] No more 115's or 128A's                [  ] Learn a trade*
[  ] Work to reduce custody level          [  ] Get therapy*
[✓] Get self-help* continue                [  ] Earn positive chronos
[✓] Stay discipline free                   [  ] Get a GED*

[  ] Recommend transfer to _____
[✓] Other
_____new psych eval_____

_____

\* These programs are recommended if they are offered at your prison and you are eligible/able to participate.

---

**HEARING PANEL**

Name _____          Date _____

Name _____          Date __7/1/O8__

Name _____          Date __1/06__

---

| **NAME** | **CDC#** | **PRISON** | **DATE** |
|---|---|---|---|
| BELL, STEVEN | J-69411 | ASP | 11/7/06 |

**BPT 1005(b)**
**(REV 04/04)**

Distribution: White-C File
Canary-BPT
Pink-Prisoner

C

1

**BEFORE THE BOARD OF PAROLE HEARINGS**

2

**OF THE STATE OF CALIFORNIA**

3
4
5

6   **In The Matter Of The First Subsequent**
7   **Parole Consideration Hearing Of**          Hearing Date:    November 7, 2006

8
                                                 Hearing Time:    8:30 a.m.
9   **STEVEN DALE BELL**
10  **#J-69411**                                 Hearing Place:   Avenal State Prison

11
12
13

14

15      **REQUEST FOR DETERMINATION OF SUITABILITY FOR**

16          **PAROLE AND SETTING OF PAROLE DATE;**

17      **SUMMARY OF FACTS AND EXHIBITS IN SUPPORT**

18
19
20
21

22                                              Linda Buchalter
23                                              1011 5th Street, No. 6
24                                              Santa Monica, CA 90403
25                                              (310) 393-7033
26
27                                              Attorney for Steven D. Bell

# TABLE OF CONTENTS

Page

REQUEST FOR DETERMINATION OF
SUITABILITY AND SETTING OF DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.    Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    II.    Commitment Offense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    III.    Criminal History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    IV.    Institutional Programming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        A.    Work History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        B.    Education/Vocation . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        C.    Institutional Self-Help Activities . . . . . . . . . . . . . . . . . . . 6
        D.    Independent Self-Help Activities . . . . . . . . . . . . . . . . . . . 7
        E.    Disciplinary History . . . . . . . . . . . . . . . . . . . . . . . . . 8
        F.    Board's Directives . . . . . . . . . . . . . . . . . . . . . . . . . . 8
        G.    Other . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    V.    Parole Plans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    VI.    Risk of Danger to Society . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    VII.    Circumstances Tending to Show Unsuitability . . . . . . . . . . . . . . . . . 14

    VIII.    Circumstances Tending to Show Suitability . . . . . . . . . . . . . . . . . . . 16

    IX.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    X.    Verification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

EXHIBITS    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## BEFORE THE BOARD OF PAROLE HEARINGS
## OF THE STATE OF CALIFORNIA

| | |
|---|---|
| **In The Matter Of The First Subsequent Parole Consideration Hearing Of**<br><br>**STEVEN DALE BELL**<br>**#J-69411** | **REQUEST FOR DETERMINATION OF SUITABILITY FOR PAROLE AND SETTING OF PAROLE DATE; SUMMARY OF FACTS AND EXHIBITS IN SUPPORT**<br><br>Hearing Date:  November 7, 2006<br>Hearing Time:  8:30 a.m.<br>Hearing Place:  Avenal State Prison |

**TO THE HONORABLE CHAIR OF THE THE BOARD OF PAROLE HEARINGS, AND TO THE PANEL MEMBERS OF THE BOARD BEFORE WHOM STEVEN D. BELL WILL APPEAR:**

California prisoner **Steven D. Bell, #J-69411**, hereby respectfully requests that he be found **suitable for parole** and that his **term be fixed** under authority of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article I §§7 and 15 of the California Constitution, California Penal Code §§1168 and 3041, and 15 CCR §§2400, *et seq.*, and in accordance with governing case law, including *In re Dannenberg*, 34 Cal.4th 1061 (Cal. 2005), *In re Rosenkrantz*, 29 Cal.4th 616 (Cal. 2002), *McQuillion v. Duncan*, 306 F.3d 895 (9th Cir. 2002), and *Biggs v. Terhune*,  334 F.3d 910 (9th Cir. 2003).

Mr. Bell submits the following summary of facts and exhibits in support of the above request, pursuant to 15 CCR §§2247 and 2249.

Mr. Bell is confident that when this Board has considered all reliable evidence, it will find not only that he does **not** pose "an *unreasonable* risk of danger to society" (15 CCR §2402(a)), but indeed *does not pose any public safety risk whatsoever*.  Accordingly, Mr. Bell should be found suitable and his term fixed at this parole hearing.

1
2
3

# SUMMARY OF FACTS

## I. BACKGROUND

4    Steven Bell was born and raised in California.  He grew up in a stable, two-parent, middle-
5    class, suburban household free from any form of abuse.  Mr. Bell attended public schools, earned
6    excellent grades, participated in various extracurricular activities (e.g., Boy Scouts, band, choir,
7    athletics, school paper, yearbook, etc.), and was well thought of by both teachers and peers.  He
8    earned his own money by mowing neighborhood lawns and part-time work in a grocery store.  Mr.
9    Bell graduated from high school in 1973, fourth in a class of three hundred (first among "college
10   prep" students).  In 1977, while working full-time as an apprentice computer programmer, he
11   received his Bachelor of Science degree, *cum laude*.  (Exhibit A)[1]

12   Mr. Bell pursued a successful career in computer information systems, steadily advancing in
13   professional skills and responsibilities, and earning awards for outstanding achievement and
14   contributions. (Exhibit B)  He operated his own software business for several years, published
15   articles in trade journals, and conducted technical education courses for colleges and corporations.
16   Mr. Bell was ambitious and hardworking, earned an above-average income, was financially stable,
17   participated in family and community activities, traveled widely, and pursued continual personal
18   and professional self-improvement.   He has absolutely no criminal history whatsoever.

19   Steven Bell married in 1978 and has two children, now grown.  This marriage lasted thirteen
20   years, and upon divorce Mr. Bell was awarded custody of his two minor children, a testament to his
21   stability and character.  He actively participated in his children's lives (e.g., school, youth soccer,
22   Boy and Girl Scouts, etc.) which were free from abuse and abnormal disciplinary problems;
23   indeed, both children were on their schools' Honor Rolls.  Mr. Bell's second marriage ended as a
24   result of the commitment offense.  In 1996, while incarcerated, he married his current wife, Susan,
25   whom he has known for more than thirty years.  They have enjoyed a committed, stable, and loving

---

[1] This and each subsequent exhibit is a true and correct copy of the document identified, is attached to
this Summary, and is incorporated by reference herein.  The designation "PH" refers to the transcripts
of Mr. Bell's 2004 Parole Hearing, while "RT" refers to the Reporter's Transcript at his 1995 trial.
"Lifer Report" refers to the 9-page 2006 "Life Prisoner Evaluation Report" prepared by Mr. Bell's
correctional counselor and contained in his CDCR Central File.

Parole Consideration of Steven D. Bell                      -2-

1    marriage for more than ten years, with frequent visits, phone calls, and copious correspondence.

2        In summary, Steven Bell was an upstanding citizen who contributed positively to society prior

3    to the commitment offense. His sole desire is to rebuild his life, to resume his positive

4    contributions, and to make amends to those he has harmed wherever possible.

5

6    **II. COMMITMENT OFFENSE**

7        Mr. Bell was convicted under Penal Code §§664/187 of attempted murder, with a finding of

8    premeditated and deliberate. His M.E.P.D. was January 3, 2004. (Lifer Report, p. 1)

9        Mr. Bell stipulates to the official court record in this case, and accepts full responsibility for

10   the commitment offense and for his subsequent conviction and imprisonment. However, upon the

11   advice of counsel and recognizing his due process rights, he respectfully declines to discuss the

12   facts of the commitment offense.[2]

13       Mr. Bell will discuss with this Panel all other matters, including his feelings and insights about

14   his actions which led him to prison, and the positive changes he has made in his life since then.

15

16   **III. CRIMINAL HISTORY**

17       Mr. Bell has absolutely no juvenile nor adult criminal history other than to the commitment

18   offense. He likewise has absolutely no history of violence, physical or emotional abuse, substance

19   abuse, or gang involvement. (Lifer Report, pp.2-3; PH at p. 127; Exhibit P)

20

21   **IV. INSTITUTIONAL PROGRAMMING**

22       As more fully set forth below, Mr. Bell has been a model prisoner throughout his years of

23   incarceration, with a positive work history, laudatory chronos, participation in every available self-

24   help program, and more. (PH at p.58)  He is completely disciplinary free.  Since 2002, his earned

25   Classification Score has been zero (administrative minimum: 19). (Lifer Report, p. 4; PH at p. 31)

26   //

---

[2] It should be noted that neither declining to discuss the commitment offense nor even an outright denial of guilt is a basis for denying parole under Penal Code §5011, 15 CCR §2236, and various case law, e.g., *In re Caswell*, 92 Cal.App.4th 1017, 1033 (Cal.App. 1 Dist. 2001).

1  ### A. Work History

2  Mr. Bell's institutional work history is <u>outstanding</u>. He has never missed a day of work (i.e.,

3  no "A" days). All of his CDC-101 Work Supervisor's Reports, for all of his prison jobs, have

4  graded him "1 = Exceptional", the highest possible score. (Exhibit E)  His supervisors' comments

5  have been similarly outstanding, including :

6  - *"Without exception the best clerk I have had in fourteen years"*

7  - *"Exceeded expectations in all respects"*

8  - *"Exceptional skills, attitude, and performance"*

9  - *"Quality and quantity of work exceeds expectations"*

10  - *"I have never encountered a finer work ethic"*

11  - *"Outstanding work habits"*

12  Mr. Bell's work assignments have included:

| Dates | Assignment | Institution |
|-------|-----------|-------------|
| 03/01/96 - 03/14/96 | Housing Unit Porter | CSP-LAC, Level IV |
| 03/15/96 - 03/31/96 | Recreation Clerk | CSP-LAC, Level IV |
| 04/01/96 - 10/19/96 | Library Clerk | CSP-LAC, Level IV |
| 11/20/96 - 09/30/97 | Personnel Assignment Clerk | CSP-LAC, Level III |
| 10/01/97 - 01/31/98 | Captain's Clerk, Central Ops | CSP-LAC, Level III |
| 02/01/98 - 10/18/99 | Law Library Clerk | CSP-LAC, Level III |
| 06/13/00 - 04/19/01 | Vocational Landscaping Clerk | CSP-LAC, Level IV[3] |
| 03/12/04 - 09/30/04[4] | Vocational Carpentry Clerk | ASP, Level II |
| 03/26/05 - Present | Trash Crew | ASP, Level II |

23  In addition to his outstanding performance of assigned job duties, Mr. Bell has consistently

24  worked to improve overall operations. *"He not only did the work I assigned him, but he took the*

---

[3] Mr. Bell was retained on institutional overrides when the last remaining Level III yard at CSP-LAC was converted to Level IV.  (see Central File)

[4] Because of Mr. Bell's advanced education and "exceptional skills with computers" (Lifer Report, p.8), and his in-prison computer training, CDCR determined that his knowledge and skills *exceed staff's ability to monitor his activities,* administratively removing Mr. Bell from this clerical job assignment; CDCR acknowledges that there was no misconduct by Mr. Bell. (Exhibit M)

1   *initiative and was constantly looking for ways to improve our office procedures.*" (Exhibit H)

2          As a library clerk, he developed and maintained the first author and title catalogues at CSP-

3   LAC, initiated a periodicals tracking system, and developed a newspaper tagging procedure to

4   reduce theft.  As a personnel assignment clerk, he created databases to improve the staff watch and

5   RDO bidding procedures, and developed a report tracking procedure to reduce unnecessary

6   paperwork.  As a law library clerk, he created instructional aids to help inmates understand the legal

7   process and how to conduct legal research.  As a vocational clerk, he created new course materials

8   and examinations, developed a student completion tracking system, and automated the quarterly

9   CDC-128-E Educational Progress Reports.

10         Mr. Bell's exceptional job performance has earned him many laudatory chronos, certificates of

11  appreciation, and letters of reference (Exhibit H), amply demonstrating his employability upon his

12  release.  In fact, he already has several valid job offers (see below).

13  **B.  Education/Vocation**

14         Mr. Bell's T.A.B.E. scores have consistently been 12.9 (highest possible) in every section and

15  overall. (Central File)  He also has a college degree.  (Exhibit A)   Consequently, he has not

16  participated in institutional educational (G.E.D.) programs.

17         At Mr. Bell's documentation hearing on February 9, 2000, he was instructed to "complete as

18  many Voc. Programs as is possible."  He has since completed three of these:

19             •   Vocational Landscaping, 4/9/00

20             •   Vocational Office Services/Business Occupations, 12/17/02

21             •   Vocational Carpentry, 3/12/04  (Exhibit J)

22         The panel at his initial parole hearing on March 23, 2004, did not instruct Mr. Bell to continue

23  taking vocational classes.  Nevertheless, he enrolled in Vocational Welding and was making

24  outstanding progress until CDCR discontinued the course.

25         It should be noted that Mr. Bell was the "*first student ever to complete the [Office Services]*

26  *course*" at Avenal State Prison, and that he did so "*with honors.*"  (Exhibit J)   "*He completed the*

27  *[Carpentry] course in record time.*"  (Exhibit H)   He also represented Vocational Carpentry on the

28  Institutional Education Advisory Committee.  (Exhibit H)

29         As with his institutional work assignments (above), Mr. Bell's vocational performance has been

1    exceptional. (Exhibit L)  He has never missed a day of class (i.e., no "A" days).  All of his CDC-

2    128-E Education Progress Reports, for all of his vocational courses, reflect grades of "A", "A+", or

3    even "A++".  (Exhibit L)  His instructors' comments have included:

- *"Doing an excellent job"*
- *"Surpassed student expectations"*
- *"Outstanding student"*
- *"Outstanding level of accomplishment"*

6        Mr. Bell's outstanding performance in, and completion of, these vocational courses amply

7    demonstrate his ready employability upon leaving prison.  In fact, he already has several job offers

8    (see below).

9    *C. Institutional Self-Help Activities*

10        At Mr. Bell's documentation hearing on February 9, 2000, he was told he "must participate in

11    AA or NA".  The panel at his initial parole hearing on March 23, 2004, told him to "continue to

12    participate in self-help programs." (PH at p. 132)

13        Except for the time lost to transfers and waiting lists, Mr. Bell has consistently attended NA

14    since 2000 - - despite the fact that he has never been a substance abuser.  (Exhibit F; PH at p. 32)

15    He has worked diligently to apply 12-step principles to his own life (e.g., preparing and updating  a

16    moral inventory, practicing daily meditation, living the "Serenity Prayer", etc.).

17        Even prior to the Board's March 23, 2004, directive, Mr. Bell completed, on his own

18    initiative, every self-improvement program offered by the institution, including:

- EAGLE/CALM Program
- Early Engagement Program
- Parenting Skills
- Arts in Correction (Exhibit N)

21        In 2006, Avenal began offering an Independent Study Program for self-improvement from

22    Golden Hills Adult School.  Mr. Bell has already completed three of these:

- Anger Management
- Values for Responsible Living
- Life Management (Exhibit N)

25    He continues to work on other Independent Study courses in this program.

26        Mr. Bell has completed the Pro-Literacy America Workshop to become a certified Laubach

27    literacy tutor.  (Exhibit H)  He is currently assisting three inmates in achieving their G.E.D.s.

28        Mr. Bell remains on institutional waiting lists for classroom self-help instruction when offered.

29    (Exhibit N)

### D.  Independent Self-Help Activities

1

2      Mr. Bell's commitment to personal growth and self-improvement extend far beyond the

3  programs offered by CDCR.  On his own initiative, he has sought other, outside opportunities for

4  self-improvement.  Since the demise of Pell grants, college courses have been cost-prohibitive for

5  Mr. Bell.  But when he became aware of the free Independent Study Program offered by the

6  Federal Emergency Management Agency (F.E.M.A.), he completed eight F.E.M.A. courses

7  (Exhibit O) and has requested at least a dozen more.  These courses further improve his

8  employability.

9      The panel at Mr. Bell's initial parole hearing on March 23, 2004, suggested that he take an

10  anger management class.  The panel did not note that the EAGLE/CALM program he completed

11  included two weeks of anger management exercises, nor that his Parenting course likewise had

12  stress and anger management components. (Exhibit K)   Subsequent to that initial hearing, Mr. Bell

13  completed an anger management correspondence course offered by Creative Options, Academy of

14  Human Development.[5] (Exhibit K)   He also completed the Golden Hills Adult School Independent

15  Study course in anger management. (Exhibit K)

16      For the past four years, Mr. Bell has been practicing daily meditation using two different

17  programs: the Heart Mountain Prison Project and, more recently, Saraha Buddhist Center's Inmate

18  Correspondence Program *Freeing the Mind.*  (Exhibit O)   He has explored the healing concepts of

19  Restorative Justice and attempted to become involved in a Victim-Offender Reconciliation

20  Program.[6] (Exhibit O) He regularly studies self-improvement books, working to apply the concepts

21  to his life.[7]  (Exhibit G)

---

[5] It should be noted that Avenal has not offered an anger management class since Mr. Bell's previous parole hearing.  He remains on the institutional waiting list for this. (Exhibit N)

[6] Mr. Bell has begun the design of an on-line Restorative Justice database (similar to adopted child/birth parent reconciliation websites) where crime victims and offenders can register if they are willing to meet to attempt mutual healing and reconciliation.  He plans to implement this website at his own expense upon his release.

[7] Mr. Bell has been reading such books throughout his incarceration but has only recently begun writing these self-study reports at the suggestion of his correctional counselor. (Exhibit G)

1       Mr. Bell will continue to seek meaningful self-improvement wherever he can find it.

2   *E. Disciplinary History*

3       None.  (PH at p. 31; Lifer Report, p. 7)

4   *F. Board's Directives*

5       At Mr. Bell's documentation hearing on February 9, 2000, the Board directed him to:

6           1.  Complete as many vocational programs as is possible

7           2.  Participate in A.A. or N.A.

8           3.  Remain disciplinary free

9   As noted above, Mr. Bell not only complied with all three of these directives, *on his own initiative*

10  *he exceeded them.* (Exhibits F, J, N, O; Lifer Report)

11      At Mr. Bell's initial parole hearing on March 23, 2004, the Board directed him to:

12          1.  Participate in self-help (anger management suggested)

13          2.  Remain disciplinary free

14  Once again, Mr. Bell has not only complied with the Board's requirements, but has *exceeded these*

15  *directives in every way,* even seeking self-help opportunities outside those offered by CDCR.

16  (Exhibits F, G, K, N, O)  He has completed four anger management programs.  (Exhibit K)

17      Mr. Bell's willing compliance with all Board directives, demonstrate his enhanced ability to

18  function within the law upon release.  *"Mr. Bell has expressed a strong desire to work and live in*

19  *accordance with BPH conditions and guidelines."* (Lifer Report, p. 8)

20  *G. Other*

21      As noted in IV.A. and IV.B. above, Mr. Bell has consistently done an outstanding job in  his

22  institutional work and vocational assignments.  But his positive efforts are not limited to these

23  assignments; Mr. Bell has also given of himself to help others outside of work hours.  (Exhibit H, I)

24  Such volunteer service is an example of his ongoing efforts to make amends.

25      For long after his assignment in the library was finished, Mr. Bell returned on his days off as an

26  unpaid voluntary clerk to help others - - inmates and staff alike.  He independently organized

27  regular tutoring sessions with other inmates to help them pass their G.E.D.s even before becoming a

28  certified literacy tutor.  (Exhibit H)    He participated in the chapel fellowship and has filled-in to

29  facilitate services when a chaplain wasn't available.

1    Of special note are Mr. Bell's efforts to initiate an inmate blood drive. (Exhibit I)  Responding
2    to news reports of critical shortages, he first contacted the local Red Cross and the prison
3    administration.  Although CDCR regulations allow for a prison blood drive, Food & Drug
4    Administration (F.D.A.) rules prohibited this.  Not willing to give up so easily,  Mr. Bell next
5    contacted several government officials to determine if the F.D.A. prohibition could be lifted or
6    modified during the blood shortages; Senator Dianne Feinstein took an active interest. (Exhibit I)
7    Ultimately, however, his efforts proved unsuccessful - - the high rate of infectious diseases among
8    inmates was simply too great a risk.

9    More recently, in 2005 Mr. Bell attempted to organize a "pop top" collection drive to benefit
10    seriously ill children and their families at the Orange County Ronald McDonald House.  (Exhibit I)
11    Denied official recognition and participation in this effort by the institution, Mr. Bell nonetheless
12    took the initiative to informally collect thousands of pop tops from other inmates and while working
13    on the prison Trash Crew; his efforts continued until ASP banned aluminum cans in March, 2006.

14    In addition, again on his own initiative, Mr. Bell has completed the Pro-Literacy America
15    workshop to become a certified Laubach literacy tutor.  (Exhibit H)  He is presently assisting three
16    other inmates with math and English lessons toward their G.E.D.s.

17    Mr. Bell's concern for others and his willingness to pursue positive solutions to problems are
18    further indications of his ability to function as an upstanding, law-abiding citizen upon release.

19
20    **V.  PAROLE PLANS**

21    Mr. Bell has made comprehensive and realistic plans for his life upon release from prison.  As
22    is more fully set forth in his November 23, 2005, memorandum to his correctional counselor (see
23    Central File), Mr. Bell plans to live with his wife, Susan Bell, at their home in Chino, California,
24    which she has owned for over twenty years.  Mr. Bell and his wife have known each other for more
25    than thirty years and have been married for over ten years - - this is a <u>very</u> stable, close, and
26    supportive relationship. (Exhibit R)  If, for any reason, Mr. Bell is unable to live with his wife, he
27    has the options of living with his mother, LaVonia Margala, with his uncle and aunt, Dale and Lynn
28    //

1    Cauble, and with others who have offered such support.[8] (Exhibit R; Lifer Report, p. 7)

2        For employment, Mr. Bell plans to return to the computer industry, where he worked for

3    almost twenty years before his incarceration. (Exhibits A, B)    CDCR has acknowledged Mr. Bell's

4    exceptional computer skills.  (Exhibit M; Lifer Report, p. 8)   Mr. Bell has two valid, full-time

5    computer job offers upon his release:

6            •  Systems Analyst, Chino Valley Medical Center

7            •  I.T. Help Desk, Alpine Development Group (Exhibit R)

8    In addition, Mr. Bell has maintained contacts in the computer industry who would assist him in

9    obtaining suitable employment if necessary. (Exhibit R)   He is also aware of several computer-

10   oriented temporary agencies and on-line computer job websites where he could obtain computer

11   programming jobs as an independent contractor.

12       Mr. Bell has taken full advantage of the vocational training offered by CDCR to update and

13   enhance his computer skills.  He has developed websites using various Microsoft tools, and created

14   interactive educational software games in Visual Basic - - both of these skills are in great demand.

15   Mr. Bell has several valid part-time or contract job offers in website design and maintenance

16   (Exhibit R), including:

17      •  Realty Executives, Inc.            •  Susan Magon (Public Accounting)

18      •  Foothill Psychological Services    •  Carol Williams (Resource Management)

19       Outside of the computer industry, Mr. Bell's completion of Vocational Office Services, with

20   exceptional skills in the full suite of Microsoft Office products and a typing speed of 85 net words

21   per minute, make him readily employable on a temporary basis, as an independent contractor, or in

22   a business of his own. (Exhibits J, L)   Mr. Bell's completion of Vocational Landscaping produced

23   skills that are readily employable in landscape maintenance, in a commercial nursery, or in a

---

[8] Mr. Bell requests that he be paroled to San Bernardino County, rather than to the county of
commitment, Santa Clara County, under the provisions of California Penal Code § 3003(b).  He has no
family, no home, and no contacts in Santa Clara County, while he has his wife, his home, his mother,
job offers, and more in San Bernardino County.  The support of his wife and his mother, both of whom
Mr. Bell has maintained strong ties while incarcerated, would significantly increase the likelihood of
his successful parole.  Neither the victim nor any witnesses reside in San Bernardino County, nor in
any adjacent counties.  Mr. Bell's parole to San Bernardino County is in the best interests of the public.

1  gardening or landscape design business of his own. (Exhibit J)  His completion of Vocational

2  Carpentry makes him readily employable in the building trades. (Exhibit J)  Mr. Bell has at least

3  two more valid job offers outside the computer industry, including:

4  •  **Warehouse Manager, ProTech Medical**

5  •  **Legal Assistant, R. Hanson, Attorney (Exhibit R)**

6  Mr. Bell is blessed with a strong support network of family and friends to aid his re-adjustment

7  to society and help ensure his successful parole.  This support is demonstrated by the attached 38

8  letters from upstanding citizens[9] (Exhibit R), which include the following specific offers of support

9  to Mr. Bell:

10

| # Letters | Offering | # Letters | Offering |
|-----------|----------|-----------|----------|
| 12 | All Needed Support | 6 | Housing |
| 11 | Financial Assistance | 8 | Employment Offers |
| 12 | Job Referrals/Assistance | 16 | Emotional Support |

14  Mr. Bell's post-parole plans, self-motivation, outstanding work ethic, advanced education,

15  career experiences, and strong support network will serve him well upon release. (Exhibits A, B, E,

16  H, J, L, M, O, R; Lifer Report)  *"Mr. Bell has expressed a strong desire to work and live in*

17  *accordance with BPH conditions and guidelines."*  (Lifer Report, p. 8)

18

19  **VI.  RISK OF DANGER TO SOCIETY (15 CCR § 2402(a))**

20  The touchstone for parole suitability is "whether the prisoner will pose an unreasonable risk of

21  danger to society if released from prison."  15 CCR §2402(a).  There is **_no_ evidence anywhere** in

22  Mr. Bell's record that he would pose **_any_ risk to public safety, much less the _"unreasonable_ risk"**

23  required by this regulation.

24  At Mr. Bell's sentencing for the commitment offense, the trial judge, the Honorable Thomas

25  Hansen, explicitly found him to be "low risk" for reoffending:

26  *"I do not perceive [Mr. Bell], other than in this instant case, as being a man of*

---

[9]  These include a retired Chief of Police, two psychologists, two social workers, a retired Special
Forces lieutenant colonel (West Point graduate), five doctors and/or clinicians, seven educators, two
pastors, a CEO, eleven business and/or computer professionals, and more.

1     *violence. And it's unlikely, in my opinion, absent some unusual circumstances, that*
2     *he will be reoffending in the future."* (Exhibit P)

3     Judge Hansen's evaluation of Mr. Bell's nonviolent nature has been born out by years of

4     disciplinary-free programming in the hostile and violent prison environment.  Likewise, the

5     Probation Officer's Report does not indicate that Mr. Bell would pose any risk upon release.

6     A psychiatric evaluation of Mr. Bell conducted for the trial court in 1995 by Dr. Paul Koller

7     concluded:

8     *"Mr. Bell does not represent a current threat to his wife or to the community at*
9     *large."* (Exhibit Q)

10    In the "Mental Health Evaluation" prepared by CDCR psychologist Dr. Steven Walker in 2002

11    for Mr. Bell's initial Board hearing, he was scored *"low risk"* on every assessment scale.  Dr. Walker

12    concluded:

13    *"Risk assessment measures suggest that the inmate poses a low likelihood to*
14    *become involved in a violent offense if released into the free community."*  (PH at
15    61) [original emphasis]

16    While seriously flawed in other respects (e.g., completely ignoring Mr. Bell's copious self-help

17    efforts and repeated expressions of remorse)[10], the current CDCR psych evaluation by Corinne

18    Schroeder, Ph.D., nonetheless found:

19    *"His risk of harm to others is below average for [the] parolee population."*

20    //

---

[10]  Mr. Bell respectfully requests that this Panel disregard the final page of the Schroeder Report and instead utilize Dr. Macomber's more comprehensive and accurate clinical assessment where: (1) Schroeder failed to follow the requirements of D.O.M. §54060.43.2 and §62090.13, *et seq.*, for BPH psychiatric reports, especially in failing to note any facts or reasons supporting her conclusions on page 4; (2) Schroeder's statement that Bell *"has not expressed remorse"* is contrary to the record, e.g., 2004 Hearing Transcript at p. 120, ln. 18-25; (3) Schroeder's statement that Bell *"has much work to do"* in self-help and specifically noting a need for *"anger management"* is unsupported and ignores Bell's many years of copious self-help (see Section IV.C. and IV.D. above; Exhibits K, N & O); (4) Schroeder conducted no standardized objective tests for risk assessment unlike the evaluations of Drs. Koller, Walker, and Maccomber (Mr. Bell has scored as *"low risk"* on all objective tests); (5) Dr. Macomber's professional review of page 4 of the Schroeder Report found her comments *"unsubstantiated and not appropriate to the facts"* (Exhibit C, p. 5), and (6) Dr. Terry Chase's sworn declaration that the Schroeder Report *"provides no clinical or logical support for it's poorly conceived conclusion"* (Exhibit D, p.2).  Because the final page of the Schroeder Report lacks any "indicia of reliability" it should be disregarded per 15CCR §2402(b) and *In re Rosenkrantz* at 652.

1        A far more comprehensive "Clinical Assessment" by Dr. Melvin Macomber[11] in March, 2006,

2    found Mr. Bell to be "*low risk, low needs,*" explaining:

3            "*[I]f 100 men were released on parole, [Bell] would do better than 99 of them...*
4            *There are no factors in this case that would indicate that he is a danger to society in*
5            *any way... The prognosis for successful adjustment in the community is*
6            *outstanding.*" (Exhibit C)

7        The Lifer Report prepared for Mr. Bell's 2004 hearing, before CDCR discontinued CC-I risk

8    assessments, found:

9            "*Bell would not pose a great deal of threat to society.*" (PH at p. 58)

10        A further indication that Mr. Bell poses no risk to society can be found in the many support

11    letters submitted to this Board on his behalf. (Exhibit R)  Without exception, the writers of these

12    letters express their confidence in Mr. Bell's positive attitude and plans for the future, and their

13    collective certainty that he poses no public safety risk.

14        Finally, in addition to the individual assessments noted above, Mr. Bell's personal

15    characteristics put him at an extremely low statistical risk for recidivism.  In 2002, the U. S.

16    Department of Justice published the most comprehensive study of recidivism ever undertaken,

17    tracking 272,111 former prisoners from 15 states (including California) who were released from

18    prison in 1994 and measuring recidivism rates against several characteristics of those prisoners.

19    (Exhibit S)  For those prisoners in the database matching all five characteristics possessed by Mr.

20    Bell[12], the recidivism rate within three years was just 8.2%, compared to 67.5% overall. (Exhibit T)

---

[11] It should be noted that Dr. Macomber is a former Parole Agent II who has been working with life-term inmates for 40 years.  As a forensic psychologist he provides mental health services to CDCR and has written more than 2,500 BPT/BPH psych evaluations. (Exhibit C)

[12] Mr. Bell possesses five characteristics matching the criteria used in this recidivism study:
    (1) *Age when released.* Those prisoners 45 years of age or older, like Mr. Bell, had the lowest recidivism rates. (Exhibit S, p.7)
    (2) *Commitment offense.* Those prisoners imprisoned for a violent offense, like Mr. Bell, had lower recidivism rates than those with property, drug, or public disorder crimes. (Exhibit S, pp. 7-8)
    (3) *Number of Prior Arrests.* Those prisoners with the fewest prior arrests, like Mr. Bell's single arrest for the commitment offense, had the lowest recidivism rates. (Exhibit S, p. 10)
    (4) *Time Served.* Those prisoners who served 61 months or more, like Mr. Bell, had the lowest recidivism rates. (Exhibit S, p. 11)
    (5) *Prior Prison Terms.* Those prisoners who were "first timers," like Mr. Bell, had the lowest

1    In short, Mr. Bell does not pose *any* current public safety risk and should be found

2    suitable for parole under 15 CCR § 2402(a).

3

4    **VII.  CIRCUMSTANCES TENDING TO SHOW UNSUITABILITY (15 CCR § 2402(c))**

5    "A parole date shall be denied if the prisoner is found unsuitable for parole under Section

6    2402(c)."  15 CCR §2401.  Under this section, there are six codified circumstances tending to

7    indicate unsuitability for parole - - *none of which applies in this case*:

8    ***Commitment Offense***.  "An offense sufficient to justify a parole denial must be *especially*

9    heinous, atrocious, or cruel...[and] must be *particularly egregious* to justify the denial of a parole

10   date."  *In re Rosenkrantz* at 668 [emphasis added].  Such an offense must exhibit "factors beyond

11   the minimum elements of the crime."  *In re Dannenberg* at 1071.  These factors must relate to a

12   prisoner's <u>current</u> threat to public safety.  *Id.* at 1084; *In re Scott*, 133 Cal.App.4th 573  (Cal.App. 1

13   Dist. 2005) ["*Scott II*"].  ***No such factors exist in this case.***[13]

14   At Mr. Bell's initial hearing, the Board explicitly negated <u>all</u> codified factors tending to show

15   unsuitability for parole except 15 CCR §2402(c)(1) "Commitment Offense."  (PH at p. 127)

16   However, the evidence supports <u>none</u> of the "commitment offense" sub-factors:

17       (A)  <u>Multiple Victims</u>: Does not apply.

18       (B)  <u>Exceptionally Dispassionate and Calculated</u>: Mr. Bell was found to have premeditated his

19            crime.  However, premeditation is an element of the offense, <u>not</u> an *exceptional* factor.

20            Further, the fact that an attempted murder was "premeditated and deliberate does not tend

recidivism rates. (Exhibit S, p. 10)

When contacted by Mr. Bell's family, the author of this recidivism study, Dr. Patrick A. Langan, a
specialist with the U. S. Department of Justice, conducted a custom search of the database of 272,111
prisoners released in 1994.  For those prisoners matching all five of Mr. Bell's characteristics, the
recidivism rate after three years was just 8.2% - - "low risk" by any measure. (Exhibit T)

[13]  It is important to note the Trial Court's characterization of the commitment offense.  Judge Thomas
Hansen found the offense to be "premeditated" (resulting in the life sentence) and to have inflicted
"significant injuries" (resulting in the three-year GBI enhancement, which Mr. Bell *has already
served*), but the Court did <u>not</u> characterize the offense as "especially heinous, atrocious or cruel", <u>nor</u> as
demonstrating "an exceptionally callous disregard for human suffering." (Exhibit P, lines 21-24)  *The
Court found only those circumstances necessary to sustain Mr. Bell's conviction and sentence, but <u>not</u>
more.*  There are <u>no</u> factors here "beyond the minimum elements of the crime."

1          to show it was carried out in a dispassionate manner, such as an execution-style murder."

2          *In re Scott*, 119 Cal.App.4th 871, 895 (Cal.App. 1 Dist. 2004) ["*Scott I*"]. *No evidence*

3          *supports this sub-factor*.

4     (C)   Victim Was Abused: There is no evidence that Mr. Bell gratuitously increased or

5          unnecessarily prolonged Mrs. Bell's suffering; no evidence of torture, mayhem, or

6          infliction of pain for personal satisfaction. Instead, the record shows only that incidental

7          infliction of pain which would be expected in any attempted murder. *People v. Davenport*,

8          41 Cal.3d 247, 271 (Cal.1985). *This is not abuse; this sub-factor is not supported.*.

9     (D)   Exceptionally Callous Disregard For Human Suffering: While all violent crimes by their

10          nature involve a degree of disregard for the suffering of another, this factor applies only

11          where "the offense in question [was] committed in a more aggravated or violent manner

12          than ordinarily shown in the commission of [attempted] murder." *Scott I* at 891. No

13          evidence supports this. Instead, the record shows Mr. Bell did not proceed when he had

14          the opportunity to do so, he helped Mrs. Bell after her injury, and he called 911 for

15          medical assistance; his first words to the arriving officer were "Please help her." (RT 549,

16          732-33, 1159-60) *These are not callous acts; this sub-factor is not supported*.

17     (E)   Inexplicable Or Very Trivial Motive: This applies only where the motive is "unexplained

18          or unintelligible," i.e., is "materially less significant (or more 'trivial') than those which

19          conventionally drive people to commit the offense in question and the offense has "no

20          discernable purpose." *Scott I* at 892-893. Such is not the case here. The record reveals

21          multiple motives including marital discord and fear of financial ruin. (PH at p. 60) At

22          trial, the prosecution asserted these motives were "*strong (and) compelling*," and that Mr.

23          Bell's life was a "*pressure cooker*" with stress building for months before the offense.

24          (Exhibit V) *No evidence supports this sub-factor.*

25       Where none of the above sub-factors apply, much less point to any current threat to public

26 safety, the commitment offense cannot justify a denial of parole for Mr. Bell. Further, after more

27 than twelve years of exemplary incarcerated behavior, the predictive value of the commitment

28 offense is near zero; the facts surrounding the offense no longer constitute "some evidence" with

1   "some indicia of reliability" of his dangerousness.

2

3       As for the remaining criteria  under 15 CCR §2402(c), the record reveals that none of these

4   apply to Mr. Bell, as acknowledged by the panel at his 2004 parole hearing:

5       *Previous Record of Violence*. The previous panel correctly acknowledged that Mr. Bell has

6   absolutely no history of violent or assaultive behavior. (Exhibits C, P, Q, R; Lifer Report, pp. 2-3;

7   PH at p.127)

8       *Unstable Social History*. The previous panel correctly acknowledged that Mr. Bell has

9   absolutely no history of unstable or tumultuous relationships with others. (Exhibits C, Q, R; Lifer

10   Report p. 3; PH at p. 127)

11      *Sadistic Sexual Offenses*. The previous panel correctly acknowledged that Mr. Bell has

12   absolutely no history of sexual offenses, sadistic or otherwise.    (Exhibit C, P; Lifer Report; PH at

13   p. 127)

14      *Psychological Factors*. The previous panel correctly acknowledged that Mr. Bell has absolutely

15   no history of mental problems. (Exhibits C, Q; Lifer Report; PH at p. 127)

16      *Institutional Behavior*.  While the previous panel acknowledged that Mr. Bell's behavior has

17   been "acceptable," in fact it has been exemplary; he has a *perfect prison record*.  (Exhibit C, H, K,

18   L, N, O; Lifer Report; PH at pp. 31, 128; see Section IV, above)

19      In short, 15 CCR §2402(c) simply does not apply in this case. *There are no factors tending to

20   show Mr. Bell unsuitable for parole.*

21

22   **VIII.  CIRCUMSTANCES TENDING TO SHOW SUITABILITY (15 CCR § 2402(d))**

23      "A parole date **shall be set** if the prisoner is found suitable for parole under Section 2402(d)."

24   15 CCR §2401.  Under this section, there are eight codified circumstances tending to indicate

25   suitability for parole - - *Mr. Bell meets all applicable criteria.*

26      *No Juvenile Record*. The previous panel correctly acknowledged that Mr. Bell has absolutely

27   no previous criminal record whatsoever, juvenile or otherwise.  (PH at p. 127; Lifer Report, pp. 2-3;

28   Exhibit P)

29      *Stable Social History*. The previous panel correctly acknowledged that Mr. Bell has a history of

1    stable and positive relationships with others as evidenced by the many support letters from family

2    and friends, and by three psychological evaluations. (PH at p. 127; Exhibits C, Q, R)

3        ***Signs of Remorse***.  Mr. Bell has indicated that he understands the commitment offense, that he

4    accepts full responsibility for this crime, and that he is profoundly remorseful for the pain and

5    suffering he has caused. (PH at p. 120; Exhibits C, R)  Mr. Bell further demonstrated this by

6    voluntarily accelerating his restitution payments, completely meeting this obligation years earlier

7    than required.  He has sought to make amends by living a positive life, doing his best to contribute to

8    his environment, and through voluntary service to others. (Section IV, above; Exhibits E, H, I, L)

9        ***Motivation for Crime***.  As characterized by the prosecution, the commitment offense resulted

10    from significant stress in Mr. Bell's life built up over a period of time, including fear of discovery of

11    his affair, pressure for a romantic commitment, and fear of financial ruin.  The prosecutor described

12    Mr. Bell's stress as "*The pressure cooker is on the stove.  And it's cooking.*" (Exhibit V)  He

13    elaborated for the jury:

14            "*Things started to compress...It got more intense.  The pressure increased...And
15            motivated the defendant [Mr. Bell] to do what he did.*" (Exhibit V)

16    Clearly this was a unique and very stressful situation in Mr. Bell's life, and one that is unlikely to

17    recur, as the trial court explicitly recognized. (Exhibits C, P; Lifer Report)

18        ***Battered Woman Syndrome***.  Does not apply.

19        ***Lack of Criminal History***.  The previous panel correctly acknowledged that Mr. Bell has

20    absolutely <u>no</u> criminal history. (Lifer Report, pp. 2-3; PH at p. 127; Exhibit P)

21        ***Age***.  Mr. Bell's personal growth and present age, 51, reduce the probability of recidivism.

22    (Exhibit C, pp. 7-8; Exhibit S, p.7)

23        ***Understanding and Plans for Future***.  As is more fully set forth in Section V above, Mr. Bell

24    has comprehensive and realistic plans for release, many marketable skills, several job offers, a stable

25    home, and a <u>very</u> strong support network of family and friends to aid his re-entry into the

26    community. (Exhibits A, B, C, J, M, R; Lifer Report, pp.7-8)  The previous panel acknowledged

27    Mr. Bell's parole plans and marketable skills. (PH at pp. 58, 128)

28        ***Institutional Behavior***.  As is more fully set forth in Section IV above, Mr. Bell's institutional

29    behavior has been exemplary in every respect, including outstanding job and vocational

1  performance, extensive <u>voluntary</u> self-improvement, and remaining 100% disciplinary free; he has a

2  *perfect prison record.* (Exhibits C, E, H, J, K, L, N, O; Lifer Report; PH at pp. 31, 128)

3  In short, 15 CCR § 2402(d) fully applies in this case. *Mr. Bell possesses <u>every</u> characteristic*

4  *showing him suitable for parole.*

5

6

7  **IX. CONCLUSION**

8  In consideration of all the aforementioned evidence, facts, and exhibits, showing that Steven

9  Bell in <u>no</u> way poses any current risk of danger to society, this Panel should now find him suitable

10  for parole and fix his term.

11  Dated this  *14*  day of  *OCTOBER*  , 2006, at Santa Monica, California.

12

13

14  Respectfully submitted,

15
16  *Linda Buchalter*
17  Linda Buchalter
    Attorney for Steven D. Bell

**X. VERIFICATION**

I, the undersigned, say:

I am the prisoner candidate for parole in the above entitled matter. I have read the foregoing summary of facts and know the contents thereof; that the same is true of my knowledge, except as to the matters which are therein stated on my information or belief, and as to those matters, that I believe it to be true.

I declare under penalty of perjury under the Laws of the State of California that the above is true and correct.

Dated this ___15th___ day of ___October___, 2006, at Avenal, Kings County, California.

Steven D. Bell

1

## TABLE OF EXHIBITS

2

3

| Exhibit | Description | No. of Pages |
|---------|-------------|-------------|
| A | Diploma, Bachelor of Science, *cum laude* (1977) . . . . . . . . . . . . . . . . . . | 1 |
| B | Resume' of Steven Bell (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2 |
| C | Dr. Melvin Macomber's Psychiatric Evaluation (2006) . . . . . . . . . . . . . . | 9 |
| D | Declaration of Dr. Terry Chase, Ph.D. (2006) . . . . . . . . . . . . . . . . . . . . | 5 |
| E | C.D.C.-101 Work Supervisor's Reports . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| F | Recent Narcotics Anonymous Certificates . . . . . . . . . . . . . . . . . . . . . . | 3 |
| G | Self-Study Reports for Self-Improvement . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| H | Sample C.D.C.-128 Laudatory Chronos, Appreciation Certificates, and Staff Commendations . . . . . . . . . . . . . . . . . . . . . . . . . | 7 |
| I | Excerpts from Prison Blood Drive Letters and Ronald McDonald House Program . . . . . . . . . . . . . . . . . . . . . . . . . | 8 |
| J | Vocational Completion Certificates . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 |
| K | Anger Management Completion Certificates . . . . . . . . . . . . . . . . . . . . . | 4 |
| L | Sample C.D.C.-128-E Education Progress Reports and Progress Certificates with Comments . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| M | C.D.C.-128 Re: Bell's Exceptional Computer Skills (2005) . . . . . . . . . . . | 2 |
| N | Institutional Self-Help Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 |
| O | Outside Self-Improvement (FEMA, Creative Options, Restorative Justice, Meditations) . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 8 |
| P | Excerpt from Sentencing Transcript, Judge Thomas Hansen's Comments (RT 30) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 |
| Q | Dr. Paul Koller's Psychiatric Evaluation (1995) . . . . . . . . . . . . . . . . . . . | 4 |
| R | Community Support Letters (2005-2006) . . . . . . . . . . . . . . . . . . . . . . . | 47 |
| S | Recidivism Study, U.S. Department of Justice (2002) . . . . . . . . . . . . . | 16 |
| T | Inquiry and Response, U.S. Department of Justice (2002), Recidivism of Prisoners Similar to Steven Bell . . . . . . . . . . . . . . . . . . . . | 1 |
| U | (Unused) | |
| V | Excerpts from Prosecutor's Closing Argument at Trial (RT 1614-15, 1623-24, 1645) . . . . . . . . . . . . . . . . . . . . . . . . . . | 5 |

D

Paul Koller, Ph.D.
Licensed Clinical Psychologist
P.O. Box 907
Moss Beach, CA  94038
(415) 728-8401

June 11, 1995

Phillip H. Pennypacker
One Almaden Boulevard--Suite 200
San Jose, CA  95113-2213

Re: Steven Dale Bell

Subject: Psychiatric Evaluation

Dear Mr. Pennypacker:

Background:

    As authorized by your office, on June 7, 1995, I conducted a
psychiatric evaluation of defendant Steven Dale Bell.  It is my
understanding that Mr. Bell has been convicted of one count of
Attempted Murder, and that the purpose of my evaluation was to
provide an impartial psychological assessment to be presented to
the Court pursuant to his sentencing.  I met with Mr. Bell in
custody at the San Jose Main Jail.  At the beginning of the
interview I informed Mr. Bell of the nature and purpose of my
evaluation.  I then conducted a three hour clinical interview,
during which time I administered a Mental Status Examination,
Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Rorschach
Inkblot Test, and Thematic Apperception Test (TAT).

Brief Psychosocial History:

    The following information was obtained primarily from Mr.
Bell.  He is a 40 year old, married, caucasian male who comes from
a family with one sister, 38 years old, who works as a teacher for
the deaf.  His parents divorced when he was in college.  His father
owns a printing business, and his mother works as a data processor
for a school district.  He was raised in Southern California and
reports a relatively happy childhood, denying any history of
physical or sexual abuse or any family psychiatric history.  He was
active in school sports (wrestling and track), student government,
band, and choir.  He denies any juvenile criminal record and denies
any history of serious medical problems.  He never served in the
military, graduated from California Polytechnical Institute in
1977, and has completed some post-graduate work in business at San
Francisco State University.  He has a steady work history, most
recently working for more than seven years for Kaiser Permanente,
currently serving as a senior consultant and project manager.  He
acknowledges occasional social use of alcohol and a history of
having experimented with marijuana about 15 years ago.  He denies
any recent use of illicit substances or history of problems with

alcohol. He was married to his first wife from 1978-1989 and since the divorce has served as the custodial parent of their 14 year old son and 12 year old daughter. He met his current wife in 1991. They were married in 1993, living with his two children and his wife's two teenage daughters. He denies any history of psychiatric treatment, but acknowledges some couples counseling during his first marriage, and family therapy immediately prior to his second marriage in order to help the family adjust to the impending changes. Among his other interests, Mr. Bell reports that he has served as past president of a local Toastmasters group.

## Mental Status Examination:

Mr. Bell was open and cooperative with the evaluation. He was neatly groomed, fully oriented, made good eye contact, and was taking no prescription medications at the time of the interview. He exhibited no unusual motor movements, his speech was logical, goal oriented, and responsive to the questions asked. He evidenced a slight stutter at times, but otherwise his speech was unpressured and evenly paced. He described his mood as somewhat depressed secondary to his incarceration and current legal situation, but otherwise reported no history or current symptoms of clinical depression or bipolar affective disorder. His abstract reasoning, long and short term memory, concentration, fund of general information, and capacity for appropriate social judgment were all at the average or above average level. His IQ was estimated to be at least in the High Average range of intellectual functioning. There were no indications or self-report of symptoms suggesting any formal thought disorder, paranoid ideation, or gross organic brain syndrome. There appeared to be some very mild, sub-clinical obsessive-compulsive features noted, but well within a non-problematic or pathological range of parameters.

## Minnnesota Multiphasic Personality Inventory-2 (MMPI-2):

The MMPI-2 is a relatively objective, highly validated psychological test used to assess psychopathology and personality style. It compares a subject's personality profile with that of others who responded similarly to the 567 test items.

The Validity Scales help provide a gross measure of overall adjustment and tend to suggest attempts to either malinger or hide negative symptoms. The following behavioral description has been applied to subjects with a Validity Scale profile similar to that obtained by Mr. Bell:

"...suggest a healthy balance between positive self-evaluation and self-criticism. Such people tend to be well adjusted psychologically and to manifest few signs of emotional disturbance. They are independent, self-reliant, and capable of dealing with problems in their daily lives. They tend to have high intellectual abilities and wide interests, and to be ingenious, enterprising, versatile, and resourceful. They think clearly and approach problems in a reasonable and systematic way. In social situations, they mix well with other people, are enthusiastic and verbally

fluent, and tend to take an ascendant role." (Graham, 1993)

All scores on the Clinical Scales of the MMPI-2 fell within the normal range. There was no suggestion of any acute psychiatric condition or chronic character pathology. Broken down into Subscales, two categories reached clinical significance: Social Alienation and Naivete. These Subscales suggest that Mr. Bell currently feels isolated and estranged from others, feels lonely, unhappy, and concerned about how other people are viewing him. They further suggest that he tends to have very optimistic attitudes about other people, seeing them as honest, unselfish, and trust-worthy. People who score high on these Subscales also tend to have high moral standards and do not experience hostility and negative impulses. (Graham, 1993)

## Rorschach Inkblot Test:

The Rorschach is a more projective assessment instrument, useful in forensic work, because the ambiguous nature of the task makes it extremely difficult for a naive subject to deliberately fake or manipulate a desired outcome. In general, results of the Rorschach were consistent with overall clinical impressions. There was no suggestion of any thought disorder, paranoia, gross signs of brain damage, or indication of serious character pathology.

The protocol did suggest that Mr. Bell is very aware of his internal emotional states, but does not become disorganized by strong feelings or experience a need to overcontrol them. He is clearly aware of other people and sensitive to their needs as separate and distinct from his own. He is able to gain a perspective on his problems, appears to be relatively mature, and is likely to be relatively comfortable with his sexual identity. If there was problem suggested, it might be a tendency to minimize awareness and recognition of the legitimacy of his own personal needs and desires.

## Thematic Apperception Test (TAT):

The TAT is another projective psychological test. It tends to identify interpersonal conflicts and unresolved issues which a person may consciously be unaware of or be reluctant to share with others.

The TAT suggested that Mr. Bell tends to be a hopeful person, with a generally positive outlook. He may at times have unrealistic expectations about relationships, and while he is willing to work hard to accomplish his goals, he may at times feel disappointed by others. Some of this may stem from a tendency to overly idealize significant others, particularly authority figures. This disappointment may take the form of feeling misunderstood, unappreciated or poorly supported at times.

## Discussion:

No psychiatric diagnosis or significant psychological problems were identified by this evaluation. I can say with virtual

certainty that if 100 qualified psychologists or psychiatrists evaluated Mr. Bell, all 100 would agree that there is no indication of an antisocial personality disorder.  He has above average intelligence, appears to be emotionally stable and responsible, and appears fully capable of complying with any probation or alternative sentencing requirements placed upon him.  There is a notable absence of any overt or overcontrolled anger or hostility, and he appears strongly motivated to return to his family and get back on track with his life as soon as possible.

Psychiatry has historically been relatively poor at predicting violent behavior.  With this caveat in mind, however, all psychological testing, clinical impressions, and historical material presented strongly and consistently suggest that Mr. Bell does not represent a current threat to his wife or to the community at large.  In my professional opinion, he appears to be as positive a candidate for consideration by the Court for probation or alternative sentencing as any defendant I have evaluated in my forensic career.

Please feel free to contact me for additional information or with any questions you may have regarding the above evaluation.

Sincerely,

Paul Koller PhD

Paul Koller, Ph.D.

E

# MENTAL HEALTH EVALUATION
## FOR THE BOARD OF PRISON TERMS
### DECEMBER 2002 CALENDAR
### LIFER PROGRAM UNIT
### AVENAL STATE PRISON

## I. PSYCHOSOCIAL ASSESSMENT

**IDENTIFYING INFORMATION:** Mr. Steven Bell, CDC# J-69411, is a 47-year-old (DOB: 5/21/55), thrice married, White first-termer, committed from Santa Clara County. He is serving a Life plus four-year sentence for Attempted First Degree Murder with use of a Deadly Weapon (pipe) and with Great Bodily Injury. The index offense occurred on 8/15/94, and he entered into the California Department of Corrections (CDC) for this crime on 7/17/95. He arrived at ASP on 4/20/01. The inmate was 39 years of age at the time of his involvement in the controlling offense. His MEPD was calculated at 1/3/04. Current classification score is 8 (10/16/01), and will likely be reduced at the time of the inmate's December hearing. The inmate listed a religious preference as a "non-denominational deist with a Christian flavor." He described his spirituality as a "very personal thing." He denied having any tattoos. He denied the use of any aliases. The inmate has no known gang affiliation.

The inmate's central file and health record were reviewed. He was interviewed on 10/16/02. He was informed that the interview was not confidential and that a report with the results of the evaluation would be submitted to the Board of Prison Terms to assist in determining his eligibility for parole. The inmate appeared to understand the nature of the evaluation and the possible consequences of the interview to the best of the inmate's ability. For reasons not limited to the possibility that an individual may have a mental disability or condition, which may qualify under the Americans with Disabilities Act, the evaluation was conducted by a licensed psychologist. Also, it is the conclusion of the undersigned examiner that it was not necessary to provide auxiliary aids or assistance to achieve effective communication.

**DEVELOPMENTAL HISTORY:** Mr. Bell's developmental history seems to be unremarkable. There were no indications of prenatal/perinatal concerns, birth defects or serious medical problems. Developmental milestones were attained roughly within expected time periods, and he reportedly recovered adequately from all the normal childhood illnesses. The available information reflects that Mr. Bell did not experience any serious adjustment difficulties due to physical disabilities during his childhood.

The inmate reportedly grew up in a relatively stable, conservative and traditional dual parent household as the elder of two children (younger sister). He was born and raised in southern California (Los Angeles area), and described his childhood as "ordered, structured. My father was the disciplinarian, and my mother was the caregiver. It was a

BELL, Steven        J-69411        1        BPT        DECEMBER 2002

INMATE COPY

standard, middle class American, somewhat more conservative, educational and loving" upbringing. Although the family moved a few times early in the inmate's childhood, they settled in Glendora, California when Mr. Bell was approximately age eight. The inmate was raised in a Baptist home, and noted that attending church services was a regular event. He added that his maternal uncle and grandfather were both Baptist ministers. As a child, the inmate indicated that he enjoyed various activities, both solitary and social, including riding bikes, playing with friends, fishing, belonging to the Cub Scouts (and later the Boy Scouts to the rank of Life Scout), and being a voracious and passionate reader. Mr. Bell suggested that his earliest rebellion took the form of religious experimentation, as after the age of 12 he began considering different spiritual belief, from atheist to attending services of various denominations, including Jewish, Catholic, and pagan (Wicca), among others.

The inmate acknowledged no behavioral markers of antisocial personality traits prior to the age of 13 years, such as lying, stealing, vandalism, fighting, curfew, truancy, runaway, arson, burglary, behavioral cruelty, or witnessing violence. He never had any formal contact with juvenile authorities, and was never remanded to juvenile hall or any out of home placement. He denied being the victim of any type of abuse or neglect during his childhood.

**EDUCATION:** Mr. Bell described attending three different elementary schools without major transitional difficulty, before his family settled in the Glendora area when the inmate was finishing the third grade. His elementary school education was relatively unremarkable, with no history of special education classes, suspensions, expulsions, deportment problems, nor any record of treatment for an attention deficit disorder. The inmate noted that, relative to education, he "always did well." His strongest subject was math, while his weakest grades were in geography/social studies.

Mr. Bell denied any transition problems in the move to junior high school and, conversely, enjoyed the freedom and the curriculum changes. He noted that he graduated second in his class from the eighth grade. He went on to high school, where he initially tried his hand at sports (track, wrestling), but later focused extracurricular energy on band and drama. He continued to do well academically, and indicated that he graduated fourth in his class of 300 in 1973, while taking advanced courses (he reported making all A's in high school, with the exception of two B's in German). He went on to college, and graduated with honors from California Polytechnic University – Pomona in 1977. He subsequently continued to take graduate level coursework, in the MBA degree curriculum, at both UC-San Bernardino and San Francisco State University.

Institutional achievement testing (TABE) assessed the inmate to be academically functioning at above the high school graduate (12.9) level (11/14/95). While incarcerated the inmate has utilized the opportunity to improve himself vocationally, and reported that he completed all phases of Vocational Landscaping. He noted that he completed this vocational endeavor at the request of the BPT, which made being financially self-sufficient in prison very difficult. The inmate would prefer to program in paying positions, and does not believe that he needs further vocational training because he is

relatively quite employable given his educational and experience background. He verbalizes, however, that he is amenable to following any directives from the BPT.

Self-help/psychoeducational program completions include the E.A.G.L.E. program (2001), Early Engagement (2001), and a Parenting course (2002). He has also been regularly attending AA/NA meetings (2001-02), which he started in 1999.

**FAMILY HISTORY:** Mr. Bell is the elder of two children (one sister) born to the now-divorced union of his biological parents, each of who eventually remarried. The inmate and his sister grew up in a stable two-parent household in a middle-to-upper middle class neighborhood. His parents divorced in approximately 1976, while the inmate was in college (age 21). He indicated that he was never very close emotionally to his sister, and described their current relationship as "not close, not distant – just friendly." The inmate described his father as fairly emotionally aloof, rigid and sometimes punitive, but noted that their relationship today is much improved. His father, now age 68, typically worked in managerial positions in electronic firm or was self-employed in this field, and is presently working in Lincoln, Nebraska. Mr. Bell reported that his mother, now 67 years old, is retired from an administrative position in the Oregon school system and is living in Upland, California. He offered that he always felt emotionally close to his mother, and that currently he feels even closer. The inmate noted that both of his parents are in "excellent" health.

Positive family history for emotional problems, legal entanglements, and/or substance abuse was denied by Mr. Bell.

The inmate reported that he has ongoing contact with his family, including his mother (visits once a month), father, sister (in Oregon), a maternal uncle in California (visits thee times a year), friends, and his wife and children. The inmate indicated that his family is emotionally and financially supportive, in that his wife, mother, and uncle have all expressed an offer of a place to stay should the inmate be granted a parole.

**PSYCHOSEXUAL DEVELOPMENT:** Mr. Bell entered into puberty at about the age of 13. He identified himself as exclusively heterosexual. He first began dating at the age of 15. His first full sexual experience was at age "17 years, five months" with a 16-year-old girl whom the inmate would later marry. He estimated that he has had sexual relations with "roughly twenty" different women, but clarified that about ten of his sexual partners were during an experimental period of "open marriage" with his first wife, between the years of 1978 and 1983. He indicated that he once went to a prostitute, while he was touring Europe with a friend. He denied ever contracting, or being treated for, a sexually transmitted disease.

**MARITAL/RELATIONSHIP HISTORY:** Mr. Bell has been married three times. He was married to Debra on 2/25/78 (age 22), and this relationship produced the inmate's only two children, a son, Sean (now 22), and daughter Erin (now 19). The marriage was marred at the end by his wife's infidelity (apart from the open marriage they practiced together for five years) and two separations (she first left the family home in 1987 for a

year), the last (1990) leading to a divorce, which was finalized in 1991.  The inmate was awarded sole physical custody of the couple's two children.  Mr. Bell married Catherine (victim in controlling crime) in 1993, and this marriage lasted 15 months until the instant offense on 8/15/94.  Mr. Bell noted, of Catherine, "She filed for divorce the next day." While involved in this marriage, the inmate had begun having an affair with his current wife, Susan, to whom he has been married since 1996.  Mr. Bell observed that both Susan and Debbie were women he had known while in the high school band, and that his first two wives (Debbie and Catherine) were from alcoholic households.

**MILITARY HISTORY:**  Mr. Bell has no record of military service.

**EMPLOYMENT/INCOME HISTORY:**  According to the Probation Officer's Report (POR) dated 5/1/95, a pre-sentencing report from the Center on Juvenile and Criminal Justice of 6/15/95 (submitted to the court by the inmate's attorney), and the inmate, his employment history has been stable and with a generally high level of income generated from employment in the computer/software/management industry.  He was most recently employed as a computer project manager for three years at Kaiser Permanente.  The inmate noted that he has always been financially employed, including a seven year period of self employment as a software consultant (1981-87), from which he eventually had to file bankruptcy.  He noted that his longest period of unemployment was for about a month, which was actually a planned hiatus between jobs.  He denied ever receiving any public assistance funds or disability benefits.  At the time of the index offense, he had been employed for three years at Kaiser, was living in his home with his wife and his children and stepchildren (two), although the children were out of the home at the time of the index crime.  Mr. Bell denied that he has ever sold illicit substances, or participated in any illegal activity, as a way to augment his income.

While in prison, the inmate has worked in areas that include clerk positions (library, law library, captain, personnel) and vocational landscape.  At present, he is working in vocational office services, where he was assigned 9/28/01.  Work supervisor reports have generally reflected "excellent" performance.  Work related laudatory chronos are noted in 1998 and 1999 for his efforts as the lead clerk in the law library.

**SUBSTANCE ABUSE HISTORY:**  Mr. Bell denied any significant history of substance abuse, and there is no indication in the records to the contrary.  He admitted occasional use of alcohol (wine with dinner averaging once a week) as an adult, but no reported negative effects on work or relationships as a result of such use.  He denied blackouts or symptoms of increased tolerance.  He estimated that he had been intoxicated approximately five times, the first of which was on his 21st birthday.  He also admitted to the use of marijuana on about six occasions while in college, but otherwise denied any other substance use or experimentation.  He has no history of arrests for substance related offenses.  At the time of the index offense, the inmate denied use of any substance.

The inmate does not consider himself to have a problem with substance abuse, and stated that he was involved in AA/NA meetings "because the Board wants me to.  It is hard to

relate to people with substance abuse problems." He currently attends NA meetings on a regular basis.

**PSYCHIATRIC AND MEDICAL HISTORY:** According to his record, it appears that Mr. Bell has never utilized mental health services, either prior to or following his incarceration. Since his arrival into CDC, he has been classified as a GP (General Population) inmate. His involvement with mental health services in prison is relegated to specific evaluations for the Board of Prison Terms hearings. At this time, Mr. Bell has either not been formally evaluated for the BPT or, if he has, there is no report available for review. A pre-sentencing psychological evaluation completed while the inmate was in county jail described the inmate as being without any diagnosable psychiatric condition on either Axis I or Axis II.

Medically, the inmate denied any significant health problems, other than a recent history of allergies. He denied any history of head injury, seizures, hospitalizations, or surgeries (not already reported) that were either traumatic or severe.

**PLANS IF GRANTED RELEASE:** Mr. Bell has submitted to his correctional counselor (and a copy is in the central file) a two-page version of his plans for parole, including contingencies if he is unable to use either his first or second choice of residence. In the parole plans, the inmate has addressed his living arrangements, (wife in Chino, or mother in Upland, or uncle in Redondo Beach), and noted both his past experience, and his current efforts to update his occupational skills, in computer programming as beneficial levers to his very likely employment in the computer industry. He has indicated that letters of support for the above are either forthcoming, or are already in the file.

## II. CLINICAL ASSESSMENT

**CURRENT MENTAL STATUS/TREATMENT NEEDS:** Mr. Bell's mental status was essentially within normal limits. He presented as being of medium height and build, with graying and neatly trimmed hair and a matching mustache. He was neatly groomed and dressed and displayed appropriate personal hygiene. His demeanor was initially stoic and cautious, but he was nonetheless responsive and cooperative. Affect was full range, and congruent to cognitive content. Cognitive functions and sensorium were grossly intact, and essentially unremarkable. There were no signs of disturbance in thought, mood, affect, ideation, or perception. The most remarkable feature about the inmate's presentation was a deliberate and precise manner of speech, and in conjunction with a varied and well-practiced vocabulary.

The inmate noted that he does not consider himself to be a criminal, nor does he believe himself to have a substance abuse problem. He described himself as "cautious, intelligent, educated, with integrity – as a general rule, though sometimes I have fallen

short. I set high expectations for myself, but lately I have been less critical and less perfectionistic if I don't meet my expectations. I am more accepting of myself as a human being, flaws and all." He described his greatest personal strength as his intelligence, and his creativity. His biggest weakness was that he is "too judgmental. I often make judgments about people when there is no reason to." He takes his greatest measure of pride in his children: "I am extraordinarily proud of them and miss them a great deal." Although he has pursued his hobby of music (jazz ensemble) while in prison, he is also focused on pursuing his legal challenge of his current incarceration in the United States District Court in San Francisco.

There is no evidence of mental illness in the inmate. There is likewise no evidence of a substance abuse problem. He does present some personality features of the passive-aggressive and compulsive variety, but not to the point where there is impairment in daily life functioning or interference with interpersonal relationships. Relative to his commitment offense, the only possible issue might be a level of emotional overcontrol, which is not inconsistent with the personality features noted above.

**DIAGNOSTIC IMPRESSION:**

| Axis I: | V71.09 | No diagnosis or condition on Axis I. |
|---------|--------|--------------------------------------|
| Axis II: | V71.09 | No diagnosis, but with some passive-aggressive and compulsive features. |
| Axis III: | | None known/deferred. |
| Axis IV: | | Incarceration for life term. |
| Axis V: | | GAF: 97. |

**CRIMINAL HISTORY/REVIEW OF LIFE CRIME:** Mr. Bell has no juvenile or adult criminal record prior to the index offense.

The instant offense, according to the POR, occurred on 8/15/94 at approximately 7:22 a.m., and involved the inmate assaulting his wife by hitting her on the head with a metal pipe. Mr. Bell later called 9-1-1 and reported that "the victim had hit her head and was bleeding and was ranting." Upon arrival by emergency personnel, the victim "was noted to be breathing very rapidly and she was crying hysterically. The victim told the police officer, 'He tried to hurt me.' The defendant explained, 'She thought I was trying to hurt her, but I was trying to help her.' After the defendant was escorted from the room, the victim said something about having a bag on her face. She said she did not know if her husband had placed the bag there and she did not know what had happened." All four of the children in the home were away visiting relatives at the time of the incident. The inmate had maintained a stance of innocence in the assault, and ignorance as to what had happened to cause injury to his wife. Blood was found in the master bedroom and master bathroom. In an adjacent bedroom, police located a white trash bag under a blanket on the bed and, beneath "the trash bag was a metal pipe approximately two feet long, which had been wrapped in a tan-colored plastic bag and secured with tape." Bloodstains of the victim were found on the pipe and the white plastic bag. No latent prints were detected.

Later, the victim offered that she and the inmate had a disagreement regarding an anniversary present the night before the offense, and that she had slept in an adjacent bedroom. She came into the master bedroom the next morning, and was "instructed to sit on the edge of the bed. He repeatedly told her to keep her eyes closed. She heard the closet door open and she heard the sound of rustling plastic, and she assumed he was getting her present. Her next memory was waking up lying on her back on the floor. A white plastic bag was pressed tightly over her face. She could not breathe and she felt as if she would die. The sides of her head were held by hands, and she was fighting to loosen the hands." The POR and the CJCJ report include issues of possible motivation such as the inmate's ongoing affair with another woman (now his wife), and the inheritance of "over $300,000 from a life insurance policy, a retirement account, and a third of the $90,000 equity in their home" (CJCJ). It was noted that the inmate's wife owned the home prior to their marriage.

According to the inmate, he is at this time unwilling to make any statements regarding the index offense, on the advice of his attorney. He did note that the instant offense was also covered in a pre-sentencing report from an outside agency (CJCJ, 6/15/95).

**PRISON OFFENSES:** Since his incarceration for the controlling offense, Mr. Bell has received no CDC-115 Rule Violation Reports (RVRs).

**RISK FOR VIOLENCE:** The current research literature indicates that an empirically based approach is the most reliable and valid method for assessing risk for future violence. In the present evaluation, three separate psychological instruments were used to help estimate this individual's risk for future violence in the community. The information for scoring these instruments was obtained from both the clinical interview and the available records. These three measures are widely used and are supported by years of research. They have been cross-validated with various forensic populations, including United States males in correctional settings. However, the following results need to be regarded with some level of caution since some individuals may possess idiographic differences that could limit the applicability of these instruments. The evaluator has taken these above factors into consideration in determining how much weight to give each of the three measures and in formulating an overall estimate of risk for future violence in the community. Estimates of risk for violence will be stated categorically low, moderate, or high.

On the Psychopathy CheckList – Revised, (PCL-R), a measure of static risk factors, Mr. Bell scored within the *low* range of severity. As illustrated above, he had a nonexistent history of juvenile offenses, was self supporting and fiscally responsible as an adult, has no substance abuse history, and maintained a close interpersonal relationship for a number of years. Behavioral control was generally adequate, and adult criminal arrests were exclusive to the controlling offense. The inmate's first formal encounter with the criminal justice system was for the index offense, which occurred when the inmate was 39 years of age. During the interview, the inmate did not present as glib or superficial, and offered no other excuses or blame for his behaviors (although he

chose not to discuss any aspect of the events surrounding the instant offense, or in any way to implicate himself).

On the Violence Risk Appraisal Guide (VRAG), an actuarial measure, the inmate scored in the *low* range of violence risk. This is a static measure, and the inmate's score or category on this particular instrument is unlikely to significantly change over the course of his incarceration.

On the History-Clinical-Risk – 20 (HCR-20), which includes historical and dynamic risk factors associated with violence, the inmate obtained a score within the *low* range of severity. Historical items pertaining to the index offense weighed most heavily for Mr. Bell, and essentially constitute what brought him to prison. He has no significant attitudinal difficulties, has no major mental illness, is emotionally and behaviorally stable, and has verbalized feasible release plans.

**CONCLUSION:**  The index offense presents as a crime of instrumental violence, and was committed by the inmate for suggested reasons of marital discord and monetary gain. The inmate had no history of violent behavior, or of any illegal criminal behaviors, prior to the instant offense. The motivation for the offense, and the specific sequence of events, is still unclear owing, in part, to the inmate's denial of significant involvement in the crime. Given his conviction by a jury, the inmate might be viewed as not taking responsibility for his behaviors, as focusing blame onto other things, and thus is himself a victim of a questionably fair justice system.

Mr. Bell has changed somewhat over the years, but the changes appear to be more internal, thus subtler. He has apparently always lived an outwardly correct and upright life, but did evidence some moral cracks in his rigid adherence to the social expectations that he had come to internalize. That is, his sexual expressiveness ("open marriage" in the marriage to the mother of his children, marital affair in at least one of his other marriages) was an interestingly juxtaposed facet to the conservative, goal-directed, and family-focused man he outwardly presented to most people. Still, he has no known violent history other than the instant offense. He continues to take pride in his general work ethic, but now appears less motivated by social or financial ascendance than by improving his relationships and sense of connectedness with the meaningful others in his life. While in prison, the inmate has programmed well, and has used his time to evidence a willingness to embrace the expectations and demands of supervised, but shared, social living.

There are no signs of a mental disorder, either historically or currently. Mr. Bell does not evidence a substance abuse problem, has no history, or any current expressions, of violence.

Risk assessment measures suggest that the inmate poses a *low* likelihood to become involved in a violent offense if released into the free community. This estimate takes into account the inmate's cultural background, language issues (if any), personal, social and criminal history, institutional programming, community/social support, release plans, and

BELL, Steven          J-69411          8          BPT          DECEMBER 2002

current clinical presentation. In addition, there is the caveat that such an assessment is at least partially based on the likelihood of continued abstinence from any substance abuse.

The inmate has been disciplinary free for his entire seven-plus years of incarceration. His classification score is 8 (and will likely continue to reduce), suggesting a behavioral ability to refrain from blatantly undesirable activities, and an applied capacity to focus more on a prosocial program. He is apparently an able and reliable worker in vocational office services, as he has been in most all of his positions while incarcerated. He does not currently present as a candidate for any noteworthy change as a result of psychotherapeutic intervention. Ongoing education, and involvement in self-help or introspective treatment groups when he is ready (and if such groups are available), is suggested and encouraged, but this potential group involvement should not be considered as mandatory.


_____          10/19/02
Steven Walker, Ph.D., CA License # PSY-11894        Date
Forensic Psychologist
Lifer Program/Forensic Services Unit
Health Care Services Division
California Department of Corrections

F

**AVENAL STATE PRISON**
**Life-Term Evaluation for the Board of Prison Terms**

### MENTAL HEALTH EVALUATION

#### Performed by C. Schroeder, PhD
#### Board Certified/Forensic

## I.    Identifying Information:

Name:              Steven Bell
CDC#:              J69411
Age:               50              DOB: 05/21/55
Marital Status:    Married
Race:              White
Sex:               Male

## II.    Developmental History:

Mr. Bell was born in Los Angeles. Both parents were present
in the home, and he had the benefit of both sets of
grandparents. He began to walk and talk at the normal ages,
and socialization skills emerged in order and on time. "*I
was born left handed but my parents forced me to use my
right hand.*" There was *no* sexual abuse, but he was spanked
by hand or belt. He attended public school and did not
require Special Education services. "*I was the nerdy smart
guy...academic artistic type...played the trumpet...had a dog and
guppies.*" Mr. Bell denied red flag behaviors. He did not
set fires, abuse animals, or suffer symptoms of enuresis.

## III:    Education:

Mr. Bell earned his Bachelor of Science degree at Cal Poly,
and worked toward his MBA degree. He completed Vocational
Landscaping and Office Services and Carpentry "*for home
projects, not employment*".

## IV:    Family History:

"*I have one younger brother, a Special Ed teacher in
Oregon. My dad worked in the electronics industry as a
supervisor and plant manager. He retired and bought a print
shop...specialty printing. He died three weeks ago. My mom
worked as a secretary and data processing specialist for
the Glendora School District.*"

## V:    Psychosexual Development and Sexual Orientation:

Mr. Bell reached puberty at age 12 and became sexually active as a heterosexual at age 17. He reported no problems or behaviors out of the normal range in type or frequency in this area of life.

## VI:  Marital History:

"My current marriage is my third. The first was my high school sweetheart. Our son is 25…builder in Bend, Oregon, and our daughter is serving in the Navy in avionics on the USS Stennis. My second marriage lasted a little over a year…resulted in my current conviction…victim of my commitment offense. We each had two children from prior marriages…four in the house…ages 8-16. I've been married to my third wife for 9½ years…dated in high school and college…an affair while married to my second wife…alleged motive for my crime. She is a remarkable woman."

## VII:  Military History:  None

## VIII: Employment/Income History:

"I worked in Data Processing for 19 years in information services…mostly in the health care industry…last job was project manager for Kaiser.  I have had clerk jobs in prison…lots of laudatory chronos. Now, you can't be a clerk if your skills are greater than staff…can't check on what you are doing."

## IX:   Substance Abuse History:

Mr. Bell denied using drugs except for marijuana on one or two occasions. He has not participated in AA, but has attended NA "ever since my 2000 Board hearing".

## X:    Psychiatric & Medical History:

Mr. Bell has enjoyed good health and has not required mental health treatment.

## XI:   Plans if Granted Release:

"I plan to live with my wife Susan in our home in Chino. I have a variety of contacts in the computer industry, and other friends in other countries if necessary.

*I have letters for interviews and consideration for hiring...references and reference letters."*

## XII:  Current Mental Status/Treatment Needs:

Mental status is clear in all areas of the exam: behavior, speech, thought content, thought processes, speech, and cognition.

### DSM IV Diagnosis:

```
AXIS I:    V71.09 No Diagnosis or Condition
AXIS II:   V71.09 No Diagnosis
AXIS III:  MEDICAL CONDITIONS RELEVANT TO AXES I&II: None
AXIS IV:   PSYCHOSOCIAL STRESSORS:  Incarceration
AXIS V:    GLOBAL ASSESSMENT OF FUNCTIONING, 1-100: 85
```

## XIII:  Review of Life Crime:

On 04/05/95, the jury found Mr. Bell guilty:

PC664/187 attempted murder w/in PC189
PC245(a)(1) Assault w/Deadly Weapon

enhancements:
PC12022(b)  use of deadly weapon
PC12022.7(a) infliction of GBI

He was sentenced to Life + 4 years.

Mr. Bell was asked to describe his crime:

*"My attorney advised me not to discuss it...convicted of trying to kill my second wife Cathy...testified it was her belief that I tried to kill her...to run off with my current wife. I stip to the official record but decline to discuss it."*

## XIV:  Assessment of Dangerousness:

Mr. Bell's commitment offense is his only known act of violence. His risk of harm to others is below average for parolee population, but his risk of harm to others before his crime was also low. He did not commit his crime during a moment or rage or loss of control. He was calm and deliberate in his actions.

## XV:  Clinical Observations and Recommendations:

Mr. Bell has programmed well during incarceration. He has
no disciplinary 115's or 128's since entering the CDC
at San Quentin on 07/17/95. Anger management programs would
be beneficial, but they are not as available in the CDC
as in years past. Mr. Bell has not come to terms with his
crime. He has not expressed remorse. Mr. Bell must to come
to terms with his crime in order to move toward resolution.
He needs to look in the mirror instead of out the window.
He has much work to do.


C Schroeder PhD                          11-11-05
Corinne Schroeder, PhD.                    Date
Bd. Certified/Forensic

G

**M E M O R A N D U M**

**DATE:**  October 18, 2006

**TO:**  CC-I B. Hindt

**FROM:**  I/M S. Bell, #J-69411, 120-236-L

**RE:**  STATEMENT OF DISAGREEMENT WITH B.P.H. MENTAL HEALTH
EVALUATION OF C. SCHROEDER

Pursuant to Civil Code §1798.36, 15 CCR §§2247 and 2249, and the second
level response to CDC-602 Log No. ASP-06-01602 (Exhibit A), I request that
this statement be filed with C.Schroeder's 11/11/05 BPH Mental Health Evalua-
tion in my C-File and in all other pertinent files containing this disputed
report (e.g., medical file, psychiatric file, etc.).

As set forth more specifically below, any supposed "credibility" (sic)
that the Schroeder report might have had is <u>completely undermined</u> by its per-
vasive errors and omissions, including:

(1) Omits readily-available material facts (e.g., ignoring my
copious self-help activities then concluding I need self-help);

(2) Makes factual assertions contrary to the record (e.g., that I
have not expressed remorse);

(3) Ignores regulatory requirements for BPH psych evaluations
(e.g., DOM §§54060.43.1, 54060.43.2, and 62090.13.2, which
require facts and/or reasons supporting all conclusions);

(4) Makes self-contradictory statements (e.g., noting no DSM-IV
diagnosis yet describing supposed "antisocial traits" (sic)
which require such a diagnosis);

(5) Includes no standardized tests or other objective measures of
risk assessment (unlike <u>all</u> other psych reports about me); and,

(6) Falls <u>so</u> far short of prevailing professional standards for
content and construction that it could no withstand any meaning-
ful peer review (Exhibit E, p. 4, ¶10).

Further, where Schroeder and her CDCR supervisors were repeatedly notified
of the report's factual inaccuracies and other shortcomings (Exhibit C), her
(and their) refusal to investigate and correct these errors demonstrates a
reckless disregard for the truth. The Schroeder report has <u>no</u> "indicia of
reliability" and should be disregarded when making any determinations about
me and/or my suitability for parole.

Specific examples of this report's shortcomings include, but are not

- 1 -

**1**

limited to, the following excerpts:

"He did not commit his crime during a moment or [sic]
rage or loss of control. He was calm and deliberate
in his actions." (p. 3)
      This statement is not only <u>unsupported</u> by anything in the record,
it is <u>contrary</u> to the evidence presented at trial. Schroeder cites
<u>no</u> reason or basis for this conclusion as required by DOM §§54060.43,
et al. This statement contradicts her own report's lack of a DSM-IV
diagnosis (p. 3); such a diagnosis would be <u>required</u> had I actually
exhibited such "calm and deliberate" antisocial traits. (Exhibit E,
p. 3, ¶7) It also contradicts her GAF rating of 85 (p. 3), well
above any score indicating dangerousness. (Exhibit E, p. 3, ¶8)

"Anger management programs would be beneficial." (p. 4)
      Schroeder cites <u>no</u> fact or reason supporting this recommendation
as required by DOM §§54060.43.1, et al. <u>Nothing</u> in the record even
remotely suggests that I have an anger problem. This statement
contradicts her own report which notes that the commitment offense
was not based on anger (p. 3) and that I've been disciplinary free
since entering prison over ten years ago (p. 4) — I could not have
remained disciplinary free if I had an anger problem. Schroeder
ignored readily-available documentation in my C-File of my anger
management self-help, including EAGLE/CALM, Parenting, and an out-
side anger management correspondence course. All other psych eval-
uations correctly noted these. (Dr. S. Walker, 10/19/02, p. 3;
Exhibit B, pp. 2-3; Exhibit C, p. 3, ¶6)

"Mr. Bell has not come to terms with his crime." (p. 4)
      Schroeder cites <u>no</u> fact, <u>no</u> reason, and <u>no</u> psychopathy for this
conclusion as required by DOM §§54060.43.1, et al. As her own
report documents, I did not discuss the commitment offense with her
pursuant to Penal Code §5011 and 15 CCR §2236 (p. 3), so she has
<u>no</u> basis to make any conclusion about what I have or have not "come
to terms" with. This statement is also contradicted by <u>all</u> other
mental health evaluations. (Exhibit B, pp. 2-3; Exhibit E, p. 2,
¶5)

"He has not expressed remorse." (p. 4)
      Schroeder cites <u>no</u> fact, <u>no</u> reason, and <u>no</u> psychopathy for this
conclusion as required by DOM §§54060.43.1, et al. This conclusion
is <u>contrary</u> to the record, where I have consistently expressed
remorse for my actions (Exhibit D). This statement is also con-
tradicted by <u>all</u> other mental health evaluations. (Exhibit B, p.
5; Exhibit E, p. 2, ¶5)

"Mr. Bell must come to terms with his crime in order
to move toward resolution." (p. 4)
      Schroeder cites <u>no</u> fact, <u>no</u> reason, and <u>no</u> psychopathy for this
conclusion as required by DOM §§54060.43.1, et al. As her own report
notes, I did not discuss the commitment offense with her (p. 3), so
she has <u>no</u> basis to conclude anything about what I've "come to terms"
with. This conclusion also contradicts <u>all</u> other mental health eval-
uations. (Exhibit B, p. 5; Exhibit E, p. 2, ¶4)

**2**

"He needs to look in the mirror instead of
out the window.  He has much work to do." (p. 4)

        Schroeder cites <u>no</u> fact, <u>no</u> reason, and <u>no</u> psychopathy for this
conclusion as required by DOM §§54060.43.1, et al.  Schroeder's
report ignores my extensive self-help activities and all the work
I've done at self-improvement — over a decade of "looking in the
mirror" — including <u>every</u> CDC-offered course (e.g., EAGLE/CALM,
Early Engagement, Parenting, etc.) as well as outside correspondence
courses I sought and completed on my own initiative (e.g., Anger
Management, FEMA, meditation, etc.)  (see my C-File)  She cites no
reasons to question the efficacy of these programs.  <u>All</u> other psych
evaluations correctly noted my self-help activities, which Schroeder
somehow "missed."  (Dr. S. Walker, 10/19/02, p. 3; Exhibit B, pp.
2-3; Exhibit E, p. 2, ¶4)  This conclusion also contradicts all other
reports which found that further self-help is <u>not needed</u>; i.e., I
do <u>not</u> have "much work to do."  (Dr. S. Walker, 10/19/02, p. 9;
Exhibit B, p. 3)  Dr. Macomber's psych evaluation specifically notes
that Schroeder's conclusion here is "unsubstantiated and not approp-
riate to the facts."  (Exhibit B, p. 5)

    In addition to the above, it shouls be noted that Schroeder's report is
the <u>only</u> psych evaluation I've received which included <u>no</u> objective standardized
testing of risk assessment.  (Exhibit E, p. 4, ¶9)  Prior and subsequent ob-
jective tests have included:

        Psychopathy Check List - Revised
        Violence Risk Appraisal Guide
        History-Clinical-Risk-20
        Millon Clinical Multiaxial Inventory III
        Psychological Inventory of Criminal Thinking Styles
        Level of Service Inventory

(see Dr. S. Walker, 10/19/02, pp. 7-8; Exhibit C, pp. 3-4; Exhibit E, p. 4, ¶9)
<u>All</u> of these objective measures indicated that I am psychologically healthy
with a <u>low risk</u> of danger to society.  "[I]f 100 men were released on parole,
[I] would do better than 99 of them."  (Exhibit B, p. 4)  The only contrary
"findings" (sic) are Schroeder's unsupported, arbitrary conclusions in her
seriously-flawed report.

<u>The Schroeder report should be ignored as completely unreliable.</u>

                                    Respectfully submitted,

                                      Steven D. Bell, #J-69411

**3**

E X H I B I T  A

CDC-602 APPEAL, LOG NO. ASP-06-01602

3 PAGES

4

INMATE/PAROLEE
APPEAL FORM
CDC 602 (12/87)

RECEIVED
JUL 19 2006
ASP APPEALS OFFICE

Location: Institution/Parole Region    1. ĪXĒ    Log No. 1. 06-01602    Category 8.

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|------|--------|-----------|------------------|
| Steven Bell | J-69411 | 3/W Trash Crew | 120-236-L |

A. Describe Problem: On 6/8/06, my counselor (cc-I Hindt) requested a new/corrected BPH psych. report for me from Dr. G. Schroeder, Ph.D. (Attachment A). The first report Dr. Schroeder prepared, dated 8/1/05. ~~████████████████~~ ~~████████ in prison they concludes~~ I need to take such self-help. (Attachment B, p. 4) She specifically recommends "anger management" without noting 3 prior classes I've completed on the ~~████████████~~). She states I've not expressed remorse when I've repeatedly done so on the record (BPH & Court). Her conclusions & recommendations are unreliable where based on these ~~████████████~~ & assumptions. She refuses to acknowledge the 6/8/06 request or to correct her report ~~████████~~

If you need more space, attach one additional sheet.

B. Action Requested: ① Because this 602 will likely prejudice any new/corrected report from Dr. Schroeder, I request a new psych. evaluation from a new psychologist. ② No retaliation for filing this 602. ③ New BPH psych report to replace existing erroneous report in my C-File & all other CDC/BPH records.

Inmate/Parolee Signature: ~~[signature]~~    Date Submitted: 6/26/06

C. INFORMAL LEVEL (Date Received: _____)

Staff Response:

BYPASS

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

BYPASS

Signature: _____    Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number: _____

06-01602

J69411                          6-8-06

Bell —

I saw the psy Dr.
today & told here that
You wanted a new psy
report. I gave her your
name; # — in case she
did not get the message
before.

Shrelt cc/

ATTACHME    6

State of California

Department Corrections and Rehabilitation

# Memorandum

**Date:**    August 25, 2006

**To:**    Inmate BELL, J-69411
Housing Unit: 120-236 Low
Avenal State Prison

**Subject:** SECOND LEVEL APPEAL RESPONSE
LOG NO.:    ASP 06-01602

### ISSUE:

It is the appellant's position that he had a psychological evaluation on 11/11/05 which was done as part of his Life-Term Evaluation for the Board of Prison Terms. He states he disagrees with the findings of the psychologist, Dr. C. Schroeder, Ph.D.

*No, I agree w/ the fact omission* 🖉

On appeal, the appellant is requesting the following:

1. A new psychological evaluation from a new psychologist.
2. No retaliation for filing this 602.
3. A new BPH psychological report to "replace existing erroneous report in my C-file and all other CDC/BPH records".

**INTERVIEWED BY:** R. Sheldon, Ph.D., Chief of Mental Health, on August 22, 2006

**FINDINGS:** Mr. Bell, in reaching a decision on your appeal your CDC 602, your medical file, applicable sections of the California Code of Regulations (CCR) Title 15, Departmental Operations Manual and your interview were reviewed and considered.

As was discussed during the interview, if you disagree with the psychologist's evaluation you have the right to either discuss/rebut the findings during your Board of Parole Hearing or you can write a response/rebuttal letter that can be placed in your Central File. The answers to your appeal requests are as follows:

1. You cannot request a new psychological evaluation because you disagree with the evaluator's opinion.
2. You may discuss the evaluation during your hearing; this is your opportunity to discuss any discrepancies.
3. You do not have the right to request removal of a document from your Central File or Unit Health Record.

*NOT the fa The fa are w* 🖉

**DECISION:** The appeal is denied.

7

# E X H I B I T   B

### DR. M. MACOMER'S MENTAL HEALTH EVALUATION
### 03/06/06

### 9 PAGES

**8**

**Melvin Macombei    .D.**

*Forensic Psychology*
*CA Lic. # Psy 10145, M16125*

*Diplomate-American Board of Psychological Specialties-Forensic Clinical Psychology*
*Board Certified-American Board of Forensic Medicine; Board Certified-American Board of Disability Analysts;*
*Diplomate-American Board of Professional Disability Consultants    Fellow-American College of Forensic Examiners*

P.O. Box 3098, Paso Robles, CA 93447-3098   (805) 467-2692

## CLINICAL ASSESSMENT

| | |
|---|---|
| **Inmate Name:** | Bell, Steven |
| **CDC Number:** | J-69411 |
| **Date of Birth:** | 5-2-55 (Age 50) |
| **Institution:** | CSP-Avenal |
| **Commitment Date:** | 7-17-95 |
| **Date of Offense:** | 8-15-94 |
| **Offense:** | Attempted First Degree Murder with use of a Deadly Weapon with Great Bodily Injury |
| **Sentence:** | Life plus 4 years |
| **Evaluation Date:** | 3-6-06 |
| **Date Typed:** | 3-9-06 |

**Identifying Information:** Mr. Steven Bell is a 50 year old, first term, married, Caucasian male, who has served 11 years on his sentence from Santa Clara County. His MEPD is 1-3-04

Since the psychosocial history was documented in the 10-19-02 psychological evaluation by Steven Walker, Ph.D., forensic psychologist, this information will not be repeated at this time.

**Sources of Information:** Mr. Bell was interviewed on 2 separate occasions for a total interview time of 4 hours. These interviews occurred at Avenal State Prison. Also, several psychological tests were administered, including The Millon Clinical Multi-Axial Inventory-3, The Psychological Inventory of Criminal Thinking Styles, and the Level of Service Inventory-Revised. His prior psychological evaluations were also reviewed.

**9**

Literary Tutoring Program, and AA, which is not really necessary in his case, as well as 9 courses in the federal emergency management administration, in order to learn how to handle emergency situations. In addition, he is a highly skilled computer software technician. He has completed vocational landscaping also, in order to comply with the BPT requests. At this point, there is no need for Mr. Bell to participate in further self-help programs or in psychotherapy. There is no need at all for him to participate in NA and AA, although he states he finds this program useful in developing problem solving techniques for life in general. There is no need for further psychological evaluation in this case.

## Psychological Test Results

<u>The Millon Clinical Multiaxial Inventory III</u>: This is a 175-item inventory that is designed to identify Axis I and Axis II psychiatric disorders. The validity scales on this measure were in the normal range. His responses show that he was self disclosing, meaning that he was very open with his thoughts and feelings, and was not trying to look good on this assessment. The clinical personality pattern scales show that Mr. Bell is free from an Axis II Personality Disorder. His Axis II Personality Disorder Scores were all in the average range compared to the normal citizen. There were no Axis I Clinical Disorders evident. His scores do show a tendency to rigidly adhere to rules and regulations. He tries very hard not to get into any kind of difficulties or problems with authority figures. There is no evidence at all of any problems with anxiety, depression, mental illness or anti-social thinking.

<u>Psychological Inventory of Criminal Thinking Styles by Glenn D. Walters, Ph.D., 2001</u>: This instrument is designed to identify a person's cognitions in the form of attitudes, beliefs, and thinking styles. There are eight thinking styles that are assessed. *Mollification* is a tendency to blame one's criminal involvement on others. *Cut Off* is a measure of impulsivity. *Entitlement* is a sense of ownership, privilege and uniqueness. *Power Orientation* is a measure of the desire for power and control over others. *Sentimentality* is a belief that performing good deeds erases the harm done. *Super Optimism* is the belief that one will be able to postpone or avoid negative consequences of criminal acts. *Cognitive Indolence* is a tendency to take short-cuts and the easy way around problems. *Discontinuity* reflects a tendency to lose sight of one's goals and be easily sidetracked by environmental events. Mr. Bell's scores were all in the normal range, indicating that he does not have any criminal thinking styles at this point in his life.

On 10-19-02, a psychological evaluation was prepared for the BPT by Steven Walker, Ph.D., forensic psychologist with CDC. This is a very thorough and complete evaluation. No mental or emotional problems were identified. Several actuarial measures were administered to assess risk on parole. These measures were consistent in indicating a low risk for dangerous behavior.

On 11-10-05, a psychological evaluation was prepared for the BPT by Corinne Schroeder, Ph.D., contract psychologist, Avenal State Prison. In this evaluation under his attorney's advice, he went along with the official record, but declined to discuss the details of the commitment offense. Under "assessment of dangerousness" it was noted that his risk of harm to others is below average for the parole population, and that his risk for harm to others was also low. Because, Mr. Bell did not discuss the commitment offense with the psychologist. The psychologist noted that he was not remorseful, that he had much work to do, because he needed to come to terms with his crime, in order to move towards resolution. "He needs to look in the mirror instead of out the window" (page 4). This comment was unsubstantiated and not appropriate to the facts of Mr. Bell's efforts at self-improvement.

## XIII.  Review of Life Crime:

We discussed at length the details of the commitment offense. In my opinion, Mr. Bell shows a great deal of self-examination, introspection, and remorse for his sins, which include his marital unfaithfulness to his wife at the time. I believe he has very excellent insight. He accepts responsibility for the things that he did wrong at that time in his life.

His statements are consistent with his prior statements given to law enforcement personnel about what happened in this offense. He accepts full responsibility for his choices and for his behavior which ultimately brought him to prison. He indicated how he has grown in maturity and self-awareness through various programs in which he has participated. He is very aware of the hurt and pain he has caused Cathy and her family. His feelings of remorse appear to be sincere and genuine.

## XIV. Assessment of Dangerousness:

A.  In considering the assessment of dangerousness in the institutional setting, Mr. Bell has been incarcerated now for 11 years. He has remained disciplinary free for all 11 years. This is commendable. Notably, there is no evidence of any disciplinaries or of aggressive behavior, violence, or defiance of authority. He continues to live in a dormitory setting, surrounded by anti-social individuals, many of them eager to steal property or to engage in violence. Remaining

5. Mr. Bell is an excellent employee, who has a strong work ethic. Mr. Bell has worked throughout his lifetime. He definitely has a very strong work ethic. In his current institutional job, he consistently receives above average and excellent chronos for his various endeavors.

6. Mr. Bell has remained disciplinary free throughout his 11 years of incarceration. This is a commendable achievement. Inmates live in a hostile environment, in which confrontations from other inmates and difficult interpersonal relationships develop on a regular basis. A person who can maintain his excellent record of being disciplinary free demonstrates a great deal of self-control, positive resolution of conflict, and excellent social relationship skills.

7. Mr. Bell has been using his time in a productive manner by taking all of the programs available to him in the form of therapy and self-help. Even though self-help programs are almost nonexistent at Avenal State Prison. He continues to attend Narcotics Anonymous, even though he does not have a substance abuse problem. He has participated in Early Engagement, Eagle/Calm, parenting which has a significant anger management component, a 9 month anger management course by correspondence, Breaking Barriers, Creative Options, the Laubach Literary Tutor Course, as well as 9 courses of the Federal Emergency Management Administration, to learn how to handle national emergencies.

8. Current testing shows that Mr. Bell does not have a substance abuse problem. This has never been a problem in his life. These findings support the conclusion that he will make a good adjustment in the community.

9. Mr. Bell has a well-developed program for his release to the community. He has an employment offer available as a business manager and computer manager for the Chino Valley Medical Center in Chino, California. He also has residence available with his wife. He has strong family support, as well as a valid job offer.

10. According to US Department of Justice, Bureau of Justice Statistics, Probation of Parole Violators in State Prison, 1991 (August 1995), the propensity to commit crimes declines with age. According to a federal study of state recidivism statistics, older parolees and probationers are

Tehachapi, DVI-Tracy, Folsom State Prison, Mule Creek State Prison, CTF-Soledad, and Pleasant Valley State Prison. I have calculated that I have written well over 2500 BPT evaluations. I would readily submit my comments and conclusions to any experienced evaluator for review.

Sincerely,

*Melvin Macomber, PhD*

Melvin Macomber, Ph.D., FACFE, DABFM, DAPPS, FPPR

MM:mgm

# E X H I B I T   C

### NOTIFICATIONS OF FACTUAL INACCURACIES
01/30/06 — 09/11/06

5 PAGES

**DATE:**      January 30, 2006

**TO:**        C. Schroeder, Ph.D., BPH Psychologist

**FROM:**      I/M S. Bell, #J-69411, 120-2-36-L

**RE:**        BPH Mental Health Report

On Friday, 1/27/06, I briefly discussed with my counselor, CC-I B. Hindt, the BPH mental health report you prepared following our 11/11/05 meeting. It appears that you might not have been provided complete information about my self-improvement activities for your assessment, and Ms. Hindt suggested that I contact you about this.

As best I understand the "Recommendations" section on the final page, you seem to have the (mis)impression that I have spent my years in prison "look[ing] out the window" (i.e., idly wasting time) instead of "look[ing] in the mirror" (i.e., introspective self-improvement). The need for "anger management" is specifically noted here.

Although the topic of my self-help efforts (other than N.A.) didn't come up in our 11/11/05 meeting, I assumed (apparently mistakenly) that CDCR would provide this information to you from my C-file. I apologize for this omission. In addition to more than five years in N.A. (ongoing), I have completed every CDCR-offered self-improvement program (e.g., Early Engagement, EAGLE/CALM, Parenting, etc.) as well as several self-initiated correspondence courses, including a nine-month anger management course. (Please note that both EAGLE/CALM and Parenting also included significant anger management components.) Would your conclusions have changed had you been provided this information?

Also, I am puzzled by the notation that I have not "come to terms with [my] crime" nor "expressed remorse" for it. Though I have consistently, upon advice of counsel, exercised my legal right not to discuss the facts of my commitment offense in any BPH venue (including BPH psych evaluations), I have just as consistently and repeatedly — and on the record — accepted full responsibility for my actions and my conviction, and expressed profound remorse for the pain I caused my ex-wife, our respective families, and others; I've tried to make amends where I could.

Thank you for your consideration of the above. I would welcome the opportunity to further discuss any of this with you.


cc:  B. Hindt, CC-I
     L. Buchalter, Attorney
     file

**15**

STATE OF CALIFORNIA
GA-22 (9/92)

# INMATE REQUEST FOR INTERVIEW

DEPARTMENT OF CORRECTIONS

| DATE | TO | FROM (LAST NAME) | CDC NUMBER |
|------|----|------------------|------------|
| 2/28/06 | C. Schroeder, Ph.D., Psychologist  B.P.H. | S-Bell | J-69411 |

| HOUSING | BED NUMBER | WORK ASSIGNMENT | JOB NUMBER |
|---------|-----------|-----------------|------------|
| 120 | 2-36-L | 3/W Trash Crew | FROM 1400    TO 2130 |

| OTHER ASSIGNMENT (SCHOOL, THERAPY, ETC.) | ASSIGNMENT HOURS |
|------------------------------------------|------------------|
|  | FROM        TO |

### Clearly state your reason for requesting this interview.
You will be called in for interview in the near future if the matter cannot be handled by correspondence.

On 1/30/06, I wrote you about my concerns regarding your 11/11/05 BPH psych. report, specifically the omission of all my post-conviction self-help programs. With my freedom & my future riding in large part upon your report, I am certain you share my concerns about its completeness & accuracy. Please contact me or CC-I Hindt about this. Thanks

| INTERVIEWED BY | DATE |
|----------------|------|
| DISPOSITION | |

**16**

Ms. Henderson, Mental Health                    3/19/06
   S. Bell              J-69411        120          2-38-L

3/w Trash Crew                    1400          2130

I am writing you in the hope that you can bring my concerns about my B.P.H. Mental Health Report to the attention of its author, Dr. Corinne Schroeder. I have attempted to raise this directly with her, first by the original of the enclosed document on 1/30 & then with a follow-up Request For Interview on 2/28. I have received no reply -- I don't even know if she received these.

I would have done this through my counselor, CC-I B. Hindt, but she is presently (& for the foreseeable future) unavailable.

My concerns are set forth in the enclosed, which I hope you will deliver to Dr. Schroeder on whatever days she visits Avenal. Briefly, the report omits <u>all</u> of my self-help activities -- years of effort & growth -- then concludes I need such programs before I'm ready to go home. I have <u>not</u> spent my time "gazing out the window."

With my future & my freedom at stake here, I am certain that you & Dr. Schroeder share my concerns that my B.P.H. report be complete and accurate.

Thank you for your time and assistance.

<u>P.S.:</u> Please let me know that you have received this. Thanks.

**17**

To: _Dr. Sheldon, Director, Mental Health_    Date: _4/18/06_

From: _____S. Bell_____    _J-69411_    _120_    _2-36-L_
               (Last Name)        (Number)      (Housing)    (Bed Number)

Work Assignment _3/W Trash Crew_    Job Hours _1400_    To _2130_

Other Assignment _____    From _____    To _____
               (School, Therapy, etc.)

Kindly explain in detail your reason for requesting this interview. You will be called in for an interview in the near future if the matter cannot be handled by correspondence. Unless your problem is stated clearly, this form will be returned.

I am writing you in the hope that you will help resolve some material inaccuracies in my B.P.H. Mental Health Report. I'm sure you know how important this report is to "term-to-life" prisoners like me who must appear before the Board, & I trust that you share my concerns about its completeness & accuracy.

Dr. Corinne Schroeder wrote my report following a brief (35 minute) interview on 11/11/05. During this meeting, she did not ask me about my post-conviction self-help efforts, my personal growth, my insights etc., which I found odd enough at the time to speak to my counselor about & to write my B.P.H. attorney with my concerns. I'd hoped Dr. Schroeder would gather my self-help activities from my C-file, but her report makes no mention of this (save only N.A.). In fact, I have taken every C.D.C-offered self-help course, plus outside correspondence courses & have put the lessons to work in my life. I'm not "gazing out the window."

On 1/30/06, I wrote Dr. Schroeder with my concerns (attached), then I sent a follow-up on 2/28/06. She has not replied. I wrote Ms. Henderson on 3/19/06, attaching a copy of my 1/30/06 inquiry & asking her to pass it along to Dr. Schroeder. I've still heard nothing, so I'm writing you.

Please do whatever you can to help correct my B.P.H. report. Thank you. S.B.

(Do not write below this line. If more space is required, write on back.)

Interviewed By: _____    Date: _____

Disposition: _____

GA-22

**18**

To: _Dr. Force, Ph.D., Chief of Mental Health_   Date: _9/11/06_

From: _S. Bell_   _J-69411_   _120_   _2-36-L_
(Last Name)   (Number)   (Housing)   (Bed Number)

Work Assignment _3/W. Trash Crew_   Job Hours _1400_   To _2130_

Other Assignment _____ From _____ To _____
(School, Therapy, etc.)

Kindly explain in detail your reason for requesting this interview. You will be called in for an interview in the near future if the matter cannot be handled by correspondence. Unless your problem is stated clearly, this form will be returned.

It is my understanding that you recently replaced Dr. Sheldon as the Chief of Mental Health. I have also heard rumors to the effect that the Mental Health department has undertaken new efforts to ensure the accuracy of BPH "Life-Term Evaluations". With this in mind, I am writing you in hopes of resolving the factual inaccuracies in my BPH evaluation (EXHIBIT A) before I appeal Dr. Sheldon's denial (EXHIBIT C) to Sacramento.

Dr. Schroeder's evaluation omits all of my self-help activities for the past 12 years, including Anger Management, then concludes I need self-help and Anger Management. (EXHIBIT A, p4) This is contrary to the facts in my C-File, as I tried to resolve with her informally (EXHIBIT B). Her factual statement that I have not expressed remorse is likewise contrary to the record (Exhibit A, p.7; Exhibit B; 2004 Parole Hearing Transcript p. 120)

My disagreement with Dr. Schroeder's report is NOT with her "opinion" perse, but with the factual errors & omissions upon which it is based. My C-File documents this, but she never looked & never asked me about this -- she just made it up! Please order a corrected BPH evaluation.

(Do Not write below this line. If more space is required, write on back.)

Interviewed By: _____   Date: _____

Disposition: _____

GA-22

**19**

**E X H I B I T   D**

EXCERPTS OF RECORD, EXPRESSIONS OF REMORSE
(Trial Transcript & 2004 BPH Transcript)

3 PAGES

**20**

1           This is not the kind of justice this

2   community deserves.  The goal here should be to

3   protect the community from those who pose the

4   greatest risk and to release back to the community

5   those who demonstrate the greatest potential for

6   rehabilitation and contribution.

7           The best determinate for evaluating risk

8   is the defendant's prior criminal history.  And

9   since Steve has no prior criminal history, this

10  should be the primary basis for sentencing, and less

11  so on the crime itself.  Thank you.

12          THE COURT:  Thank you.

13          MR. PENNYPACKER:  Judge, I don't know if

14  you wanted to hear from Mr. Bell at this point.

15          THE COURT:  If he'd like to address me,

16  that's fine.  It's entirely up to him.

17          MR. PENNYPACKER:  That would be great.

18          THE COURT:  Mr. Bell?

19          THE DEFENDANT:  Your Honor, a little over

20  ten months ago, a tragedy occurred, a tragedy which

21  destroyed a marriage, devastated two families, and

22  disrupted the lives of many good people.  None of

23  our lives will ever be the same.

24          We're all here at this time, at this

25  place, to seek a resolution of that, to seek

26  justice.  ████████████████████████████████████████

27  ███████████████████████████████████████.  I was

28  unfaithful to the woman I loved, my wife, Cathy, a

1          As Your Honor knows, I have no prior
2   criminal record.  I have no history of violence or
3   abuse.  I do not misuse alcohol or drugs.  I possess
4   none of the risk factors that would make me a danger
5   to myself or a danger to society.

6          Most importantly, I am not a danger to my
7   wife.  I have read Cathy's letter to the court in
8   which she expresses her concern that I am plotting
9   some kind of revenge against her.

10         Nothing could be further from the truth.
11  I have absolutely no desire nor intention of seeking
12  revenge, retaliation or retribution.  Down that path
13  lies only the darkness of self-destruction.  And I
14  will have none of it.

15         When I think of Cathy, I do not think of
16  revenge.  Instead, ████████████ for what we have
17  lost.  I ████████████████████████████████████████
18  ████████, and I feel pity for the pain that she
19  has caused herself.

20         It is my sincere wish that she obtain all
21  the help she needs to live her life in peace.  I am
22  not naive.  I am well aware that I am hated by some
23  in this courtroom.  But I refuse to hate in return.

24         Twenty-two years ago, in his darkest hour
25  of personal defeat, a man that I admire said to the
26  world, quote:  You are never defeated because people
27  hate you.  You don't lose unless you hate them
28  back.  For them, you defeat yourself.  Unquote.

120

1  that it gets put back in.  I have before me a

2  police report by Detective Ostrander, dated

3  8/22/94.  This is page four of that report, second

4  paragraph.

5          "The victim also told me that

6          approximately one year ago she

7          recalled talking to the suspect.

8          They were joking about divorce.  And

9          during this conversation the suspect

10         told her, well, I guess if think

11         you're going to divorce me, I'll just

12         have to kill you.  She said that she

13         made the comment back, something

14         similar to, well, I guess that would

15         just make it a lot cleaner."

16  That was a joking exchange between Kathy and myself

17  long before these events occurred.  And they were

18  characterized as joking by Kathy herself.  I am not

19  a threat to her or her family in any way. ▮▮▮▮▮

20  ▮▮▮▮▮▮▮▮▮▮.  And I've never desired nor

21  contemplated any kind of revenge.  Down that path

22  lies only darkness and self-destruction. ▮▮▮▮▮

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮ hoping that she has found

25  healing and peace, her own second chance.  My

26  entire focus, everything I live for is to go home

27  and share a life with my family and loved ones.

**23**

E X H I B I T    E

DECLARATION OF DR. T. CHASE, PH.D.
09/29/06

5 PAGES

# BEFORE THE BOARD OF PAROLE HEARINGS
## OF THE STATE OF CALIFORNIA

**In The Matter Of The First Subsequent
Parole Consideration Hearing Of**

**STEVEN DALE BELL
#J-69411**

DECLARATION OF
DR. TERRY CHASE, PH.D.

I, Terry Chase, PH.D., declare as follows:

1.    I am a psychologist who has been licensed by the State of California for sixteen years. I am the Chief Executive Officer for Foothill Psychological Services, Inc., in Chino, California.

2.    I have many years of professional experience working with clients who have been convicted of violent crimes. I also have extensive experience performing pre-employment and fitness-for-duty evaluations for law enforcement agencies and other employers.

3.    I have reviewed the following psychological evaluations conducted on Mr. Steven D. Bell since his conviction:

    (a)    Dr. Paul Koller, 6/11/95

    (b)    Dr. Steven Walker, 10/19/02

    (c)    Dr. Corinne Schroeder, 11/10/05

    (d)    Dr. Melvin Macomber, 3/9/06

Each of these evaluations concludes with virtual certainty that Mr. Bell is not a sociopath and each consistently find that his risk of future violence is low. Objective testing conducted as part of the three more thorough evaluations (i.e., a, b, and d) strongly

Page -1-

25

1  support that Mr. Bell is a psychologically healthy individual who has no need to

2  participate in self-help programs or in psychotherapy.

3      4.    The report prepared by Dr. Schroeder (3.c., above) is one of the least

4  professional I've ever seen, providing no clinical or logical support for its poorly

5  conceived conclusion:

6          *"Mr. Bell must to (sic) come to terms with his crime in order to move*
7          *toward resolution. He needs to look in the mirror instead of out the*
8          *window. He has much work to do."* (page 4)

9  Even the most cursory review of Mr. Bell's prison record indicates that he has done

10  everything *except* look out the window. As documented in both Dr. Walker's and Dr.

11  Macomber's evaluations (3.b. and 3.d., respectively), Mr. Bell has actively participated in

12  a variety of self-help programs. He has taken every opportunity available to him within

13  prison, and on his own initiative has sought outside correspondence courses. Only by

14  *completely ignoring* Mr. Bell's record could Dr. Schroeder have concluded that "[h]e has

15  much work to do."

16      5.    Dr. Schroeder's finding that *"Mr. Bell has not come to terms with his crime. He*

17  *has not expressed remorse."* (page 4) is not supported anywhere in her report nor, as far

18  as I know, anywhere in Mr. Bell's record. Since her own report notes that Mr. Bell

19  *"stip[ulated] to the official record but declin[ed] to discuss [his crime]"* (page 3), Dr.

20  Schroeder appears to have absolutely no basis for arbitrarily speculating what Mr. Bell

21  has "come to terms" with. As documented in both Dr. Koller's and Dr. Macomber's

22  evaluations (3.a. and 3.d., respectively), Mr. Bell has excellent introspection and insight

23  into his thoughts and behavior.

24          *"He accepts full responsibility for his choices and for his behavior which*
25          *ultimately brought him to prison... His feelings of remorse appear to be*
26          *sincere and genuine."* (3.d., Dr. Macomber, page 5)

27  //

28  //

**Page -2-**

6.    Dr. Schroeder's suggestion that *"[a]nger management programs would be beneficial"* (page 4) is likewise unsupported by the record. Mr. Bell's commitment offense was not based on anger or "heat of passion," and I'm aware of no evidence indicating he has a history of anger problems. As Dr. Schroeder herself notes contradictorily in the same paragraph:

> *"Mr. Bell has programmed well during incarceration. He has no disciplinary 115's or 128's since entering the CDC at San Quentin on 07/17/95."  (page 4)*

Given Mr. Bell's stressful and hostile living environment over the past eleven years, he could not have remained disciplinary free if he had any kind of anger problem. Further, Dr. Schroeder completely ignored Mr. Bell's in-prison completions of the E.A.G.L.E./C.A.L.M. and Parenting programs, both of which contained significant anger management components, and of a nine-month anger management correspondence course (see, e.g., 3.d., Mr. Macomber's report, page 2).

7,    Dr. Schroeder characterized Mr. Bell's commitment offense as *"[h]e was calm and deliberate in his actions."* (page 3)  This conclusion could be valid only if Mr. Bell has an antisocial personality disorder or at least antisocial traits. Nothing in her report even remotely suggests this diagnosis; as with all other evaluations of Mr. Bell, Dr. Schroeder found that he has no psychological diagnoses on DSM-IV Axis I or Axis II, a clear contradiction to her "calm and deliberate" characterization here. Further, I am aware of no trial testimony or other evidence supporting this characterization of the commitment offense, which appears to be pure speculation.

8.    Another thing that I find bizarre and inconsistent in Dr. Schroeder's report is that she gives Mr. Bell a global assessment of functioning (GAF) rating of 85. While this is noticeably lower than the GAF ratings in Dr. Walker's and Dr. Macomber's evaluations (3.b. and 3.d., respectively), it is well above the score of an individual who is deemed to be at risk of causing harm to others (i.e., a GAF score of 20 or below).

Page -3-

27

9.    Of all four psychological evaluations of Mr. Bell, Dr. Schroeder's is the only one which included *no objective tests* of any kind.  On every objective test conducted by all other psychologists (i.e., 3.a., 3.b., and 3.d., above) Mr. Bell has been shown to be a psychologically healthy and well-adjusted individual who is not a threat to society in any way.  The only contrary "findings" (sic) are Dr. Schroeder's unsupported and subjective conclusions outlined above.

10.    When I first reviewed Dr. Schroeder's report, I found it to be so poorly constructed that I checked with the California Board of Psychology to make sure she was really a licensed psychologist.  As she appears to be licensed, I can only conclude from this report that Dr. Schroeder either was uninterested in doing a competent job or was deliberately denigrating Mr. Bell to further some personal agenda (e.g., possibly punishing him for exercising his legal right not to discuss the facts of his crime).  Dr. Schroeder's report would not stand up to any meaningful peer review.

11.    Decisions of the Board of Parole Hearings must be based upon accurate and reliable evidence.  In my professional opinion, for the reasons outlined above, Dr. Schroeder's report is neither accurate nor reliable.  Reliance upon such a subjective, unsupported, inconsistent, and unprofessional report where Mr. Bell's life and future are at stake cannot be justified.  I encourage the Board to disregard Dr. Schroeder's report and to decide on Mr. Bell's suitability for parole using Dr. Macomber's evaluation (3.d., above).

12.    In keeping with the professional tenets of full disclosure, I note here that I have known Mr. Bell's wife, Susan Bell, for twenty years in both professional and social capacities.  I have visited with Mr. Bell at Avenal State Prison on one occasion where we discussed his psychological reports and his insights into his behaviors both pre- and post-conviction.  While our discussion should not be considered a professional evaluation, I found Mr. Bell to be mature, intelligent, open, and honest, with a pleasant demeanor and

Page -4-

**28**

1    appropriate affect. I saw no indications of anxiety, depression, or anger and he exhibited

2    no criminal thinking or behavior. His interactions with his wife were healthy, positive,

3    and affectionate. I have written support letters to the Board of Parole Hearings on behalf

4    of Mr. Bell because I believe he is an ideal candidate for parole; I have never written

5    similar letters for any other prisoners despite several requests to do so. My belief in Mr.

6    Bell, and my relationships with him and his wife, have not influenced my professional

7    criticisms of Dr. Schroeder's report, which is objectively inaccurate and unreliable, nor

8    my recommendation that the Board instead utilize Dr. Macomber's more comprehensive

9    evaluation.

10      I declare under penalty of perjury that the foregoing is true and correct. Dated this

11    _29th_ day of _September_____, 2006, at Chino, California.

12

13

14                 _Terry Chase Ph.D._

15             Terry Chase, Ph.D.

16             Licensed Psychologist

17             # PSY 11141

Page -5-

**29**

H

# *Melvin Macomber, Ph.D.*

*Diplomate-American Board of Psychological Specialties-Forensic Clinical Psychology*
*Board Certified-American Board of Forensic Medicine;  Board Certified-American Board of Disability Analysts;*
*Diplomate-American Board of Professional Disability Consultants    Fellow-American College of Forensic Examiners*

**Forensic Psychology**
CA Lic. # Psy 10143, M16125

P.O. Box 3098, Paso Robles, CA 93447-3098   (805) 467-2692

## CLINICAL ASSESSMENT

| | |
|---|---|
| **Inmate Name:** | Bell, Steven |
| **CDC Number:** | J-69411 |
| **Date of Birth:** | 5-2-55 (Age 50) |
| **Institution:** | CSP-Avenal |
| **Commitment Date:** | 7-17-95 |
| **Date of Offense:** | 8-15-94 |
| **Offense:** | Attempted First Degree Murder with use of a Deadly Weapon with Great Bodily Injury |
| **Sentence:** | Life plus 4 years |
| **Evaluation Date:** | 3-6-06 |
| **Date Typed:** | 3-9-06 |

**Identifying Information:**  Mr. Steven Bell is a 50 year old, first term, married, Caucasian male, who has served 11 years on his sentence from Santa Clara County. His MEPD is 1-3-04

Since the psychosocial history was documented in the 10-19-02 psychological evaluation by Steven Walker, Ph.D., forensic psychologist, this information will not be repeated at this time.

**Sources of Information:**  Mr. Bell was interviewed on 2 separate occasions for a total interview time of 4 hours. These interviews occurred at Avenal State Prison. Also, several psychological tests were administered, including The Millon Clinical Multi-Axial Inventory-3, The Psychological Inventory of Criminal Thinking Styles, and the Level of Service Inventory-Revised.  His prior psychological evaluations were also reviewed.

## XII.  Current Mental Status/Treatment Needs:

Mr. Bell's mental status was within normal limits.  There is no history of mental or of emotional problems in this case.  Hygiene and grooming were good.  His hair, which is graying, is neatly trimmed.  He was well oriented, and his thinking was rational, logical, and coherent.  His speech was normal, fluent and goal oriented.  There is slight stuttering on occasion.  Affect was appropriate.  There is no evidence of anxiety or depression.  Eye contact was good.  Intellectually he is functioning in the high average to superior ranges.  His judgment was intact.  His memory was intact.  His self-awareness and insight were very good.

Mr. Bell is an impressive individual.  He is a person that is in sharp contrast to his fellow inmates.  He does not think or act like a criminal.  He has good feelings for others, empathy towards others, and care for others.  There is no history of any substance abuse problems with alcohol or drugs.

He has an outstanding history of successful employment in the community.  He graduated from college with honors from California Poly-Tech University in Pomona, in 1977.  He has had graduate training in the MBA Degree Program.  He has a stable, continuous work history in the computer and software management area.  He was a computer project manager for 3 years at Kaiser Permanente.  He worked as a self-employed software consultant from 1981-1987.  In the institution, he has worked in various clerk positions.  He currently is working on the yard crew.  His work reports have shown excellent performance.  He received a work related laudatory chrono for his efforts as lead clerk in the law library.

Mr. Bell continues to be entirely disciplinary free during his 11 years of incarceration in State Prison.  This is commendable.  He currently lives in a dormitory environment, surrounded 24 hours a day by other inmates.  This environment provides very little privacy.  Due to the enforced, compressed living conditions, there is always ongoing hostility, interpersonal conflicts, arguments, and sometimes altercations.  He has remained entirely free from any involvement in these situations.  He is a mature individual that is able to resolve problems with other people in a productive, responsible and intelligent manner.

He has been very actively involved in participating in self-help programs in prison.  Avenal, based upon this writer's personal experience, has very few self-help programs.  Therefore, the opportunity to participate in these programs is very limited.  He has participated and completed Breaking Barriers, a self-study lifestyle journaling program, Victim Awareness, Early Engagement, Eagle/Calm Program, parenting courses, a 9 month anger management correspondence course, Creative Options, the Laubach

Literary Tutoring Program, and AA, which is not really necessary in his case, as well as 9 courses in the federal emergency management administration, in order to learn how to handle emergency situations. In addition, he is a highly skilled computer software technician. He has completed vocational landscaping also, in order to comply with the BPT requests. At this point, there is no need for Mr. Bell to participate in further self-help programs or in psychotherapy. There is no need at all for him to participate in NA and AA, although he states he finds this program useful in developing problem solving techniques for life in general. There is no need for further psychological evaluation in this case.

## Psychological Test Results

The Millon Clinical Multiaxial Inventory III: This is a 175-item inventory that is designed to identify Axis I and Axis II psychiatric disorders. The validity scales on this measure were in the normal range. His responses show that he was self disclosing, meaning that he was very open with his thoughts and feelings, and was not trying to look good on this assessment. The clinical personality pattern scales show that Mr. Bell is free from an Axis II Personality Disorder. His Axis II Personality Disorder Scores were all in the average range compared to the normal citizen. There were no Axis I Clinical Disorders evident. His scores do show a tendency to rigidly adhere to rules and regulations. He tries very hard not to get into any kind of difficulties or problems with authority figures. There is no evidence at all of any problems with anxiety, depression, mental illness or anti-social thinking.

Psychological Inventory of Criminal Thinking Styles by Glenn D. Walters, Ph.D., 2001: This instrument is designed to identify a person's cognitions in the form of attitudes, beliefs, and thinking styles. There are eight thinking styles that are assessed. *Mollification* is a tendency to blame one's criminal involvement on others. *Cut Off* is a measure of impulsivity. *Entitlement* is a sense of ownership, privilege and uniqueness. *Power Orientation* is a measure of the desire for power and control over others. *Sentimentality* is a belief that performing good deeds erases the harm done. *Super Optimism* is the belief that one will be able to postpone or avoid negative consequences of criminal acts. *Cognitive Indolence* is a tendency to take short-cuts and the easy way around problems. *Discontinuity* reflects a tendency to lose sight of one's goals and be easily sidetracked by environmental events. Mr. Bell's scores were all in the normal range, indicating that he does not have any criminal thinking styles at this point in his life.

The Level of Service Inventory–(LSI-R): This inventory was developed in 1995 to assist service providers in the assessment of the offender's need for services on probation or parole. It is a quantitative survey of attributes of offenders and of their situations to determine their level of risk. It addresses the offender's criminal history as well as his current education levels, employment, family and marital adjustments, choice of associates, current alcohol and drug problems, and his current attitudes towards society's rules and regulations. Mr. Bell obtained an overall score that places him in the low risk, low needs area. This score indicates that he would make a good adjustment in open and free society. His score placed him at the 0.4 accumulative frequency in comparison to other prison inmates. This score means that if 100 men were released on parole, he would do better than 99 of them. This actuarial measure predicts that Mr. Bell will make a good adjustment in society.

Based upon current psychological testing, as well as on the psycho-diagnostic interview, Mr. Bell is free from a diagnosable mental disorder.

### Current Clinical Diagnosis:

|          |                                  |
|----------|----------------------------------|
| Axis I   | Mo Mental Disorder               |
| Axis II  | No Personality Disorder          |
| Axis III | No Physical Disorder             |
| Axis IV  | Current Stressors:  Incarceration |
| Axis V   | Current GAF 97                   |

### Review of Previous Psychological Evaluations:

On 6-11-95, Paul Koller, Ph.D., clinical psychologist in Moss Beach, California, did a psychological evaluation for the court in which he administrated extensive psychological tests, including the MMPI-2, which provided a normal profile with no suggestion of acute psychiatric condition or of chronic character disorder; the Rorschach Inkblot Test, which indicated no evidence of any thought disorder, evidence of brain damage or serious character problems; the TAT which again showed a normal personality in a person that was hopeful, with a generally positive outlook. He concluded that there were no mental or emotional problems. There was no evidence of over-controlled anger or of hostility. He was strongly motivated to return to his family. He did not pose a threat to his wife or to the community at large. He was an excellent candidate for consideration for probation.

On 10-19-02, a psychological evaluation was prepared for the BPT by Steven Walker, Ph.D., forensic psychologist with CDC. This is a very thorough and complete evaluation. No mental or emotional problems were identified. Several actuarial measures were administered to assess risk on parole. These measures were consistent in indicating a low risk for dangerous behavior.

On 11-10-05, a psychological evaluation was prepared for the BPT by Corinne Schroeder, Ph.D., contract psychologist, Avenal State Prison. In this evaluation under his attorney's advice, he went along with the official record, but declined to discuss the details of the commitment offense. Under "assessment of dangerousness" it was noted that his risk of harm to others is below average for the parole population, and that his risk for harm to others was also low. Because, Mr. Bell did not discuss the commitment offense with the psychologist. The psychologist noted that he was not remorseful, that he had much work to do, because he needed to come to terms with his crime, in order to move towards resolution. "He needs to look in the mirror instead of out the window" (page 4). This comment was unsubstantiated and not appropriate to the facts of Mr. Bell's efforts at self-improvement.

### XIII. Review of Life Crime:

We discussed at length the details of the commitment offense. In my opinion, Mr. Bell shows a great deal of self-examination, introspection, and remorse for his sins, which include his marital unfaithfulness to his wife at the time. I believe he has very excellent insight. He accepts responsibility for the things that he did wrong at that time in his life.

His statements are consistent with his prior statements given to law enforcement personnel about what happened in this offense. He accepts full responsibility for his choices and for his behavior which ultimately brought him to prison. He indicated how he has grown in maturity and self-awareness through various programs in which he has participated. He is very aware of the hurt and pain he has caused Cathy and her family. His feelings of remorse appear to be sincere and genuine.

### XIV. Assessment of Dangerousness:

A. In considering the assessment of dangerousness in the institutional setting, Mr. Bell has been incarcerated now for 11 years. He has remained disciplinary free for all 11 years. This is commendable. Notably, there is no evidence of any disciplinaries or of aggressive behavior, violence, or defiance of authority. He continues to live in a dormitory setting, surrounded by anti-social individuals, many of them eager to steal property or to engage in violence. Remaining

disciplinary free in this environment is a commendable achievement. The potential for dangerous behavior in the institutional environment is definitely below average in comparison to other inmates.

B.  In considering the assessment of dangerousness if released to the community on parole, it is evident that Mr. Bell has more factors supporting a good adjustment in the community, than he does indicating a negative adjustment. There is no history of mental or of emotional problems. There is no history of drug or alcohol problems. As a result, Mr. Bell does not pose any more risk to society than the average citizen. The factors that are listed below support this conclusion:

1.  Mr. Bell has no history of delinquent behavior or of criminal behavior prior to the commitment offense. Current psychological testing as well as his 11 years of good adjustment in the institution demonstrates that he is not criminally oriented. His values are solidly pro-social.

2.  Mr. Bell does not have any antisocial personality features. He demonstrates strong feelings of compassion toward others, understanding of others' feelings, and feelings of empathy to those who are in distress.

3.  Mr. Bell is married. His wife is very supportive and thoroughly committed to this marriage. I spoke to her on the phone, and it is clear that she is very supportive and committed to Mr. Bell. Mr. Bell has many supportive individuals in his life, and these factors are a strong indicator of successful adjustment in the community.

4.  Mr. Bell has completed vocational training in landscaping in order to comply with BPT requests. However, he is a highly skilled computer software manager, who has an ability of generating a high income. He has years of experience in this field. He has experience as a manger also. Upon his release his skills will be in high demand in this field. The possession of viable vocational skills is a strong indicator of successful adjustment in the community.

5. Mr. Bell is an excellent employee, who has a strong work ethic. Mr. Bell has worked throughout his lifetime. He definitely has a very strong work ethic. In his current institutional job, he consistently receives above average and excellent chronos for his various endeavors.

6. Mr. Bell has remained disciplinary free throughout his 11 years of incarceration. This is a commendable achievement. Inmates live in a hostile environment, in which confrontations from other inmates and difficult interpersonal relationships develop on a regular basis. A person who can maintain his excellent record of being disciplinary free demonstrates a great deal of self-control, positive resolution of conflict, and excellent social relationship skills.

7. Mr. Bell has been using his time in a productive manner by taking all of the programs available to him in the form of therapy and self-help. Even though self-help programs are almost nonexistent at Avenal State Prison. He continues to attend Narcotics Anonymous, even though he does not have a substance abuse problem. He has participated in Early Engagement, Eagle/Calm, parenting which has a significant anger management component, a 9 month anger management course by correspondence, Breaking Barriers, Creative Options, the Laubach Literary Tutor Course, as well as 9 courses of the Federal Emergency Management Administration, to learn how to handle national emergencies.

8. Current testing shows that Mr. Bell does not have a substance abuse problem. This has never been a problem in his life. These findings support the conclusion that he will make a good adjustment in the community.

9. Mr. Bell has a well-developed program for his release to the community. He has an employment offer available as a business manager and computer manager for the Chino Valley Medical Center in Chino, California. He also has residence available with his wife. He has strong family support, as well as a valid job offer.

10. According to US Department of Justice, Bureau of Justice Statistics, Probation of Parole Violators in State Prison, 1991 (August 1995), the propensity to commit crimes declines with age. According to a federal study of state recidivism statistics, older parolees and probationers are

re-incarcerated very infrequently. While 51.4 percent of parolees and probationers returned to prison were between the ages of eighteen and twenty-nine, and 36.2 percent were between the ages of thirty and thirty-nine, only 11 percent were between the ages of forty and fifty-four, and 1.4 percent were fifty-five or older. Mr. Bell is 50 years of age. His risk for criminal behavior or re-offense is very low.

11. A study by the Pennsylvania Prison Society, dated 1993, states that the recidivism rate for paroled life-sentenced inmates is lower than virtually every other category of sentenced inmates. It also reported that experience suggests that no individuals who have been released on parole after serving a life sentence have returned for committing a second first-degree murder, and few have returned for other crimes as well. North Dakota reported that in the previous 16 years, no paroled life sentenced inmate had been returned to confinement. New Jersey reported that older offenders had the lowest rate of post-released re-arrest. There were no arrests for new homicides. New York reported, in a 1990 study, that homicide parolees had the lowest return rate for either new convictions or parole violations of any category of paroled inmates. No other category was close.

C. There are no risk factors in this case.

## XV. Clinician Observations/Comments/Recommendations:

Mr. Bell is free from any mental or emotional problems that would interfere with granting parole. There are no factors in this case that would indicate that he is a danger to society in any way. His prison adjustment is excellent. He is a highly skilled person that will be immediately employable upon his release. He is an open, honest, truthful, responsible person, who accepts responsibility for the sins that he has committed in his life. He does not need to participate in further psychotherapy, and he does not need further psychological evaluations. The prognosis for successful adjustment in the community is outstanding.

In case the writer is not familiar with this evaluator, I have been working with life term inmates now for 40 years. I began as a parole agent in Los Angeles, supervising lifers on parole. As a Parole Agent II in West Los Angeles, I had a caseload that consisted for the most part of life term inmates on parole. My experience with them is supported by a great deal of research that has been done on these inmates after they are released on parole in the community. In addition, I have been writing BPT evaluations on life term inmates since 1975. I have written evaluations at CCI-

Tehachapi, DVI-Tracy, Folsom State Prison, Mule Creek State Prison, CTF-Soledad, and Pleasant Valley State Prison. I have calculated that I have written well over 2500 BPT evaluations. I would readily submit my comments and conclusions to any experienced evaluator for review.

Sincerely,

*Melvin Macomber, PhD*

Melvin Macomber, Ph.D., FACFE, DABFM, DAPPS, FPPR

MM:mgm

# Melvin Macomber, Ph.D.

*Diplomate-American Board of Psychological Specialties-Forensic Clinical Psychology*
*Board Certified-American Board of Forensic Medicine;  Board Certified-American Board of Disability Analysis;*
*Diplomate-American Board of Professional Disability Consultants    Fellow—American College of Forensic Examiners*

**Forensic Psychol**
*CA Lic. # Psy 10145, M1*

## EDUCATION

| | |
|---|---|
| 1975 | Ph.D., University of Southern California. |
| 1968 | M.A., Pepperdine University, Los Angeles |
| 1961 | B.A., Westmont College, Santa Barbara |

## EXPERIENCE

| | |
|---|---|
| 1999-2003 | Consulting Psychologist, Sacramento Assessment Center, Diagnosis and Treatment<br>*Evaluation of adolescents referred by probation.  Academic, social attachment,*<br>*criminality, and psychological problems assessed.* |
| 1998-2003 | Consulting Psychologist, California Department of Mental Health, Mentally Disordered<br>Offender (MDO) Program |
| 1991-2000 | Consulting Psychologist, California Department of Corrections, Board of Prison Terms |
| 1988-1999 | Valley Mountain Regional Center, Modesto,<br>*Psychological evaluations assessing developmental disabilities.* |
| 1988-1989 | Clinical Psychologist, Modesto Psychiatric Center<br>*Intellectual and personality testing of disturbed adolescents* |
| 1987-1988 | Clinical Psychologist, Crossroads Psychiatric Unit, Memorial Hospital, Ceres<br>*Psychological testing and assessment of children and adults* |
| 1984-1991 | Senior Psychologist, California Department of Corrections<br>*Parole Outpatient Clinic*<br>*Evaluation and treatment of sex offenders and the mentally ill* |
| | *As a prison based psychologist, conducted hundreds of psychological evaluations on inmate*<br>*in the following prisons:* |
| 1977-1982 | Deuel Vocational Institution, Tracy<br>*Senior Psychologist* |
| 1975-1977 | California Correctional Institution, Tehachapi |
| 1973-1975 | California Institution for Men, Chino<br>*Clinical Director, 90 Day Diagnostic and Assessment Unit* |
| 1968-1973 | Assistant Parole Supervisor, Los Angeles |
| 1965-1968 | Parole Agent, Los Angeles |
| 1977-1997 | Professor, (Adj), Psychology, Chapman College |

## LICENSING

Clinical Psychology, State of California (PSY 10145)
Marriage and Family Counselor, State of California (M16125)
Life Community College Credentials: Psychology, Sociology and Criminal Justice

I

1         And on that basis, I would submit it to
2  the court.  Thank you.
3         THE COURT:  Anything further?
4         MR. PENNYPACKER:  No.
5         THE COURT:  Is there any legal cause at
6  this time why sentence should not now be
7  pronounced?
8         MR. PENNYPACKER:  No.  There is none.
9         THE COURT:  First of all, with respect to
10 the position of the defense that the sentence that
11 is mandated for this offense constitutes cruel and
12 unusual punishment.
13        It is quite true that Mr. Bell has no
14 prior record of convictions, or arrests, for that
15 matter, as far as I know.



21        However, the crime itself, which I
22 believe was amply demonstrated as being planned and
23 premeditated, as well as as the significant injuries
24 that were inflicted upon the victim in this case,
25 warrant the sentence that is called for by law.
26        Accordingly, do I not find that the
27 sentence that is recommended constitutes cruel and
28 unusual punishment.

BARBARA IVES, CSR NO. 4438

1           Having said those things about Mr. Bell,
2    lets me say, first of all, based on what I heard in
3    this courtroom, I have no doubt, Mr. Bell, that you
4    committed the crime for which you were convicted.  I
5    have no doubt about that.
6           And it's unusual.  You're a very
7    intelligent man, extremely intelligent.  Extremely
8    hard working.  You have demonstrated that to
9    everyone who has known you, including your former
10   wife, the victim in this case.  I'm quite confident
11   that at one point in time, she was deeply in love
12   with you, as you were to her.
13          But by the same token, in my opinion,
14   your character flaw, if you will, is that you're an
15   extremely controlling individual.  And my personal
16   opinion is, you got yourself into a situation which
17   you felt you couldn't control.
18          As a consequence, we all met,
19   unfortunately, in this tragic case.  It's tragic not
20   only to your former wife, but to everybody in this
21   courtroom, who has known you in the past, who has
22   trusted you in the past, as well as, obviously, your
23   two children, who will be deprived of your presence
24   for probably a significant length of time.
25          You are ineligible for a grant of
26   probation under Penal Code Section 1203.075(a),
27   because of the personal infliction of great bodily
28   injury in connection with the conviction for

BARBARA IVES, CSR NO. 4438

J

126

1      **CALIFORNIA BOARD OF PRISON TERMS**

2                  **D E C I S I O N**

3          **DEPUTY COMMISSIONER LOPEZ:**  We're back on

4      record.

5          **PRESIDING COMMISSIONER WELCH:**  Okay.  The

6      Panel reviewed all information received from the

7      public and relied on the following circumstances in

8      concluding that at this time the prisoner is not

9      suitable for parole and would pose an unreasonable

10     risk of danger to society or a threat to public

11     safety if released from prison.  And I'll try to

12     articulate why we denied parole at this time.  One,

13     contrary to what counselor said, the Panel reviewed

14     the offense and we feel that this offense was

15     carried out in an especially cruel and callous

16     manner.  This was supposedly someone that the

17     prisoner loved, his wife, to take a pipe and whack

18     her over the head with it.  It's certainly cruel,

19     and it is certainly callous in the view of the

20     Panel.  The offense was carried out in a

21     dispassionate and it appeared to be to the Panel,

22     that it was calculated.  Certainly, in our view,

23     the victim was abused during this offense.  But

24     back to the issue she was smacked her over the head

25     with paddle and pummelted with pipe and a plastic

26     bag was placed over her head.  So certainly, we

27     **STEVEN BELL    J-69411    DECISION PAGE 1    3/23/04**

127

1   feel that that was abusive kind of behavior.  The

2   offense was carried out in a manner that

3   demonstrates a total callous disregard for a human

4   being, not to mention a person that you supposedly

5   loved, your wife.  So that was a callous disregard

6   for the suffering of another human being.  And the

7   motive for the crime was inexplicable, at the very

8   least, very trivial.  Conclusion drawn from the

9   statement of facts wherein on August 15, 1994, a

10  call was made to 911 by the prisoner indicating

11  that Kathy Bell had hit her head and was bleeding

12  and ranting.  Police responded and then they found

13  the victim.  An investigation was determined that

14  the prisoner had basically attempted to murder his

15  wife by hitting her over the head and placing a

16  plastic bag over her head.  And the evidence was

17  found in the apartment.  Now, the prisoner had no

18  previous criminality.  There's no indication that

19  the prisoner had an escalating pattern of criminal

20  conduct.  There is no indication that he had an

21  unstable social history, quite to the contrary, it

22  appears that he had a quite stable social history.

23  To include, educationally, he's well educated.  It

24  appeared that he grew up in a home  where there was

25  love and support by the family members.  And it's

26  quite apparent from the letters of support that

27  **STEVEN BELL    J-69411    DECISION PAGE 2    3/23/04**

1    came in to the Panel today that you have a lot of
2    family support as well as community support.  The
3    prisoner has programmed in a somewhat acceptable
4    manner while incarcerated.  Recent psychological
5    evaluation by a Dr. Steven Walker, a licensed
6    forensic psychiatrist, indicates that, a
7    psychologist, forensic psychologist, indicates that
8    the prisoner's level of danger inside the community
9    as well as in the structured environment is
10   perceived by him as being low.  It shows that he is
11   making progress.  The prisoner does have parole
12   plans.  However, he could work on employment plans,
13   certainly a job offer in his file would help him.
14   However, he does it, it does appear that the
15   prisoner has a marketable skill that could be put
16   to use upon his release.  The Hearing Panel notes
17   that in response to Penal Code 3042 notices
18   indicating opposition to a finding of suitability,
19   that the (indiscernible) and the Deputy District
20   Attorney from Santa Clara County spoke in
21   opposition to a finding of suitability.  Also, the
22   victim in this case appeared in the hearing and
23   spoke in opposition to a finding of suitability.
24   Panel's final findings, the Panel finds that the
25   prisoner needs to continue to involve himself in
26   positive kinds of programs, the kinds of programs
27   **STEVEN BELL    J-69411    DECISION PAGE 3    3/23/04**

1   that will enable him to be able to understand,

2   especially because of the factors for this crime,

3   and cope with stressful situations in a non-

4   destructive manner.  Until more progress is made,

5   the prisoner continues to be unpredictable,

6   therefore a threat to others.  Prisoner has made

7   gains and certainly we want to commend the prisoner

8   for some of the gains that he's made.  Self-help

9   programs, certainly the prisoner should be

10  commended for that, (indiscernible) the lifeskills,

11  the Eagle Program, prisoner's occupation, all of

12  those kinds of programs, his vocational program

13  plans, office services, the kinds of programs that

14  he's been involved in.  And prisoner basically does

15  not have a major disciplinary history.  So

16  certainly, he's programmed good in prison.  He's

17  received good work reports from his supervisors and

18  also there are some letters of chronos in the file

19  indicating, attested to his work ethic as well as

20  letters from the community attesting to his work

21  ethic.  However, those positive aspects of the

22  prisoner's behavior does not outweigh the fact of

23  his unsuitability.  Now, this is going to be a two-

24  year denial.  And I'm going to explain to you why

25  for two-year denial.  One, there's a lot of

26  discussion of any (indiscernible) from the part of

27  **STEVEN BELL   J-69411    DECISION PAGE 4    3/23/04**

130

1    the people and the prisoner in terms of the

2    commitment offense and going over the issues that

3    occurred in trial.  However, the Board did not feel

4    that we got a lot of insight today in terms of why

5    this crime was committed, the causative factors,

6    and whether or not the prisoner, who would have a

7    lot of insight into what caused him to commit this

8    crime.  And I think that was grossly lacking.  And

9    it appears, it appears to the Board that it's going

10   to take the prisoner at least two years to gain

11   that insight.  The Board was presented with a lot

12   of issues that dealt with the trial, and what

13   happened at the trial, and the dialogue back and

14   forth there.  But in terms of what the prisoner has

15   gained, the insight into why he committed this

16   crime, the causative factors were, did not feel

17   that we received enough information to make a

18   determination of suitability.  Therefore, the

19   parole is denied for two years.  And actually two

20   years is the max denial for a, this crime.  In a

21   separate decision the Hearing Panel finds that it's

22   not reasonable to expect that parole would be

23   granted at a hearing during the following two

24   years.  The specific reasons, one, as I previously

25   noted, we totally disagree with counselor in her

26   argument that this was not cruel especially heinous

27   **STEVEN BELL    J-69411    DECISION PAGE 5    3/23/04**

131

1    crime in compared to other crimes.  We thought it
2    was especially cruel and callous a crime.  To take
3    a metal pipe and beat one's wife over the head with
4    it and put a plastic bag over her head.  Certainly,
5    we feel that that was an especially cruel and
6    callous way to attack another individual,
7    especially if that individual that you supposedly
8    love.  The offense was carried out in a
9    dispassionate and the Panel feels that this was
10   calculated.  We feel that the prisoner planned this
11   crime.  Certainly as I previously stated, we feel
12   that the victim was abused.  Anytime you take a
13   pipe when a person is not suspecting it, then hit
14   her on the head with it and put a plastic bag over
15   her head, certainly the victim was abused.  The
16   offense was carried out in a manner that
17   demonstrates an exceptionally callous disregard for
18   another human being.  And certainly that's an issue
19   that played a little heavier on our mind also, in
20   terms of the denial, that callous disregard for
21   another human being.  The Board was looking real
22   hard for a motive, some insight into why the
23   prisoner would do what he did to the victim.  And
24   we weren't able to find that insight today.  The
25   motive for the crime was inexplicable.  There
26   again, the Board was desperately looking for some
27   **STEVEN BELL    J-69411    DECISION PAGE 6    3/23/04**

1    insight to the causative factors, and we felt that

2    it was grossly lacking today.  Recent psychological

3    reports, certainly raise some issues.  However, it

4    shows that the prisoner's level of dangerousness is

5    reduced (inaudible).  The prisoner has not

6    completed the necessary programming which is

7    essential to this and needs additional time to gain

8    such programming.  Certainly we feel that the

9    prisoner should continue to participate in self-

10   help programs such as Stress Management, Anger

11   Management, and Self-Control, the kinds of programs

12   that will enable him to be able to gain insight

13   into his actions.  Therefore, following a period of

14   observation and evaluation of the prisoner's is

15   required, before the Board shall find that he is

16   suitable for parole.  The Panel recommends first of

17   all that the prisoner remain disciplinary-free, and

18   that he continue to participate in self-help

19   programs.  And certainly, and to address the

20   correctional counselor's report, the Panel did

21   review the psych, correctional counselor's report.

22   We did give it some weight.  We realize that this

23   is a subjective report.  And all of it, and we

24   relied, and we took into consideration too the

25   prisoner's objections.  On the other hand, the

26   Panel feels that you can't appeal, or you can't

27   **STEVEN BELL    J-69411    DECISION PAGE 7    3/23/04**

1    keep from the Board the kinds of information, these

2    objective opinions.  That at some point the

3    prisoner needs to really look at the crime and come

4    to terms with the causative factors.  And in

5    looking at the Board report, some of it was

6    subjective, however, my colleague and myself had

7    the opportunity to go to the C-File and the other

8    documents.  And all the information contained in

9    this Board Report is contained in the C-File.  And

10   we rely most heavily on the prisoner's C-File and

11   other documents rather than on the correctional

12   counselor's report.  We did give in terms of

13   suitability, we did give the psychological report

14   more weight than we gave the correctional counselor

15   in terms of her assessment, or his assessment of

16   the prisoner's level of dangerousness because we

17   realize a correctional counselor is not a trained

18   clinician trained to deal with this type of

19   behavior.  We realize that his opinions was

20   subjective, but in looking at the report we, the

21   correctional counselor did try to base this report

22   on some documents that, on the material that he had

23   reviewed in the C-File.  So certainly we gave it

24   some credence.  But not as much as we gave the

25   psychological evaluation, because the psychiatrist

26    is a trained professional in that area.  And with

27   **STEVEN BELL    J-69411    DECISION PAGE 8    3/23/04**

1    that said, we are going to request a new

2    psychological evaluation.  In areas we're going to

3    ask the Commission to take a look at this time is

4    the prisoner's violent potential to the community

5    again.  We think that's significant and we're going

6    to ask him to take another look, a real close look

7    at the hearing that the Board had the most concern

8    about, the extent of which the prisoner had

9    explored his commitment offense and come to terms

10   with the underlying causes, the causative factors.

11   And that's the area that the Board have the

12   greatest, greatest concern with.  And I guess

13   that's, that's, that's the issue, will the prisoner

14   be a threat to the community if released and fully

15   understand the causative factors?  Now, that

16   concludes the reading of the Decision.

17   Commissioner, do you have any comments?

18          **DEPUTY COMMISSIONER LOPEZ:**  I have none.

19          **ATTORNEY BUCHALTER:**  I have one objection to

20   the two-year denial, I'd like to put on the record.

21          **PRESIDING COMMISSIONER WELCH:**  Okay.  Well,

22   a two-year denial is the, is appropriate.  He

23   cannot get more than a two-year denial.

24          **ATTORNEY BUCHALTER:**  I understand.  I would

25   like to make a record.

26          **PRESIDING COMMISSIONER WELCH:**  And I'm going

27   **STEVEN BELL    J-69411    DECISION PAGE 9    3/23/04**

1   to overrule your objection.  The two-year denial

2   stands.

3       **ATTORNEY BUCHALTER:**  I'd like to put on the

4   record why I'm objecting.

5       **PRESIDING COMMISSIONER WELCH:**  Okay.

6       **ATTORNEY BUCHALTER:**  It's because it is not

7   only unreasonable to expect that another Board in

8   one year could not find him suitable based on his

9   excellent prior lack of criminality, his exellent

10  stable social history, and all of the factors that

11  point towards suitability which could easily by

12  another Board be found to outweigh the life offense

13  itself.  And I would ask that you reconsider the

14  two-year denial.  That's my objection for the

15  record.

16      **PRESIDING COMMISSIONER WELCH:**  Okay.  If I

17  can overrule your objection.  This hearing is

18  concluded at approximately 12:15 p.m.  Good luck to

19  you, Mr. Bell.  You're doing a good job, and I

20  think one day you will get a parole date.

21                          --oOo--

22

23

24

25  **PAROLE DENIED TWO YEARS**          **JUN 2 1** ....

26  **FINAL DATE OF THIS DECISION**_____

27  **STEVEN BELL   J-69411   DECISION PAGE 10   3/23/04**

K

*ADDITIONS TO THE PROPOSED TEXT ARE INDICATED IN UNDERLINE ("___") AND DELETIONS IN STRIKETHROUGH ("———") FORMAT*

(d) Matrix of Base Terms for Attempted Willful, Deliberate and Premeditated Murder committed on or after January 1, 1987.

### CIRCUMSTANCES

### SUGGESTED BASE TERM

| ATTEMPTED MURDER Penal Code § 664(a) (in years and does not include post conviction credit as provided in § 2410) | A. *Minor Injury* Victim unharmed or received minor injury. | B. *Victim Assaulted* Victim assaulted or otherwise seriously injured. | C. *Major Injury* Victim suffered major injuries. | D. *Torture* Victim was subjected to prolonged infliction of physical pain. |
|---|---|---|---|---|
| I. *Participating Victim* Victim was accomplice or otherwise implicated in a criminal act with the prisoner, e.g., crime partner, drug dealer, etc. | 7-8-9 | 8-9-10 | 9-10-11 | 10-11-12 |
| II. *Prior Relationship* Victim was involved in a personal relationship with prisoner, e.g., spouse, family member, friend, etc. which contributed to the motivation for the attempted murder. If victim had a personal relationship but prisoner hired and/or paid a person to commit the offense, use category IV. | 8-9-10 | 9-10-11 | 10-11-12 | 11-12-13 |
| III. *No Prior Relationship* Victim had little or no personal relationship with prisoner or the motivation for the attempted murder was related to the accomplishment of another crime, e.g. robbery, rape, or other felony. | 9-10-11 | 10-11-12 | 11-12-13 | 12-13-14 |
| IV. *Threat to Public Order or Murder for Hire* The attempted murder constituted a threat to the public order, e.g. police officer, correctional officer, public official, fellow patient or prisoner *or* any attempted murder within an institution, any attempted murder where the prisoner hired and/or paid another person to commit the offense. | 10-11-12 | 11-12-13 | 12-13-14 | 13-14-15 |

# LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING #1
### MARCH 2006 CALENDAR

**BELL, Steven**                                                        **J-69411**

## I.    COMMITMENT FACTORS:

### A.    LIFE CRIME:

Steven Bell was committed to the California Department of Corrections (CDC) on July 17, 1995, from Santa Clara County, Case number 177776, following a conviction of Count One (1), Penal Code Section (PC) 664/187, attempted murder, within the meaning of PC Section 189 with an enhancement of PC 12022(b) and PC 12022.7(a). Count two (2), PC Section 245(a)(1), assault with a deadly weapon, within meaning of PC Section 667 and 1192.7 with an enhancement of PC 12022.7(a), Count 2, stayed. S was sentenced on Count I to a total term of LIFE plus four (4) years for the enhancements. Minimum Eligible Parole Date (MEPD) is January 3, 2004. Victim Cathy Bell, age 42. Weapon: metal pipe and garbage bag.

#### 1.    Summary of Crime:

The following information was derived from Milpitas Police Department Crime Report #94-227023, and from the District Attorney's file including a transcript of the preliminary examination occurring between the date of December 13, 1994 and January 5, 1995.

On August 15, 1994, at approximately 7:22 a.m., a 911 call was received from Mr. Bell indicating the victim, Mrs. Cathy Bell, had hit her head and was bleeding and ranting. Emergency personnel responded to Mr. & Mrs. Bell's residence, located at 646 Clauser Drive, Milpitas, California. Upon arrival of the police officer, Mr. Bell was at the front door beckoning the officer to enter. The victim, age 42, the wife of Mr. Bell, was observed lying on her back on the bed in the master bedroom. Blood was observed on the pillow and on the back of her head. Mr. Bell indicated he did not know what had happened to the victim, his wife. The victim told the police officer that her husband, Mr. Bell, had tried to hurt her. Mr. Bell was then escorted from the room. The victim recalled sitting on the end of the bed. The next thing she knew, she was on the floor with a plastic bag over her face. She did not know how she hurt her head and she didn't know if her husband placed the plastic bag over her head. Mr. Bell was transported to the Milpitas Police Department.

Mr. Bell waived his rights and provided a statement. Mr. Bell informed the police officers that he and Mrs. Bell had been married for 15 months. They both had two children each from previous marriages who were away visiting relatives at that time and he and his wife had argued the night before over the return of their children. Mr. Bell continued to state he didn't know what had happened to this wife. A search of the residence revealed there were blood spots in the master bedroom and master bathroom. In the bedroom adjacent to the master bedroom, a blanket was uneven on the bed. After further searching, it was discovered that underneath the blanket was a white trash bag, beneath the trash bag was a metal pipe that was approximately two feet long.

2.   **Prisoner's Version**:

Mr. Bell's attorney has recommended that he should refrain from making statements for the purpose of the Lifer Hearing. All statements will be withheld at this time. (See memorandum dated November 28, 2005, located in the Board of Prison Hearings (BPH) section of the central file.)

3.   **AGGRAVATING/MITIGATING CIRCUMSTANCES:**

**Aggravating Circumstances:**

a.   The victim was particularly vulnerable.

b.   The defendant took advantage of a position of trust or confidence to commit the offense.

**Mitigating Circumstances:**

a.   The crime was committed during or due to an unusual situation, as likely to reoccur.

b.   Bell has a minimal or no history of criminal behavior.

B.   **MULTIPLE CRIMES:**

None noted.

II.   **PRECONVICTION FACTORS:**

A.   **JUVENILE RECORD:**

None noted.

**B.**    <u>ADULT CONVICTIONS AND ARRESTS:</u>

On August 15, 1994, Bell was arrested by the Milpitas Police Department for the instant offense.

**C.**    <u>PERSONAL FACTORS:</u>

Steven Bell was born in Los Angeles, California, to the marriage of LaVonia Cauble and Kenneth Bell. Bell's father was employed as a supervisor at Hughes Aircraft, while his mother was a fulltime homemaker. Because his father, Kenneth Bell, held various management positions with a number of aerospace and electronics companies, the family moved frequently throughout Southern California during his early childhood. When Bell was eight (8) years old, his father accepted a job at an electronics plant before the family settled in Glendora, California. The family's Glendora home was a comfortable house in a middle to upper middle class neighborhood. Bell was raised in an environment free from verbal, physical and alcohol abuse. In August of 1972, Bell met Susan Montoya while in High School. In High School he was a perennial honor student, who took accelerated classes. In 1973, he graduated (4th) fourth in a class of (300) three hundred. Bell was a model student, and involved himself in numerous achievements and awards. Bell attended California Polytechnic University where he graduated Cum Laude in 1977. Bell has one (1) sister, Debra Garrett, who resides in Roseburg, Oregon. Bell has two children, Sean (25) and Erin (23) from a previous marriage to Debra King. Bell married Debra King in 1977 and was divorced in December 1991. Bell was employed by Chilson's Management Controls as a director of data processing. Bell established his own company, Integrated Management Systems. Bell's company was forced to file bankruptcy and as a result Bell felt depressed. Steven Bell divorced in December 1991. Bell married Cathy (the victim) in May of 1993. Cathy had two children from a previous marriage. The relationship was considered stable and healthy, however, the marriage ended due to the attempted murder. On June 28, 1996, Bell married Susan Montoya. .

**III.**    <u>POSTCONVICTION FACTORS:</u>

**A.**    <u>SPECIAL ACCOMMODATIONS / DISABILITY:</u>

Bell states he has no special needs or disabilities that would require special accommodations.

**B.**    **CUSTODY HISTORY:** (Review Period 12-19-03 through 3-22-06)

Bell began this period of review at Avenal State Prison (ASP)-II in the General Population (GP). Custody: Medium (MED) A. Work Group/Privilege Group (WG/PG): A1/A. Mandatory Minimum Placement Score (PS): 19.

Work Assignment: Vocational (VOC) Carpentry.    Bell received satisfactory behavior/assessment on his Education Progress Reports (CDC 128-E) dated 6-25-03, 9-30-03, 1-6-04 and 3-12-04, reflect satisfactory behavior/assessment. S received a certificate dated 3-1-04, for the completion of VOC Carpentry.

On 1-27-04, S was seen by Unit Classification Committee (UCC) for his Annual Review. S was placed on the Institutional Services (I/S) waiting list and continued in his present program (CPP).

On 3-9-04, S was seen in absentia by UCC for a Program Review, per S's request. S was removed from VOC Carpentry and reassigned to the Education (ED) Clerk position effective (eff.) 3-12-04.    Per CDC 128-B dated 3-2-04, authored by M. Fetyko, Instructor.    S had received the necessary skills to perform the clerk tasks in VOC Carpentry.

On 3-23-04, S was seen by the Board of Prison Term (BPT) for his Initial Parole Consideration Hearing. BPT recommended that S remain disciplinary free, participate in self help programs if offered at ASP and eligible to participate. The BPT denied parole for two (2) years. S was placed on the March 2006 Calendar for his Subsequent (SUB) Hearing #1.

On 4-1-04, S was seen by UCC for a Post Board Review. S remained assigned as an ED Clerk. (Bell received exceptional grades on his work supervisor's reports (CDC 101) dated 6-30-04 and 9-30-04.

On 10-5-04, S was seen by UCC for his Annual Review. S was unassigned from the ED Clerk position and placed on the VOC Welding waiting list eff. 9-17-05. S was assigned to VOC Welding on 10-27-04. CDC 128-E dated 1-4-05 reflects satisfactory behavior assessment.

On 2-8-05, S's case was seen in absentia by UCC for a Program Review. Per S's request, S was unassigned from VOC Welding, deleted from the ED waiting list and placed on the I/S waiting list with the recommendation to priority hire into the 120 Building, 3rd Watch Porter.

On 1-4-06, S was sent by UCC for his Annual Review. S was continued in his present program.    S was assigned to the 110 Porter position from 3-19-05 to 3-26-05. On 3-26-05, S was reassigned to the Facility One Trash Crew position. CDC 101's dated 4-15-05 and 6-30-05 reflect satisfactory grades.

## THERAPY AND SELF-HELP ACTIVITIES:

### Narcotic Anonymous (NA):

| | | |
|---|---|---|
| 01-7-04 | (ASP) | Certificate of Appreciation, 6 months. |
| 11-24-04 | (ASP) | Certificate of Appreciation, 12 months. |
| 04-27-05 | (ASP) | Certificate of Appreciation, 15 months. |
| 01-04-06 | (ASP) | Certificate of Appreciation, 18 months. |
| 03-01-06 | (ASP) | Certificate of Appreciation, 21 months. |

### Self Help:

| | | |
|---|---|---|
| 01-07-04 | (ASP) | Certificate of Achievement in Emergency Management Institute for Introduction to Mitigation, Stephen G. Sharro, Director. |
| 01-25-04 | (ASP) | Laudatory Chrono authored by D. Fetyko, VOC Carpentry Instructor, states that S is a model student, excellent worker, outstanding performance and highly self motivated. |
| 02-19-04 | (ASP) | Certificate of Achievement for VOC Carpentry in Exterior Finish, D. Fetyko, VOC Instructor. |
| 02-19-04 | (ASP) | Certificate of Achievement for VOC Carpentry in Interior Finish, D. Fetyko, VOC Instructor. |
| 02-19-04 | (ASP) | Certificate of Achievement for VOC Carpentry in Rough Framing, D. Fetyko, VOC Instructor. |
| 02-19-04 | (ASP) | Certificate of Achievement for VOC Carpentry in Materials of Construction, D. Fetyko, VOC Instructor. |
| 03-01-04 | (ASP) | Certificate of Vocational Completion in VOC Carpentry, 13 units. D. Fetyko, VOC Instructor. |
| 03-02-04 | (ASP) | CDC 128-B Chrono authored by D. Fetyko, VOC Instructor, requesting S to be assigned to his clerk's position due to S's ability to perform the required tasks. |
| 04-13-04 | (ASP) | Certificate of Completion in Anger Management, Fr. John P. Author, Creative Options. |

## Self Help (Continued):

| | | |
|---|---|---|
| 05-06-04 | (ASP) | Certificate of Achievement in Emergency Management for Mitigation for Homeowner. Stephen G. Sharro, Director. |
| 08-11-04 | (ASP) | Certificate of Achievement in Emergency Management for Professional Emergency Management. Stephen G. Sharro, Director. |
| 09-27-04 | (ASP) | Certificate of Achievement in Emergency for Department of Homeland Security, Emergency Planning. Stephen G. Sharro, Director. |
| 10-7-04 | (ASP) | Laudatory Chrono authored by D. Fetyko, VOC Carpentry Instructor, states, "I have never encountered an individual with a finer work ethic whether inside the prison or in the workplace. He is without exception the best clerk I had in the (14) fourteen years I have held this position." |
| 11-15-04 | (ASP) | Certificate of Vocational Achievement for VOC Welding in Regional Mathematics, W. Erchesman, VOC Instructor. |
| 11-29-04 | (ASP) | Certificate of Vocational Achievement for VOC Welding in Metal Metalurgy, W. Erchesman, VOC Instructor. |
| 12-17-04 | (ASP) | Certificate of VOC Achievement in Welding in Basic Welding, Joints & Symbols, W. Erchesman, VOC Instructor. |
| 12-30-04 | (ASP) | Certificate of Achievement for VOC Welding in Welding Printer Reading, W. Erchesman, VOC Instructor. |
| 12-21-05 | (ASP) | Informational Chrono authored by K. A. Brown, Staff Information Analyst, states in part that S is overqualified for his computer. |
| 12-30-05 | (ASP) | Participation in Interactive Journaling Guidebooks, "Values for Responsible Living", Mrs. Wall, Instructor. |
| 01-25-06 | (ASP) | CDC 128-B authored by Karen E. Henry, Sr. Librarian, states that S is an avid user of the central law library, uses time wisely and treats staff with respect. |

**Other Activities:**

None noted.

### D.   **DISCIPLINARY HISTORY:**

Bell has remained disciplinary free for his entire time since his incarceration, no CDC 115's or CDC 128-A's.

### E.   **OTHER:**

Bell was seen by the BPT for his Initial Parole Consideration Hearing on 3-23-04. The Board recommended that Bell;

1. Stay disciplinary free.

2. Participate in self-help and therapy programs if available and are eligible to participate.

## IV.   **FUTURE PLANS:**

### A.   **RESIDENCE:**

Upon release from custody, Bell intends to live with his wife, Susan Bell, at her home 4352 Rainier Court, Chino, California, 91710.   Mrs. Bell's telephone number is (909) 902-5680.   Susan has owned her own home for over 20 years.   She is currently working in the healthcare profession.   Mrs. Bell is considered to be stably employed.   In the unlikely event Mr. Bell could not live with his wife, he could live with his parents, LaVonia and Joseph Margala at 1692 Camel Circle West, Upland, California, 91784. Bell's parent's telephone number is (909) 982-2782.   Bell has provided his Uncle Dave and Aunt Lynn Cauble's address should he be denied residence plans with his wife or parents.   The Cauble's address is 254 Paseo De Granada, Redondo Beach, California, 90277 and their telephone number is (310) 378-1177.

### B.   **EMPLOYMENT:**

Upon release from custody, Bell intends to find employment in the computer industry. Mr. Bell has a certificate in Data Processing Computer Technology.   Support Letters are in the central file.   The following is a list of job offers in order per his preference:

<u>Full Time Positions</u>:

Chino Valley Medical Center
5451 Walnut Avenue
Chino, California 91710

Dr. James Lally, D.O.
Chief Medical Officer
(909) 464-8600
Job offered:  Information System Analyst

Alpine Development Group
39755 Berkley Drive, Suite 'A'
Palm Desert, California, 92201

Michael Aulieino
Regional CFO
(909) 260-3759 cell
Job offered:  Information Help Desk

Pro Tech Medical
4774 Murrieta Street, Suite '14'
Chino, California, 91710

Fred Armogida, RCP
Co-Owner
(909) 262-1662
Job offered:  Warehouse Manager

<u>Contract/Part-Time Positions</u>:

Roger Hanson, Attorney
1517 East 4th Street
Santa Ana, California, 92701

Roger Hanson, Ph.D.
Attorney at Law
(714) 953-0638
Job offered:  Contract Legal Assistant

Sandra Feder
8255 Bramhall Way
Fair Oaks, California, 95028

Sandra Feder, M.S.
(916)962-0955
Job offered:  Website Development

Realty Executives
2404 Stockton Hill Road, #F
Kingman, Arizona, 86401

Kathy Helton
Realtor
(928) 530-5360
Job offered: Website Design and Maintenance

C.    <u>ASSESSMENT:</u>

Bell plans to parole to his wife, Susan Bell in Chino, California.  Mrs. Bell states in her
support letter, "Steve has many family and friends who have maintained a relationship
with him are more than willing to support his efforts to transition back into the
community.  Steve is more than welcome to live with me in our Chino home, and I will
provide any and all needed support."  Bell also has two alternate places in which to live
if needed.  Bell has exceptional skills with computers and has learned other skills and
trades, which will enable him to achieve gainful employment.  Bell has numerous job
offers upon his release.  Additionally, S has 35 support letters originally left with his
attorney to present at his hearing.  Bell has expressed a strong desire to work and live in
accordance with the Board and Parole's conditions and guidelines.

V.   **USINS STATUS:**

Bell is a United States Citizen.

VI.   **SUMMARY:**

A.   Per memorandum dated 8-5-04, authored by Cheryl K. Pliler, Deputy Director Institution Division; Section V1-A of the Model Board Report, "Risk Assessment" is temporarily suspended pending further notification.

B.   Prior to release, Inmate Bell could benefit from the following:

1. Continue to remain disciplinary free.

2. Continue positive programming efforts.

3. Participate in self-help programs as available.

C.   This board report is based on ten (10) hours of report writing, central file review and interview with Bell.

D.   On 3-22-06, Bell was afforded an opportunity to examine his Central File.  Bell did not request any copies made.

E.   No accommodation was required per the Armstrong Remedial Plan (ARP) for effective communication.

Prepared by:                    Reviewed by:                    Reviewed by:

/s/ J. E. Howell CCI 3.24.06    P. Kane 3.24.06    C. Mancinas 3.30-06

B. HINDT                        P. KANE                         A. MANCINAS
Correctional Counselor I        Correctional Counselor II       Classification & Parole Representative
Avenal State Prison             Avenal State Prison             Avenal State Prison

BELL                              Page 9                              J-69411

M

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

## DIRECTOR'S LEVEL APPEAL DECISION

Date:    NOV 1 7 2006

In re:   Bell, J-69411
         Avenal State Prison
         P.O. Box 8
         Avenal, CA  93204                    120-2-36L

         IAB Case No.: 0603284        Local Log No.: ASP 06-01602

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner C. Hall, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I    APPELLANT'S ARGUMENT:** It is the appellant's position on June 8, 2006, his Correctional Counselor requested a new/corrected Board of Parole Hearings (BPH) report from Dr. Schroeder since his first one omitted mention of his copious prison self-help activities. The appellant alleges Dr. Schroeder concluded he needed more self-help activities, including anger management without noting the three previous anger management classes he completed. In addition, the appellant claims Dr. Schroeder documented the appellant shows no remorse, which he repeatedly has, and is on record. The appellant states Dr. Schroeder's recommendations are unreliable and are based upon erroneous facts and assumptions. The appellant is requesting a new psychological evaluation from a new psychologist; no retaliation for filing this CDC Form 602, Inmate/Parolee Appeal Form; a new BPH psychological report to "replace the existing erroneous report in his Central File (C-File) and all other CDC/BPH records.

**II    SECOND LEVEL'S DECISION:** It is the institution's position the appellant was informed if he did not agree with the psychologist's evaluation, he has the right to either discuss/rebut the findings during his BPH or can write a response or a letter of rebuttal to be filed in his C-File. The appellant was informed he cannot request a new psychological evaluation because he disagrees with the evaluator's opinion; he may discuss the evaluation and the alleged discrepancies during his BPH hearing; and, he does not have the right to request the removal of a document from his C-File or Unit Health Record (UHR).

**III    DIRECTOR'S LEVEL DECISION:** Appeal is denied.

**A.    FINDINGS:** The appellant is dissatisfied with mental health's psychological assessment of him as he prepared himself for a Board of Parole Hearing. The appellant claims the psychologist who conducted the assessment was not thorough and provided erroneous information of his copious self help activities and prior anger managment classes. The appellant was provided alternatives to providing a new BPH report including discussing the alleged discrepancies and omissions during his BPH and writing a letter of rebuttal. The appellant was informed he could not remove any documentation from his UHR or C-File; nor, could he request a new psychological evaluation due to not agreeing with his current evaluator's opinion. After review, there is no compelling evidence that warrants intervention at the Director's Level of Review.

**B.    BASIS FOR THE DECISION:**
California Code of Regulations, Title 15, Section (CCR): 3350, 3354, 3360, 3361, 3362, 3363
CCR: 3500, 3605

**C.    ORDER:** No changes or modifications are required by the institution.

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

N

**STEVEN D. BELL**
**#J-69411, A.S.P., 120-236-L**
**P.O. Box 9**
**Avenal, CA 93204**


January 5, 2007


Mr. John Monday, Executive Officer
Board of Parole Hearings
1515 K Street, Suite 600
Sacramento, CA 95814

Re: Comments on Proposed Decision of BPH Panel (15 CCR §2028),
   Hearing of Steven D. Bell, #J-69411, 11/07/06, Avenal State Prison

Dear Mr. Monday:

Pursuant to 15 CCR §2028(b), I request that the following information be in-
corporated into the record of the hearing noted above and considered by the
Board before the panel's proposed decision becomes effective.

As set forth more specifically below, the panel's decision should be dis-
approved and a rehearing scheduled under 15 CCR §§2041 and 2042 where:

   (1)   The panel made <u>errors of law</u> by misinterpreting 15 CCR §2236
         to prohibit all discussion of (a) my insights into decisions
         and behavior which led me to prison, and (b) my feelings of
         and actions demonstrating remorse for the harm I have caused.
         The panel then denied parole, in part, for my failure to pro-
         vide insights and express remorse — testimony they had banned;

   (2)   The panel made <u>errors of fact</u> by basing its denial, in part,
         upon a psychological report containing known factual errors
         that had <u>no</u> "indicia of reliability" and explicitly refusing
         to consider relevant and reliable evidence critical of and con-
         trary to this report's factual errors; and,

   (3)   Documentation I submitted under 15 CCR §2247 was <u>not available</u>
         <u>to the panel</u> and thus not considered in making their decision
         about my suitability for parole.

I believe that when these errors are considered by the Board there is a "sub-
stantial likelihood of resulting in a substantially different decision upon
a rehearing." 15 CCR §2042.

<u>**Errors of Law:**</u>

"The facts of the crime shall be discussed with the prisoner to assist in de-
termining the <u>extent of personal culpability</u>. The board shall not require
an admission of guilt to any crime for which the prisoner was committed. <u>A</u>

January 5, 2007
Mr. John Monday
Page 2.

prisoner may refuse to discuss the facts of the crime in which instance a de-
cision shall be made based on the other information available and the refusal
shall not be held against the prisoner." 15 CCR §2236 (emphasis added); see
also Penal Code §5011(b); In re Caswell, 92 Cal.App.4th 1017 (2001).

At my parole hearing, the "extent of personal culpability" was never in ques-
tion. From the outset, I stipulated to the official court record and accepted
full responsibility for my commitment offense and conviction. Attachment A,
p. 3. Having thus fully addressed personal culpability — the sole purpose
of 15 CCR §2236 — any further discussion of the "facts of the crime" was ir-
relevant; I exercised my legal privilege not to discuss these facts.

I expressed to the panel my willingness to discuss all other matters, espec-
ially those topics bearing on my suitability for parole, including: (a) my
insights into and understanding of my behavior which led me to prison; and,
(b) my feelings of and actions demonstrating remorse. Attachment A, pp. 3,
17. These matters have nothing to do with "personal culpability" under this
section, and nothing to do with the "facts of the crime," but are crucial to
the determination of suitability under 15 CCR §2402. See, e.g., 15 CCR §2402
(d)(3) "Signs of Remorse".

However, in response to an objection by the county prosecutor, the panel un-
reasonably and illegally prohibited all discussion of my insights and my re-
morse unless I first waived my right not to discuss the facts of the offense.
The prosecutor's flawed legal advice here, adopted credulously by the panel,
was that I could not discuss insights without also discussing the facts of the
crime I had insights into, and I could not discuss remorse without also dis-
cussing the facts of the crime I was remorseful for — in short, the panel held
that any discussion of insights or remorse constituted a waiver of privilege
under 15 CCR §2236 and compelled me to answer all questions about the "facts
of the crime."

Feelings and insights are NOT "facts of the crime," and it was clearly errone-
ous and prejudicial for the panel to equate these, prohibiting all exploration
of the former unless I discussed the latter.

(It should be noted that 15 CCR §2030(d)(2) "Role of the Prosecutor" does not
authorize the district attorney to make such objections — a parole hearing
is not a trial — and specifically prohibits a prosecutor from "render[ing]
legal advice" as was done at my hearing; another error of law which materially
affected the panel's decision in my case.)

But it gets worse: Having imposed this prohibition upon me and, as a result,
asking me no questions about my feelings, insights, and remorse, the panel then
held my silence against me. In announcing its decision, the panel soundly
criticized me for not providing insight and not expressing remorse — a real-
life Catch-22!

If, arguendo, feelings and insights are equivalent to the "facts of the crime"
or at least so closely intertwined that one cannot be discussed without the

January 5, 2007
Mr. John Monday
Page 3.

other, then the legal protection established under 15 CCR §2236 to not have my
silence held against me <u>must</u> apply, and the panel's decision here violated
this protection. If, on the other hand, feelings and insights can be discussed
separately from facts (the former addressing suitability under 15 CCR §2402
and the latter culpability under 15 CCR §2236) then the panel's prohibition at
my hearing erroneously kept them from hearing and considering reliable, rele-
vant evidence of my suitability for parole in violation of 15 CCR §2402(b).

The panel cannot have it both ways. In either of the above cases the panel's
<u>errors of law</u> here so prejudiced my hearing that there is a strong likelihood
of a "substantially different decision upon a rehearing." 15 CCR §2042.

<u>Errors of Fact:</u>

A hearing panel must consider "[a]ll relevant, reliable information." 15 CCR
§2402(b); <u>In re Dannenberg</u>, 34 Cal.4th 1001, 1082 (2005). Due process requires
that "some evidence" support the panel's determination, and that the evidence
relied upon must possess "some indicia of reliability." <u>Biggs v. Terhune</u>, 334
F.3d 910, 915 (2003); <u>In re Scott</u>, 133 Cal.App.4th 573, 591 (2005).

At my parole hearing, the panel based its decision, in part, on <u>factually er-
roneous</u> information contained in a psychological report prepared by C.Schroeder.
As pointed out to the panel, Schroeder's report lacks any "indicia of relia-
bility" where it contains factual assertions contrary to the record, including:

   (a)  Omits readily-available facts of my many years of copious self-
        help efforts (<u>which the panel itself praised elsewhere</u>), then
        asserts that I have "much work to do" (sic) in self-help (At-
        tachment B, p. 4);

   (b)  Asserts as "fact" (sic) that I have "not expressed remorse" (ibid)
        which is contrary to the record of my actions and statements in
        the trial court and before the Board; and,

   (c)  Asserts as "fact" (sic) that I have "not come to terms" with the
        commitment offense (ibid) where this is <u>completely unsupported</u> —
        I declined to discuss the "facts of the crime" with Schroeder
        pursuant to 15 CCR §2236 so she had <u>no</u> basis for this so-called
        "fact" (sic). (Note that Schroeder's evaluation was supposed to
        focus on my risk of dangerousness, not culpability under §2236.)

Despite these unsupported and unreliable "facts" (sic), the Schroeder report
nonetheless concludes that my "<u>risk of harm to others is below average</u> for
[the] parolee population." Attachment B, p. 3. But the panel explicitly re-
lied upon the above incorrect and unreliable "facts" (sic) to deny parole
while ignoring the "below average" risk assessment, stating that the Schroeder
report was "not totally supportive of parole."

(It should be noted that this finding is also an <u>error of law</u>. No statute,
regulation, or judicial decision supports the notion that a BPH psychological
report must be "totally" supportive. On the contrary, the regulatory and judi-

January 5, 2007
Mr. John Monday
Page 4.

cial standard for suitability is "whether the prisoner will pose an unreason-
able risk of danger to society if released from prison." 15 CCR §2402(a); see
also In re Dannenberg, supra, 84 Cal.4th at 1098.  The Schroeder report unequi-
vocally answers this question with a resounding "No."  Where even the above
erroneous and unreliable "facts" (sic) are insufficient to disturb my "below
average" risk to society, they are legally irrelevant to the panel's determi-
nation of suitability.  Further, the Schroeder report's incorrect assertions
that I lack insight and am not remorseful were especially damaging at my hearing
where the panel forbid me from addressing these factors (see above).)

Because the factual errors in the Schroeder report deprived it of any "indicia
of reliability," at my own expense I retained Dr. Melvin Macomber to conduct
a more thorough and accurage independent psychological evaluation, which I pre-
sented to the panel.  (Dr. Macomber's report is included here as Exhibit B of
this letter's Attachment C.)  The panel acknowledged Dr. Macomber's extensive
experience and expertise in preparing BPH evaluations, and agreed to review and
consider his report.  They found Dr. Macomber's evaluation to be "totally sup-
portive of parole," yet disregarded this in favor of the factually incorrect
and unreliable Schroeder report.

(It should be noted that the panel unreasonably ordered a new psychological
report before my next hearing because the Schroeder report was not "totally
supportive" — ignoring that in Dr. Macomber's evaluation they already had a
more current, more extensive, more accurate, and totally supportive report.
The panel also instructed me to "fully cooperate with the [next] clinician" —
i.e., ordering me to waive my legal protection under 15 CCR §2236, another
error of law — ignoring that I had already "fully cooperated" with Dr. Macom-
ber.  See "Review of Life Crime" on p. 5 of Exhibit B to this letter's Attach-
ment C.)

The panel also ignored Dr. Macomber's professional review of Schroeder's report
where he found, in part:

> "Because Mr. Bell did not discuss the commitment offense with the
> psychologist, the psychologist noted that he was not remorseful [and]
> that he had much work to do, because he needed to come to terms with
> his crime in order to move toward resolution. 'He needs to look in
> the mirror instead of out the window' (page 4).  This comment was un-
> substantiated and not appropriate to the facts of Mr. Bell's efforts
> at self-improvement."  See p. 5 of Exhibit B to this letter's Attach-
> ment C (emphasis added).

Given the panel's acknowledgment of Dr. Macomber's expertise and their agree-
ment to consider his evaluation, it was an error of fact to unquestioningly
accept Schroeder's unsubstantiated assertions as having any "indicia of relia-
bility" in light of Dr. Macomber's findings.

The panel explicitly refused to consider the sworn declaration of another ex-
perienced psychologist, Dr. Terry Chase, which was highly critical of the un-
substantiated Schroeder report.  (Dr. Chases declaration is included here as

January 5, 2007
Mr. John Monday
Page 5.

Exhibit E of this letter's Attachment C.)  The panel based its refusal on the
fact that Dr. Chase only reviewed documents but did not examine me personally
— but the purpose here was to determine the reliability of the Schroeder re-
port, not yet another evaluation of my risk to society.  The panel's refusal
was unreasonable where the American Psychological Association recognizes the
value of peer review, record review, and other professional consultations where
"an individual examination is not warranted or necessary."  A.P.A. Code of
Ethics §9.01(c).

Like Dr. Macomber, Dr. Chase found the Schroeder report to be factually unsup-
ported and unreliable, concluding:

> "Dr. Schroeder's report is neither accurate nor reliable.  Reliance
> upon such a subjective, unsupported, inconsistent, and unprofessional
> report where Mr. Bell's life and future are at stake cannot be jus-
> tified."  See p. 4 of Exhibit E of this letter's Attachment C.

It was an error of law under 15 CCR §§2028(a) and 2402(b) for the panel to re-
fuse to consider Dr. Chase's sworn declaration, and an error of fact to accept
Schroeder's unsupported assertions as having any "indicia of reliability" in
light of Dr. Chase's and Dr. Macomber's findings.  Because of these errors, there
is a strong likelihood of a "substantially different decision upon a rehearing."
15 CCR §2042.

### Unavailable Information:

The panel did not have before it, and thus did not consider, my own Statement
of Disagreement with the Schroeder report prepared pursuant to 15 CCR §2247 and
submitted on October 18, 2006, to my correctional counselor. Attachment C.  In
my Statement, included here by reference, I not only pointed out the Schroeder
report's factual errors but also its failures to conform to regulatory require-
ments for BPH psychological evaluations.  I submit this as "new information
[that] should be presented to the board" for review under 15 CCR §2042.  (Note
that Dr. Macomber's report and Dr. Chase's declaration are attached to my State-
ment of Disagreement as that document's Exhibits B and E, respectively.)

### Other Errors:

Finally, while not specifically addressed above, I request that the Board con-
sider the following additional due process errors:  (a) No factor of the crime,
nor any other evidence, indicates that I currently pose any danger to society
under 15 CCR §2402(a); (b) The panel failed to note that the evidence supports
every suitability factor under 15 CCR §2402(d) (except "Battered Woman Syndrome");
and, (c) No evidence supported the imposition of the maximum two-year denial
under Penal Code §3041.5.

### Conclusion:

On the basis of all the above errors of law, errors of fact, and new informa-
tion, I request that a rehearing be scheduled as soon as possible.  Thank you
for your time and consideration.  Please acknowledge your receipt of this letter.

Sincerely,

O

*Susan Montoya-Bell, LCSW*
*Licensed Clinical Social Worker*

November 29, 2005


Board of Parole Hearings
1515 "K" Street #600
Sacramento, California 95815

Re: Steven Bell, #J69411


To Whom It May Concern:

I have been working in the social service field since 1980, and have worked in a variety of settings, including Child Protective Services and community mental health programs. I received my BSW from Cal Poly Pomona in 1981, my MSW from USC in 1983, and my post-graduate certificate in gerontology from Cal State Fullerton in 1995. Since 1991, I have been employed at Chino Valley Medical Center, where I am the Director of Case Management, Discharge Planning and Social Services. I have been selected Employee of the Month twice and Employee of the Year once.

I have lived in southern California all of my life and have owned my current home since 1984. My two children, ages 21 and 17, live with me. I have been their primary parent for most of their lives.

I have known Steve Bell since 1972 and have been married to him since 1996. I have maintained consistent, regular contact through out his incarceration via mail, phone and visits, currently making the 225 mile drive every other week. My relationship with him is <u>very</u> strong and committed.

Through the years that I have known Steve, he has always tried to be the very best person he could be. When we were in high school and college together, he excelled in academics and music. After graduating from college, he was gainfully employed throughout his adult life. He was a loving and involved parent with his two children, Sean and Erin.

Steve has always been cooperative and conscientious in his dealings with others, even after his arrest. Whether dealing with officers or inmates, he has maintained polite and respectful interactions. I find this especially admirable given that the interactions often are provocative. Steve has demonstrated maturity and wisdom in dealing with others and has never acted out violently or destructively.

Page 2: Steve Bell

Steve has come to accept responsibility for his circumstances. He is acutely aware that the behaviors which lead to his arrest have negatively impacted a number of people, including his family. This has been a very grievous concept for him, and he has made every effort to apologize or make amends to those who would allow him to do so. I am very proud of him, and I believe his acceptance of this has fostered emotional growth in how he affects others. Further, I believe he has gained an understanding that will ensure he will not engage in any behavior which could be perceived as a threat to others.

Steve has a number of qualities which can commonly be misunderstood. For instance, Steve is extremely intelligent, a good planner, and seeks to positively influence the factors effecting his life. These are qualities which made Steve very successful in his professional career. At the same time, these factors can be misconstrued as indicating manipulative or controlling behavior. I personally admire Steve for the goal-directed behavior he has maintained in his life and have never perceived him to be manipulative or controlling.

Steve has also come to be a more patient person, despite the many frustrations and limitations of his incarceration. He has maintained a reasonable sense of humor and has not allowed obstacles to overwhelm him or cause him despair. I believe his emotional stability and maturity are exceptional, especially given his circumstances. Because of the emotional maturity I consistently see Steve exhibit, there is no question in my mind that he is not impulsive, not prone to explosive anger, nor destructive to self or others.

Even though Steve came to prison with a number of good qualities, I have found that he has grown as a person over the course of his incarceration. It is my greatest hope that the Board will give serious consideration to these gains. He is more patient, forgiving (of himself and others), flexible, empathic and accepting of his responsibility for his life circumstances. I would also hope that the Board will note the many positive resources available to Steve. Steve has many family and friends who have maintained a relationship with him and are more than willing to support his efforts to transition back to the community. Steve is more than welcome to live with me in our Chino home, and I will provide any and all needed support.

While I recognize that the instant offense was a serious one, it does not come close to defining the kind of person that Steve is today. He has the maturity and stability to be a productive member of society. He is in no way a threat to anyone. I believe in him completely.

I thank you for your time and consideration in this matter.

Susan Montoya-Bell
Susan Montoya-Bell
4352 Rainier Court
Chino, California 91710
909-902-5680

December 12, 2005


Board of Parole Hearings
1515 K Street, #600
Sacramento, CA 95815

      RE: Steven Dale Bell, #J69411

I am the Mother of Steven Bell and am retired after working in school districts for over 35 years.

Steve has been devoted to his family and extended family and has a deep desire to do the right things to make amends to any and all of those who have been hurt by this incident.  As he always has, he accepts responsibility for his actions and mistakes and will do whatever it takes to correct the situation in a positive way.

He  has always been a very dedicated parent to his children, being the sole parent on multiple occasions, and enjoyed being involved with them in their many activities.  He is looking forward to re-establishing his relationships with his now adult children and helping them where ever possible.

Steve has no criminal background or ties, he is very intelligent and has a positive outlook for his future.  His excitement for life and learning has become even more evident during these past years.  He has a BS degree in Computer Science and had nearly completed his MS course work before entering the prison system; he has participated in various professional educational programs, has taught technical classes, and has had several articles published.  In spite of all this upper-level work, Steve entered into the various AA, NA and Voc Ed classes in the prison system with the same enthusiasm for learning as he always did; he always found something that was interesting and useful.

Steve is enthusiastic about his future and plans for his life.  My husband and I are willing to help him accomplish his goals of being a law-abiding, tax paying member of our society in every way possible.  He had a wonderful life and a 20-year professional career before this unfortunate incident and we stand ready to help launch him back into society, helping him both financially and emotionally to realign his educational background with a new career, and helping him in every way that we can. Steve has always met his challenges with "vim and vigor" and has been consistently positive.  He will live with his wife in Chino, California, and if for any reason he needs another place to live, our home is always open to him for as long as he wants.

We are confident that Steve will be a useful and productive member of our society and we can all be proud of him.

Sincerely,

*LaVonia Margala*

LaVonia Margala
1692 Carmel Circle West
Upland, CA 91784

**Foothills Psychological Services, Inc.**
**11800 Central Avenue, Suite 125**
**Chino CA. 91710**
**(909) 902-9111    Fax (909) 902-9199**

March 23, 2006

Board of Parole Hearings
1515 K Street, #600
Sacramento, CA. 95815

RE: Steve Bell

Gentlemen/Gentlewomen:

I am a psychologist who has been licensed by the State of California for sixteen years. I have many years of experience working with clients who have been convicted of violent crimes. I also have extensive experience performing pre-employment and fitness for duty evaluations for law enforcement agencies and other employers.

I have been asked several times throughout the course of my career to write letters to the Board of Parole Hearings (formerly Board of Prison Terms). The only time I ever previously agreed to write such a letter was on behalf of this same applicant three years ago.

The reason that I have again chosen to write on behalf of Mr. Bell is that I believe that he remains an ideal candidate for parole. Mr. Bell has no history of violence other than his original conviction offense. He has now had over 11 years to think about this action and the factors that led to it. During this time, he has dealt with his daily stressors in an exemplary manner. He has been a model inmate with exceptional job performance evaluations and no disciplinary actions. He has shown continued emotional growth and has made consistent efforts to improve himself. Mr. Bell has attended AA/NA since 2000 as recommended by the Board of Parole Hearings, although he has no history of chemical dependency issues. He has also on his own initiative completed EAGLE/CALM, Early Engagement, Parenting, Arts in Correction, Anger Management and Emergency Preparedness classes.

I have reviewed all three psychological evaluations conducted on Mr. Bell since his arrest. Each of these evaluations concludes with virtual certainty that Mr. Bell is not a sociopath and that his risk of future violence is low. Objective testing included in the more thorough reports strongly supports Mr. Bell as a psychologically healthy individual.

Mr. Bell has an outstanding support system in the Chino area. If he is paroled, Mr. Bell will reside with his wife and will be in close proximity to my own home and place of business. I will personally do everything within my power to help him readjust to society once he is released. My support will include facilitation of any necessary mental health treatment and assistance in finding employment. I am undergoing some significant computer system renovations in my own business and I will personally hire Mr. Bell if he is available for work within the next six months.

Mr. Bell is a responsible, mature individual who is sincerely remorseful for the harm that he has caused. I cannot imagine him ever doing anything that would put him at risk of harming another person or returning to prison. I truly believe that Mr. Bell would be a positive influence in my community and that the time has come for him to resume a productive role in society.

Respectfully,

Terry Chase, Ph.D.
Licensed Psychologist
Chief Executive Officer
Foothills Psychological Services, Inc.

# Sacramento City College

*Working Together · Pursuing Excellence · Inspiring Achievement*

Professor Sandra H Feder
Computer Science Department
Sacramento City College
(916) 558-2433

March 12, 2006

Board of Parole Hearings
1515 K Street  Suite #600
Sacramento, CA 95815

To Whom It May Concern:

I am a professor of computer science at Sacramento City College where I have taught Web page design and Web programming for over 8 years. Prior to this job, I taught at San Joaquin Delta Community College in Stockton, California. I previously worked as a project manager and team leader at Sprint in Rancho Cordova, California and before that spent over 7 years at Aerojet working as a computer systems analyst. I was born and raised in California and received my BS Degree in Mathematics from the University of California, Davis and MS Degree in Computer Science from the University of Nevada, Reno. I have been an active person in the Sacramento area working with business and industry to prepare students for jobs with those high tech companies. In addition, I speak at local schools on Career Day to encourage some of Sacramento's most disadvantaged students to come to our Community College and learn the skills that will help them get careers in the high technology areas that will allow the new generation to support themselves and their families. I am proud to contribute in this much needed area. The more students we teach, the more become contributing members of society.

I am writing in regard to Steven Bell J69411 who will be coming before the Parole Board this spring. I have known Steve through a social organization since 1991. We had known each other somewhat before that point, and began to date at that point in time. Steve did not use drugs, drink excessively, gamble, smoke or associate with any undesirable people. He had a wonderful career where had been professionally employed for over 20 years. He was a hard worker, a good parent to his two children, a productive and ethical employee, and a good citizen in his community. It was hard to have the time to see each other very often because we each had two children and we were both very active with our children in Boy Scouts, Girl Scouts, and team sports. We spoke on the phone between dates and shared things common to single parents raising young children. What I know about Steve, is that he is polite, honest, courteous, a caring parent to his 2 children, and a responsible member of the community. Steve never tried to control me or anyone else with whom we came in contact. I never saw Steve get angry and never heard him express anger over anything.

Since Steve has been in prison, when we get together or write each other, I have heard him express his feelings and know that he has not become bitter or revengeful. He feels responsible and wants to make amends. He feels sorrow and regret over anything he has done to hurt Cathy and plans to live with his new wife in Southern California. Even if Steve did see Cathy or her children unintentionally, he plans no harm to any of them. The Steve who I know has never had an anger problem, and will not have one in the future. I know Steve well enough to know that he will not harm her or anyone of her friends or family. He wishes that she can move on with her life and he will move on with his life. He is ready to join society and become a productive member once again. He plans to find employment in the computer science field and reconnect with all his family and friends and start life anew. Those of us who are friends are here to support his return and make sure he gets back on track. He plans to get out of debt in the first few years he is out of prison and pay back those who supported him. He has hope when life looks hopeless, and is self motivated to do well with the tools he has.

I know that Steve has been a model prisoner while he has served time for his past mistakes. I know that he worked as a librarian helping other inmates for a period of time. I know he was trained to prepare for a career as a landscaper, office worker, and carpenter. I know that he has had no discipline problems because that is the way he lives his life, and will do the same once he is released. I know that he is ready to start life new and be an outstanding citizen and employee. He has shown me that he has grown personally in areas of maturity, forgiveness and having a positive attitude and will be a responsible member of the community. He will not be back in prison because he is so mature and able to cope with life from his years of coursework. That is what we citizens want from all people who get rehabilitation in prison. If no return visits and a crime free life is the goal, then Steve will be a shining example of success.

In order to help him prepare for the changes he will face in the computer industry, I am offering to teach him Web page design and database on the Web classes at a rapid pace. He has always been skilled in the area of computers and I am sure he will be ready to find work in the field of computer science in less than 3 months, using new Web technology. In addition, I am willing to help him find gainful employment making Web pages, since I get requests from employers who would like to hire people in this area about every month.

I keep in contact with his wife, Sue, and am ready to support them financially if that is what is needed to get him started again. I will be teaching him some new computer science skills and helping him find work in this area. Feel free to contact me if you have any other questions or concerns.

Sincerely,

*Professor Sandra H Feder*

Professor Sandra H Feder

# CHRISTOPHER D. CHRISTENSEN
## 325 North Bender Avenue
## Glendora, CA 91741-2543

January 6, 2006

Board of Parole Hearings
1515 K Street, #600
Sacramento, CA 95815

Dear Board Members:          RE:  Steven Dale Bell

For more than thirty-two years, I enjoyed a career in law enforcement, going from a patrolman to Chief of Police with the City of Sierra Madre. In 1997, I retired; however, I enjoy helping on neighborhood projects and I receive a great deal of satisfaction from assisting people. I was born, raised and educated in California and take pride in having served my state in a small way as a police officer. It was a very rewarding career.

Early in the 1970's, I wrote to the Board of Prison Terms on behalf of an individual whom I had arrested some years before. He had been convicted and incarcerated for his crime. Actually, I knew him well and truly believed that he would be a good citizen upon his re-entry to society. Others also wrote letters supporting him, and he was released early on parole. He is a true success story and proved that my confidence in him was well placed...he became a successful businessman. To this day, he and I have remained close friends. He is a very responsible citizen in the community in which he lives and is well thought of by others.

From all that I know about Steven Bell, I have the same feelings about him and truly believe that, in spite of past errors in judgement, he will definitely be a valuable member of his community. Steve has always accepted responsibility for his mistakes. He has no prior criminal history and is a very intelligent, non-violent person. His trial judge is quoted as stating that it is unlikely that he would commit any offenses in the future. He has no history of substance abuse, but has attended Alcoholics Anonymous and Narcotics Anonymous meetings for several years, at the request of the Board of Prison Terms, and continues to do so.

Steve has a great love for his family and is a very caring parent to his two children. He has a great amount of support from his family and friends. Steve maintains a positive attitude toward life in general and about his future. He had a stable career prior to his arrest and was very successful. He has been a model prisoner and has had exceptional performance evaluations. Steve has participated in all educational and self-improvement programs offered to him with excellent evaluations. Even though he was already well-educated, the classes and work accomplished while incarcerated can only be of benefit and enhance his employability.

Upon his release, Steve will live in Chino, California, with his wife Susan in a home she has owned for over twenty years. He plans to re-enter the computer industry, as he has much experience and many marketable skills in that field.

When Steve is released, I will be available to him and his family in whatever capacity I may be of help, even if it is just to listen and talk. Living in Chino, Steve will be no more than a twenty-minute drive from my home, giving me more opportunity to communicate with him. I have been blessed with common sense, and I am very proud that I have been able to help and guide others at difficult times in their lives. In my work as a police officer, I counseled many people needing help, and I would be glad to encourage Steve in making positive adjustments and decisions and offer him any emotional support needed.

Thank you for taking time to read my letter and considering my statements. I would like to reaffirm my beliefs that Steven Bell would definitely not be a risk to society, but that he would be a very responsible citizen.

Sincerely,

C. D. Christensen
Chief of Police, Retired

DEBORAH E. PRESTON
3690 MOUNT VERNON ROAD
SEBASTOPOL, CALIFORNIA 95472
(415)473-6992

January 5, 2006

Board of Parole Hearings
1515 K Street, #600
Sacramento, CA 95815

To Whom It May Concern;

I have been employed by Superior Court of California, County of Marin, for eight years.
I am currently assigned to the Information Technology/Records & Exhibits Division. I
reside in Sebastopol, California, where I have lived for the past 18 years.

I have known Steven Bell since 1970; we met and were in the same year in high school.
We were in choir together, and became good friends when the choir had an opportunity to
study and perform in Hawaii the summer of our senior year. Steve was involved in many
extra-curricular activities ranging from band to California Scholarship Federation to
varsity sports, and often was in a leadership position in those organizations. I am positive
Steve never tried illegal drugs of any kind, and his behavior was consistent with his
leadership positions and his high academic standing. He has always been a person who
has had stable, healthy relationships and is a devoted parent.

Steve and I have communicated regularly by mail throughout his incarceration; although
I am deeply saddened by his situation, I am always amazed by his positive outlook in
general, and by his persistence, hopefulness, compassion and good sense of humor in
particular. I would like to point out to the Board that Steve has been an excellent inmate
and has been discipline-free all these years. He has had an outstanding evaluation at all of
his prison jobs and vocational programs. Also, Steve has displayed the same motivation
he had as even as a young person by completing self-improvement programs and
correspondence courses. I know through Steve's letters that he accepts full responsibility
for his actions, and am confident that despite his past mistakes, he will make a law-
abiding and positive contribution to society.

It is my understanding that a number of allegations surfaced in Steve's last Board
hearing. One that I find puzzling is a reference to Steve being "unable to control his
anger", being "unpredictable and a threat to others", and that he will "seek retribution
against his former wife", Cathy and her family. I firmly believe that nothing could be
further from the truth; Steve is one of the less angry people I have known and has become
even less so while in prison. I have never known him to be unpredictably angry. Get into
a good political discussion with him. and he will show anger. But as for unpredictable
and destructive anger, I simply do not believe Steve to be capable. And Steve has stated

unequivocally that he desires no contact with Cathy and simply wants to move on with his life. One thing I have noticed through the course of Steve's incarceration is an improvement in his empathy and compassion. As to Steve's integrity, there can be no question. I believe him to be absolutely trustworthy.

Steve has very concrete plans for parole and many factors in his favor, including the fact that his wife has owned a home for 20 years in Chino. With Steve's good mind, he will have no trouble "catching up" to the advances made in the computer industry since his incarceration.

I hereby offer a promise to assist with Steve's re-entry into society in any way I can. The court I work for does employ temporaries with computer skills, and I would certainly recommend Steve to my supervisors. I will provide emotional support, and although I live in Northern California I frequently travel to the Los Angeles area to visit family, and plan to spend time with Steve when he is released or shortly thereafter. In addition, I promise to provide financial assistance if necessary. With Steve's close network of wife, family and friends, there can be no doubt that his re-entry into society will be successful and I truly look forward to the day that it happens.


Sincerely,

Deborah E. Preston

P

## BEFORE THE BOARD OF PAROLE HEARINGS
## OF THE STATE OF CALIFORNIA

In The Matter Of The First Subsequent
Parole Consideration Hearing Of

STEVEN DALE BELL
#J-69411

DECLARATION OF
DR. TERRY CHASE, PH.D.

I, Terry Chase, PH.D., declare as follows:

1.   I am a psychologist who has been licensed by the State of California for sixteen years.  I am the Chief Executive Officer for Foothill Psychological Services, Inc., in Chino, California.

2.   I have many years of professional experience working with clients who have been convicted of violent crimes.  I also have extensive experience performing pre-employment and fitness-for-duty evaluations for law enforcement agencies and other employers.

3.   I have reviewed the following psychological evaluations conducted on Mr. Steven D. Bell since his conviction:

   (a)   Dr. Paul Koller, 6/11/95

   (b)   Dr. Steven Walker, 10/19/02

   (c)   Dr. Corinne Schroeder, 11/10/05

   (d)   Dr. Melvin Macomber, 3/9/06

Each of these evaluations concludes with virtual certainty that Mr. Bell is not a sociopath and each consistently find that his risk of future violence is low.  Objective testing conducted as part of the three more thorough evaluations (i.e., a, b, and d) strongly

Page -1-

1    support that Mr. Bell is a psychologically healthy individual who has no need to

2    participate in self-help programs or in psychotherapy.

3        4.    The report prepared by Dr. Schroeder (3.c., above) is one of the least

4    professional I've ever seen, providing no clinical or logical support for its poorly

5    conceived conclusion:

6           *"Mr. Bell must to (sic) come to terms with his crime in order to move*

7           *toward resolution.  He needs to look in the mirror instead of out the*

8           *window.  He has much work to do." (page 4)*

9    Even the most cursory review of Mr. Bell's prison record indicates that he has done

10   everything *except* look out the window.  As documented in both Dr. Walker's and Dr.

11   Macomber's evaluations (3.b. and 3.d., respectively), Mr. Bell has actively participated in

12   a variety of self-help programs.  He has taken every opportunity available to him within

13   prison, and on his own initiative has sought outside correspondence courses.  Only by

14   *completely ignoring* Mr. Bell's record could Dr. Schroeder have concluded that "[h]e has

15   much work to do."

16       5.    Dr. Schroeder's finding that *"Mr. Bell has not come to terms with his crime.  He*

17   *has not expressed remorse."* (page 4) is not supported anywhere in her report nor, as far

18   as I know, anywhere in Mr. Bell's record.  Since her own report notes that Mr. Bell

19   *"stip[ulated] to the official record but declin[ed] to discuss [his crime]"* (page 3), Dr.

20   Schroeder appears to have absolutely no basis for arbitrarily speculating what Mr. Bell

21   has "come to terms" with.  As documented in both Dr. Koller's and Dr. Macomber's

22   evaluations (3.a. and 3.d., respectively), Mr. Bell has excellent introspection and insight

23   into his thoughts and behavior.

24          *"He accepts full responsibility for his choices and for his behavior which*

25          *ultimately brought him to prison... His feelings of remorse appear to be*

26          *sincere and genuine." (3.d., Dr. Macomber, page 5)*

27   //

28   //

Page -2-

1    6.    Dr. Schroeder's suggestion that *"[a]nger management programs would be*
2    *beneficial"* (page 4) is likewise unsupported by the record.  Mr. Bell's commitment
3    offense was not based on anger or "heat of passion," and I'm aware of no evidence
4    indicating he has a history of anger problems.  As Dr. Schroeder herself notes
5    contradictorily in the same paragraph:

6        *"Mr. Bell has programmed well during incarceration.  He has no*
7        *disciplinary 115's or 128's since entering the CDC at San Quentin on*
8        *07/17/95."  (page 4)*

9    Given Mr. Bell's stressful and hostile living environment over the past eleven years, he
10   could not have remained disciplinary free if he had any kind of anger problem.  Further,
11   Dr. Schroeder completely ignored Mr. Bell's in-prison completions of the
12   E.A.G.L.E./C.A.L.M. and Parenting programs, both of which contained significant anger
13   management components, and of a nine-month anger management correspondence
14   course (see, e.g., 3.d., Mr. Macomber's report, page 2).

15   7.    Dr. Schroeder characterized Mr. Bell's commitment offense as *"[h]e was calm*
16   *and deliberate in his actions."* (page 3)  This conclusion could be valid only if Mr. Bell
17   has an antisocial personality disorder or at least antisocial traits.  Nothing in her report
18   even remotely suggests this diagnosis; as with all other evaluations of Mr. Bell, Dr.
19   Schroeder found that he has no psychological diagnoses on DSM-IV Axis I or Axis II, a
20   clear contradiction to her "calm and deliberate" characterization here.  Further, I am
21   aware of no trial testimony or other evidence supporting this characterization of the
22   commitment offense, which appears to be pure speculation.

23   8.    Another thing that I find bizarre and inconsistent in Dr. Schroeder's report is
24   that she gives Mr. Bell a global assessment of functioning (GAF) rating of 85.  While
25   this is noticeably lower than the GAF ratings in Dr. Walker's and Dr. Macomber's
26   evaluations (3.b. and 3.d., respectively), it is <u>well</u> above the score of an individual who is
27   deemed to be at risk of causing harm to others (i.e., a GAF score of 20 or below).

Page -3-

9.    Of all four psychological evaluations of Mr. Bell, Dr. Schroeder's is the only one which included *no objective tests* of any kind.  On every objective test conducted by all other psychologists (i.e., 3.a., 3.b., and 3.d., above) Mr. Bell has been shown to be a psychologically healthy and well-adjusted individual who is not a threat to society in any way.  The only contrary "findings" (sic) are Dr. Schroeder's unsupported and subjective conclusions outlined above.

10.    When I first reviewed Dr. Schroeder's report, I found it to be so poorly constructed that I checked with the California Board of Psychology to make sure she was really a licensed psychologist.  As she appears to be licensed, I can only conclude from this report that Dr. Schroeder either was uninterested in doing a competent job or was deliberately denigrating Mr. Bell to further some personal agenda (e.g., possibly punishing him for exercising his legal right not to discuss the facts of his crime).  Dr. Schroeder's report would not stand up to any meaningful peer review.

11.    Decisions of the Board of Parole Hearings must be based upon accurate and reliable evidence.  In my professional opinion, for the reasons outlined above, Dr. Schroeder's report is neither accurate nor reliable.  Reliance upon such a subjective, unsupported, inconsistent, and unprofessional report where Mr. Bell's life and future are at stake cannot be justified.  I encourage the Board to disregard Dr. Schroeder's report and to decide on Mr. Bell's suitability for parole using Dr. Macomber's evaluation (3.d., above).

12.    In keeping with the professional tenets of full disclosure, I note here that I have known Mr. Bell's wife, Susan Bell, for twenty years in both professional and social capacities.  I have visited with Mr. Bell at Avenal State Prison on one occasion where we discussed his psychological reports and his insights into his behaviors both pre- and post-conviction.  While our discussion should not be considered a professional evaluation, I found Mr. Bell to be mature, intelligent, open, and honest, with a pleasant demeanor and

Page -4-

1    appropriate affect. I saw no indications of anxiety, depression, or anger and he exhibited
2    no criminal thinking or behavior. His interactions with his wife were healthy, positive,
3    and affectionate. I have written support letters to the Board of Parole Hearings on behalf
4    of Mr. Bell because I believe he is an ideal candidate for parole; I have never written
5    similar letters for any other prisoners despite several requests to do so. My belief in Mr.
6    Bell, and my relationships with him and his wife, have not influenced my professional
7    criticisms of Dr. Schroeder's report, which is objectively inaccurate and unreliable, nor
8    my recommendation that the Board instead utilize Dr. Macomber's more comprehensive
9    evaluation.

10       I declare under penalty of perjury that the foregoing is true and correct. Dated this
11    _29th_ day of _September_____, 2006, at Chino, California.

12
13
14                                _Terry Chase_
15                                Terry Chase, Ph.D.
16                                Licensed Psychologist
17                                # PSY 41141

Page -5-

Q

**AVENAL STATE PRISON**
**Life-Term Evaluation for the Board of Prison Terms**

**MENTAL HEALTH EVALUATION**

**Performed by Corinne Schroeder, PhD**
**Board Certified/Forensic**

### I:   IDENTIFYING INFORMATION

Name:              David Twinn
CDC#:              H31611
Age:               33              DOB: 7/17/72
Marital Status:    Married
Race:              Black
Sex:               Male

### II:   DEVELOPMENTAL HISTORY:

Mr. Twinn was born in Los Angeles. He began to walk and talk at
the appropriate ages, and his socialization skills developed
without delays. He did not set fires, abuse animals, or suffer
symptoms of enuresis. Both parents were present in the home
until they separated when he was age six. *"I moved to Ohio with
my mom, and my dad stayed in California in Lake View Terrace."*
He attended public schools and was in classes for gifted
students in the 5th and 6th grades. He had contact with his
paternal grandmother and both of his maternal grandparents.
*"We were a bi-racial family, Black and Winnebago Indian. I was a
quiet child…liked to be around my mother and father…took care of
my four younger brothers when my mom went back to school when
I was 12."*

### III:   EDUCATION:

Mr. Twinn was graduated from high school in CYA in 1996 at age
24. He completed Vocational Offices Services, Welding,
Carpentry, and expects to complete Vocational Machine Shop in
two weeks. He has partial completions in Sheet Metal and in
Warehousing.

### IV:   FAMILY HISTORY:

Mr. Twinn is the third of nine children; *"seven from my mother
and father, and two sisters born to my father's girlfriend"*.

"*The oldest is my sister Davette…lives in Fresno…seven children…youngest is a newborn – last month. She is single… boyfriend for many years…never married him. She is diabetic and takes insulin…doesn't work…welfare. My oldest brother Charles is a manager for the Holiday Inn in Fresno…does auditing and everything…married with four children and a step-son. I'm next. Then comes my twin brothers, John and Joseph…both in Fresno. John is a security guard…three children…training to become a janitor. Joseph is a security guard…eight children. My brother Darnell is in High Desert…will be out in 2012…single with one daughter. James is my baby brother, a little rebel…married with three children…lives back and forth between Fresno and Santa Monica. My two sisters from my father's girlfriend…Phaedra…just got out of Job Corp in Buffalo, New York…works in a store… single…no kids. Tammara is in High School…age 16…stays with my aunt, a social worker for Indians…L.A. County.*"

## V:     PSYCHOSEXUAL DEVELOPMENT AND SEXUAL ORIENTATION:

Mr. Twinn reached puberty at age 13 and became sexually active as a heterosexual at age 14. He reported no problems in this area of life.

## VI:     MARITAL HISTORY:

"*I have been married since October, 1999…one step-daughter, Deija, age nine. My wife is on disability for a back injury on the job…lifting boxes…June of `04…in a lot of pain…hoping to recover without surgery…lives in Palmdale.*"

## VII:     MILITARY HISTORY:     None.

## VIII:     EMPLOYMENT/INCOME HISTORY:

"*My first job at age 14 was removing graffiti off of walls. And, I worked for my father…auto body shop…came to prison at 17…clerk for Education in Corcoran…clerk in Warehouse…clerk for Material Store supervisor in Ironwood…kitchen work…Student Council Vice President…council in YA that handled inmate issues and charitable activities.*"

## IX:     SUBSTANCE ABUSE HISTORY:

"*I tried marijuana and alcohol…didn't like it. My father was an alcoholic…candid and honest with me…steered me away from it. I am AA chairman now…27 months in Avenal…three years total… couple of months in Corcoran…have my own Big Book.*"

**Twinn     H31611     ASP     07/16/05     page 2     cs**

## X:    PSYCHOLOGICAL AND MEDICAL HISTORY:

**Mr.** Twinn has never required or received mental health treatment, and he has enjoyed good health except for his asthma that he treats with an inhaler.

## XI:    PLANS IF GRANTED RELEASE:

*"I would work in Palmdale and live with my wife in Santa Monica. I have letters coming for Masonry and Welding from a company in Palmdale…have an AA/NA sponsor for when I go home."*

## XII:  MENTAL STATUS AND DIAGNOSIS:

Mental Status is clear in all areas of the exam: speech, mood/affect, thought content, thought processes, behavior, and cognition.

## DSM IV Diagnosis:

AXIS I:    V71.09  No Diagnosis or Condition
AXIS II:   V71.09  No Diagnosis
AXIS III: Medical Conditions Relevant to Axes I&II: None
AXIS IV:  Psychosocial Stressors: Incarceration
AXIS V:   Global Assessment of Functioning, 1-100: 85

## XIII:   CRIME:

On 01/39/92, Mr. Twinn was found guilty by Court trial:

PC187   2nd degree murder

He was sentenced to 15 years to Life, starting in CYA.

Mr. Twinn was asked to describe his crime:

*"I hit Mr. Curtis Golder a lot of times…retaliation for beating up my crime partner's Auntie Jean. My father has kids with her sister. He beat her up pretty bad…angry at her for her drug problems…collected cans for money…had a large bag of cans. My victim thought she had taken his grocery cart full of cans and beat her up badly…black eyes, facial injuries. Later on, he showed up at her mother's house and said: `Where's that bitch at?'. Me and my crimie were on our way there, walking down the street. Jean's daughter said: `That's the man that beat up my mother!' We attacked him…beat him with out fists. I kicked him once.*

**Twinn      H31611      ASP      07/16/05      page 3      cs**

He had a heart attack and died shortly after we left…had arteriosclerosis…blocked arteries…couldn't survive the beating. We had no intent, but I accept full responsibility…crimie got the same sentence…is in this building."

Remorse: "I think about it every day…don't obsess about it, but it is always on my mind, I am responsible for a man's death… think about his mother, his loved ones…may have had kids…I don't know. I made a poor decision at that moment…was angry…wasn't my place…should have pressed charges and let the Court take care of it…saw the pictures…can't believe I did it…use it as an incentive to do better in my life…don't want his death to have been in vane."

## XIV:    ASSESSMENT OF DANGEROUSNESS:

To his credit, Mr. Twinn has received only one disciplinary 115 for "attempting to alter the outcome of a DDMS hearing". "The water was contaminated." Mr. Twinn was in YA at that time. As an adult, he received one 128 A counseling letter at this institution. His risk of harm to others is below average for parolee population, and equal to the average citizen who has never been arrested.

## XV:    CLINICAL OBSERVATIONS & RECOMMENDATIONS:

Mr. Twinn presents well. He is well spoken, honest and forth coming regarding his crime, and has overachieved in vocational programs compared to other inmates. Mr. Twinn is well equipped to earn a more than adequate living. He has strong family support, and realistic parole plans in place. He has done as much as possible to better himself, and has taken full advantage of programs available to him during incarceration. He can be counted on to be a productive citizen when returned to society. He is ready to go home.


C Schroeder, PhD                          7-16-5
**Corinne Schroeder, PhD**                    Date
**Bd. Certified/Forensic**

R

1    the start and the finish to stop that, but he

2    didn't.  He continued and he continued and he

3    continued, to hit her.

4            And he wanted to rob her of some very

5    important things.  He wanted to rob her of her

6    life.  He wanted to rob her of her two daughters.

7    He wanted to rob her of her possessions, her home,

8    her money, her valuables.

9            He also wanted to rob her two daughters

10    of the love and affection of their mother.  He

11    wanted to rob her brothers of the continued support

12    and love that she gave them.  And he wanted to break

13    her father's heart.

14            And he knew all this.  And he knew the

15    consequences of his conduct.  And he continued to do

16    it.  And he did it.  And he hit her on the back of

17    the head.  And he attempted to kill her in a

18    premeditated, calculated and deliberate manner.

19            We started out by making opening

20    statements.  The opening statements aren't going to

21    be too much different than the closing statements,

22    because things haven't changed a lot.

23            The victim, to this day, remembers

24    saying, why did he do this to me?  Why?  What

25    happened?  Why did he do this to me?

26            Now, we all know.  ███████████████████

27    t███████████████████████████████████████████ and

28    motivatio███████████████████████ The same kind of

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ He

3 was going to lose all of those things.  He wanted

4 some of those things.

5          Lust for a woman who wasn't his wife.

6 She came here and you saw her, Susan Montoya.  And

7 he explained to you the growing intensity of that

8 relationship.  She explained to you the growing

9 intensity of that relationship.

10          Greed.  Simple, straightforward greed.

11 Hundreds and thousands of dollars were going to

12 accrue to him.  They were going to be his.  He was

13 going to be able to live in the house.  He told us,

14 he would live in the house.

15          He feared divorce.  He didn't want to get

16 a divorce, because he would lose all of those

17 things, lose all of those valuable things that he

18 had gotten by virtue of his union with Cathy

19 Gandrud.

20          And he feared the loss of security that

21 he had.  He had a home.  He had made it.  He had

22 gotten there.  Coming out of bankruptcy, coming out

23 of a long period where he just hadn't quite accrued

24 a whole lot of valuable assets.  He was afraid that

25 he was going to lose that, the good lifestyle that

26 he had.  Not only, he had a home, he had a family,

27 things going for him, a good job.  He had a

28 girlfriend on the side.  He took her out.  Went to

1    he has told us that he has concealed, that he has
2    fabricated, and that he has lied.  He has concealed,
3    and he has fabricated, and he has lied.
4        And he said, I lied, I lied, I lied.  I
5    fabricated, I fabricated.  I made this up.  I wanted
6    to conceal.  I did it to conceal.  I did it to
7    hide.  Time and time and time and time again.
8        And then he comes in here, and I say to
9    him, are you telling us the truth today?  And he
10   says, absolutely.  Absolutely.  It's preposterous
11   that we should believe him in any respect.
12   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
13   ▓▓ the timeframe leading up to the most -- to the
14   August 15th event.  Now, these are the days, I mean,
15   we were talking about June and July and August.
16       And most of us probably didn't have
17   calendars in front of us and don't -- can't
18   visualize what the weeks look like and so forth.
19   This is just to give a general idea as to that,
20   because there was a whole lot going on between June,
21   July and August.
22       ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ The
23   relationship with Sue Montoya ▓▓▓▓▓▓▓▓▓▓▓▓ The
24   communication between them ▓▓▓▓▓▓▓▓▓▓▓▓.
25   Catherine Bell was finding out what was going on
26   here.  It ▓▓▓▓▓▓▓▓▓▓▓▓ The ▓▓▓▓▓▓▓▓
27   increased.  So ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓re
28   things began ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

BARBARA IVES, CSR NO. 4438

1   ~~[redacted]~~

2            June, 1994, between the 21st and the 8th,

3   the defendant, the victim, and all four children, I

4   believe, was the testimony, went to Hawaii.

5            This is the period in which phone calls

6   first started to appear on the phone bill.  Credit

7   card bills from Hawaii.  You'll have the phone

8   bills.  You can look at them.  You'll have them from

9   February, I believe, through August 23rd, 1994.

10           He returned, came back, two weeks, and

11   went to Portland with Sue Montoya.  12th, 13th to

12   the 14th.  He lied about that to his wife.  Came

.    back, was home a short period of time, and then went

14   to Seattle, Canada and Los Angeles with Catherine

15   Bell through August 1st.  Through August 1st.

16   Eleven days.  Went to work on the 7th.

17           And the 3rd, August 3rd, that's the day

18   that Cathy Bell stayed home ill, opened up the phone

19   bill, made the phone calls.  The tension began to

20   increase several fold.

21           The following week, the defendant had a

22   preplanned trip with Sue Montoya to go see Phantom

23   of the Opera.

24           He told his wife he was going on a

25   business trip.  He lied.  He lied again.  He lied

26   again.  Came back.  He knew he was in serious

27   trouble.  We'll get into a little bit more of what

28   happened over the weekend.

1    Nonetheless, in evidence, we have a
2  series of letters.  Sue Montoya wrote letters.  You
3  will see those letters that Sue Montoya wrote.  You
4  can tell by the content of the letters.  You can
5  tell by what she says.  You can tell by the subject
6  matter.  You can tell by the way she writes that she
7  has an affection for the defendant.
8    And she lets him know.  And she wants to
9  talk about emotional things.  And then it gets more
10  and more intense.  And you notice in the letters,
11  they build.  They build.  And they show an
12  increasing intensity.
13    And you can see in those letters that
14  toward the end of them that she wants some kind of
15  commitment from him.  She wants a statement from
16  him.  She wants something from him.  She wants to
17  know that he loves her.
18    S̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶
19  ̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶̶
20  Because she wants him.
21    And then you look at the cards that she
22  sent.  One of them has two people in bed.  You'll
23  see it.  You'll have it in the jury room with you.
24  And it has two people closely in bed.  She says, I
25  can't wait until we're together.
26    What was her expectation?  She says, no,
27  we were just having an affair, an affair of no
28  consequence.  Just get together and have sex once in

S

1

2          SUPERIOR COURT OF CALIFORNIA **FILED**

3               COUNTY OF SANTA CLARA                **MAY 15 2007**

4                                                   KIRI TOHRE
                                          Chief Executive Officer
                                   Superior Court of CA County of Santa Clara
5                                            BY _____ DEPUTY

_____
6   In re                          )        No.: 177776
                                   )
7        STEVEN DALE BELL,         )
                                   )        ORDER
8   On Habeas Corpus               )
_____)

9

10       The California Supreme Court, in *In re Dannenberg* (2005) 34

11  Cal.4th 1061, finding the Parole Board's procedures lawful because

12  the Board is constrained by a framework within which to exercise

13  discretion, stated: "the regulations do set detailed standards and

14  criteria for determining whether a murderer with an indeterminate

15  life sentence is suitable for parole." (*Dannenberg* at p. 1080.  See

16  also page 1096, footnote 16: "the Board must apply detailed

17  standards when evaluating whether an individual inmate is unsuitable

18  for parole on public safety grounds.")  In this case, because there

19  is 'some evidence' of egregious acts beyond the minimum necessary to

20  sustain the conviction, the crime itself appears to show

21  unsuitability under the "detailed standards."  The habeas petition

22  is DENIED.

23

24  DATED: ___15 May___, 2007        _____

25                                   PAUL BERNAL
                                     JUDGE OF THE SUPERIOR COURT

26  cc:  Petitioner
         Attorney General
27       Research (4-23A)
         CJIC

28

                                    1

T



IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

**F I L E D**

AUG 2 - 2007

MICHAEL J. YERLY, Clerk

By _____
DEPUTY

In re STEVEN DALE BELL,

on Habeas Corpus.

H031773
(Santa Clara County
 Super. Ct. No. 177776)

BY THE COURT:

The petition for writ of habeas corpus is denied.

(Bamattre-Manoukian, Acting P.J., Mihara, J., and McAdams, J.,

participated in this decision.)

**AUG 2  2007**

Dated _____     **BAMATTRE–MANOUKIAN, J.** _____ Acting P.J.

U

S156519

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re STEVEN DALE BELL on Habeas Corpus

The petition for writ of habeas corpus is denied.

**SUPREME COURT**
**FILED**

MAR 1 2 2008

Frederick K. Ohlrich Clerk

Moreno, J., was absent and did not participate.

Deputy

GEORGE
Chief Justice

V

CONFORMED COPY
ORIGINAL FILED ON

SEP 2 4 2007

TODD H. BARTON, COURT EXECUTIVE OFFICER
SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF KINGS
DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF KINGS

| | |
|---|---|
| In re Application of ) | Case No. 03W00911 |
| ) | |
| STEVEN D. BELL, ) | ORDER DENYING PETITION |
| ) | FOR WRIT OF HABEAS CORPUS |
| Petitioner, ) | |
| ) | |
| For Writ of Habeas Corpus. ) | |
| ) | |

       Petitioner, STEVEN D. BELL ("Petitioner") filed a petition for writ of habeas corpus on May 20, 2007 ("petition"). Petitioner complains that the California Department of Corrections and Rehabilitation and/or Board of Parole Hearings have failed and refused to provide him with an audio tape of his parole suitability hearing. Petitioner alleges that the hard-copy transcript provided to him by the Board of Parole Hearings ("Respondent") contains a material error. In her February 13, 2007 letter to the Board of Parole Hearings, Petitioner's attorney confirms that she also believes the transcript of the November 7, 2006 hearing to be incorrect.

       On July 10, 2007, Respondent was ordered to informally respond to the petition. Respondent's Informal Response was filed on August 10, 2007. In support of its Informal Response, Respondent has provided the Court with a copy of the November 7, 2006 hearing transcript. California Code of Regulations, title 15, Section 2254 allows an inmate to request a record of his parole consideration hearing. According to Respondent, since California Penal Code Section 3042 requires the preparation of a verbatim transcript in connection with life parole consideration hearings, it is this type of record which was supplied to Petitioner. Respondent claims that, absent a showing of a meaningful error in the transcript, an extraordinary disclosure of the audiotapes from the November 2006 parole consideration hearing is not warranted.

       Petitioner's reply to the Informal Response was received on August 30, 2007. Petitioner claims that release of the audio tapes would be the most efficient path towards resolving the issue of the accuracy of the written transcript.

6. After exhausting all administrative remedies, on May 20, 2007, I filed a habeas petition in Kings County Superior Court seeking release of the audio tapes of the 2006 parole hearing to effect a correction of the transcript error. Order p. 1. That court denied the petition because, it found, "the error is clear" from context and thus the tape was unnecessary. Order p. 2.

7. Judicial notice and consideration of the attached Order is essential to the resolution of Petition.

8. I have properly served a copy of this application on Respondent per CRC Rule 8.252(a) and provided the Clerk of this Court with addressed, postage-paid envelopes for all parties per Rule 8.50(c).

9. I am a layman at law and ask the Court's indulgence for any unintentional and excusable errors in this application.

I declare under penalty of perjury under the Laws of the State of California that the foregoing is true and correct. Executed on October 2, 2007, at Avenal, California.

STEVEN D. BELL, Petitioner
In Pro Per

**ORDER**

Based on the application of Petitioner Steven D. Bell, and good cause appearing,

IT IS ORDERED that Petitioner's application for judicial notice of the September 24, 2007, Order of the Kings County Superior Court is GRANTED.

Hon. RONALD M. GEORGE
Chief Justice

STEVEN D. BELL
Avenal State Prison
#J-69411, 120-236-L
P.O. Box 9
Avenal, CA 93204-0009

Petitioner, In Pro Per

RECEIVED
OCT 06 2007
CLERK SUPREME COURT

## SUPREME COURT OF CALIFORNIA

In re                            )
                                 )    No.:  S156519
**STEVEN DALE BELL**             )
                                 )
On Habeas Corpus                 )    APPLICATION FOR JUDICIAL NOTICE;
                                 )    ORDER

To The Honorable Ronald M. George, Chief Justice:

Petitioner STEVEN DALE BELL declares:

    1. I am the Petitioner in the above-entitled matter and am un-represented by counsel.

    2. I filed the instant habeas petition on September 21, 2007 [hereafter "Petition"].

    3. I respectfully request that this Court take judicial notice under California Evidence Code §§ 452(c) and (d), 453, and 459, of the Order issued September 24, 2007, by the Kings County Superior Court ["Order"] in a related habeas matter (attached).

    4. Order was not available at the time I filed Petition.

    5. Order supports Ground 6 of Petition and Argument VII of the Brief in Support ["Brief"], a procedural due process claim that at my November 7, 2006, parole hearing the Board of Parole Hearings ["BPH"] prohibited all discussion of insights into and remorse for my commitment offense unless I waived the right to silence on the facts of the crime guaranteed by 15 CCR §2236; BPH then, as a result of no such discussion, unreasonably found that a supposed lack of insight and remorse contributed to my unsuitability for parole -- a classic Catch-22. The written transcript of BPH's prohibition here incorrectly substituted the word "acceptable" for the "unacceptable" actually spoken (Brief fn. 21), undermining this due process claim.

- 1 -

It appears from the November 7, 2006 hearing transcript that the words of Commissioner Smith may have in fact been incorrectly transcribed as alleged by Petitioner. Specifically, it appears that the term "acceptable" has been switched for the more context-correct term "unacceptable" in the following sentence; "If he wants to take about how he feels about the offense without going into the offense itself, that would be acceptable, and we'll certainly try and guard against that." (Transcript, 17:16-22.) However, since the error is clear from a review of the sentence and the discussion both following and preceding the same, Petitioner has not demonstrated that an extraordinary release of transcript tapes by the Respondent is necessary to preserve his rights on appeal. Rather, in the course of any challenge to the finding of lack of suitability for parole, Petitioner can easily and clearly highlight the transcription-related error for the Court.

To the extent that Respondent has satisfied its obligations under California Code of Regulations, title 15, Section 2254 and California Penal Code Section 3042, subdivision (b) to provide Petitioner with a verbatim transcript in connection with his November 7, 2006 parole consideration hearing, IT IS HEREBY ORDERED, the petition is denied. Petitioner is reminded that any claim of denial of due process and/or lack of factual basis for the ultimate finding reached during his parole revocation hearing, must be addressed to the Court that rendered his underlying judgment. (Cal. R. Ct., rule 4.552, subd. (c).)

Dated: __9-24__, 2007

Peter M. Schultz, Judge

Peter M. Schultz,
Presiding Judge of the Superior Court